NVB 5011 (Rev. 5/16)

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

IN RE:

DOUBLE JUMP, INC. ,

Debtor(s)

BK−19−50102−gs
CHAPTER 7

Adversary Proceeding:                     21−05072−gs

CHRISTINA W. LOVATO

Plaintiff(s)

vs

NIXON PEABODY LLP

Defendant(s)

TRANSMITTAL OF
MOTION OF WITHDRAWAL OF
THE REFERENCE

Nixon Peabody, LLC

Movant(s)

vs

Christina Lovato, Trustee

Respondent(s)

To:     U.S. District Court
        Bruce R. Thompson Federal Building,
        400 Virginia Street,
        Reno, NV 89501

Withdrawal of Reference Filed in the Same Bankruptcy Case                     not yet assigned
or in a Related ADV Case

Movant(s) and Respondent(s) are to file all matters relating to the Motion to Withdraw the Reference with the Clerk
of the District Court. All documents relating to other matters in this case shall continue to be filed with the Clerk of
the Bankruptcy Court.

Dated: 6/7/22

*Mary A Schott*

Mary A. Schott
Clerk of Court

add note show notes

**JRYTRL, WDREF**

# U.S. Bankruptcy Court
## District of Nevada (Reno)
## Adversary Proceeding #: 21−05072−gs

*Assigned to:* GARY SPRAKER                    *Date Filed:* 10/25/21
*Lead BK Case:* 19−50102
*Lead BK Title:* DOUBLE JUMP, INC.
*Lead BK Chapter:* 7
*Demand:* $120000000
  *Nature[s] of Suit:*  13 Recovery of money/property − 548 fraudulent transfer
             02 Other (e.g. other actions that would have been brought in state court if unrelated to
             bankruptcy)

*Plaintiff*
−−−−−−−−−−−−−−−−−−−−−−−−

**CHRISTINA W. LOVATO**                    represented by **ALEXANDER E. BRODY**
P.O. BOX 18417                         MELAND BUDWICK P.A.
RENO, NV 89511                         3200 SE FINANCIAL CENTER
(775) 851 1424                         200 S. BISCAYNE BLVD., STE 3200
                                       MIAMI, FL 33131
                                       (305) 358 6300
                                       Fax : (305) 358 1221
                                       Email: abrody@melandbudwick.com

                                       **MICHAEL S. BUDWICK**
                                       MELAND BUDWICK, P.A.
                                       200 S BISCAYNE BLVD., STE. 3200
                                       MIAMI, FL 33131
                                       (305) 358 6363
                                       Fax : (305) 358 1221
                                       Email: mbudwick@melandbudwick.com
                                       *LEAD ATTORNEY*

                                       **SOLOMON B. GENET**
                                       MELAND BUDWICK, P.A.
                                       200 SO BISCAYNE BLVD, STE 3200
                                       MIAMI, FL 33131
                                       (305) 358−6363
                                       Fax : (305) 358−1221
                                       Email: sgenet@melandbudwick.com

                                       **JEFFREY L HARTMAN**
                                       HARTMAN & HARTMAN
                                       510 WEST PLUMB LANE, STE B
                                       RENO, NV 89509
                                       (775) 324−2800
                                       Fax : (775) 324−1818
                                       Email: notices@bankruptcyreno.com

1

V.

*Defendant*
––––––––––––––––––––––––––––

**NIXON PEABODY LLP**         represented by  **LOUIS M BUBALA, III**
NA, NA                                         KAEMPFER CROWELL
50 W. LIBERTY ST., STE 700
RENO, NV 89501
(775) 852 3900
Fax : (775) 327 2011
Email: lbubala@kcnvlaw.com

**BAILEY W. HEAPS**
633 BATTERY STREET
SAN FRANCISCO, CA 94111

**ELLIOT R. PETERS**
KEKER, VAN NEST & PETERS LLP
633 BATTERY STREET
SAN FRANCISCO, CA 94111
(415) 391 5400
Fax : (415) 397 7188

**BENJAMIN D. ROTHSTEIN**
633 BATTERY STREET
SAN FRANCISCO, CA 94111

**DEEVA SHAH**
633 BATTERY STREET
SAN FRANCISCO, CA 94111

**CHRISTINE ZALESKI**
633 BATTERY STREET
SAN FRANCISCO, CA 94111

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 11/24/2021 | | 17 | Motion for Withdrawal of the Reference . Fee Amount $188. Filed by LOUIS M. BUBALA III on behalf of NIXON PEABODY LLP (Attachments: # 1 Exhibit A, J. Carpoff Plea Agreement # 2 Exhibit B, Nixon Proof of Claim 34 # 3 Exhibit C, Complaint, Solarmore v Nixon # 4 Exhibit D, Complaint, Solarmore v Bankruptcy Estate # 5 Exhibit E, Order, Melech v Polhill # 6 Exhibit F, Order, USACM v Compass) (BUBALA, LOUIS) (Entered: 11/24/2021) |
| 01/14/2022 | | 36 | Trustee's Response *In Opposition* with Certificate of Service Filed by MICHAEL S. BUDWICK on behalf of CHRISTINA W. LOVATO (Related document(s)17 Motion for Withdrawal of the Reference filed by Defendant NIXON PEABODY LLP.) (BUDWICK, MICHAEL) (Entered: 01/14/2022) |
| 02/04/2022 | | 52 | Reply Filed by LOUIS M BUBALA III on behalf of NIXON PEABODY LLP (Related document(s)36 Response filed by Plaintiff CHRISTINA W. LOVATO. ) (Attachments: # 1 Exhibit A) (BUBALA, LOUIS). Modified on 2/7/2022 to replace relationship to doc #36 (Hannan, KS). (Entered: 02/04/2022) |

| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>ELLIOT R. PETERS<br>epeters@keker.com<br>ERIC H. MACMICHAEL<br>emacmichael@keker.com<br>***Will comply with LR IA 11-2 within 14 days***<br>***of first appearance on Nov. 19, 2021***<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:    415 391 5400<br>Facsimile:    415 397 7188 | KAEMPFER CROWELL<br>LOUIS M. BUBALA III - # 8974<br>lbubala@kcnvlaw.com<br>50 W. Liberty St., Ste. 700<br>Reno, NV 89501<br>Telephone: 775 852 3900<br>Facsimile: 777 327 2011 |

Attorneys for Defendant Nixon Peabody LLP

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.,<br><br>                Debtor.<br><br>X      Affects DC Solar Solutions, Inc.<br>___   Affects DC Solar Distributions, Inc.<br>___   Affects DC Solar Freedom, Inc.<br>___   Affects Double Jump, Inc. | Lead Case No. BK-19-50102-gs<br>(Chapter 7)<br><br>Jointly Administered with:<br><br>19-50130-gs   DC Solar Solutions, Inc.<br>19-50131-gs   DC Solar Distribution, Inc.<br>19-50135-gs   DC Solar Freedom, Inc. |
| CHRISTINA W. LOVATO,<br><br>                Plaintiff,<br><br>        v.<br><br>NIXON PEABODY LLP,<br><br>                Defendant. | Adversary Case No.:  21-05072-gs<br><br>**MOTION TO WITHDRAW**<br>**BANKRUPTCY REFERENCE**<br><br>**JURY TRIAL DEMANDED**<br><br>**RELIEF IS SOUGHT FROM A UNITED**<br>**STATES DISTRICT JUDGE**<br><br>Hearing Date:  TBD<br>Hearing Time: TBD<br>Estimated Time for hearing:   TBD |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...........................................................................................................1

II.  BACKGROUND ...........................................................................................................2

    A.   DC Solar's Ponzi Scheme collapses. ................................................................2

    B.   DC Solar's bankruptcy and the appointment of the Trustee. ...........................3

    C.   The Trustee's adversary proceeding against Nixon Peabody. ..........................4

    D.   Related actions pending in the Eastern District of California ...........................5

III. ARGUMENT ...............................................................................................................6

    A.   Claims That Are Non-Core and Otherwise Not Finally Decidable by a
        Bankruptcy Court Predominate.........................................................................7

        1.   The claims at the heart of the Trustee's Complaint are non-core. ...............7

        2.   Two of the trustee's remaining claims must also be tried before an
            Article III court, weighing in favor of withdrawal. ...................................9

        3.   The Trustee's disallowance claim is moot. ................................................9

    B.   Each factor concerning withdrawal of the bankruptcy reference favors
        granting Nixon Peabody' motion. ..................................................................10

        1.   Judicial Efficiency .................................................................................10

        2.   Cost and Delay .......................................................................................14

        3.   Administration of the bankruptcy estate ..................................................14

        4.   Forum-shopping .....................................................................................15

IV.  CONCLUSION ..........................................................................................................15

1

**TABLE OF AUTHORITIES**

2

3

**Page(s)**

4

**Federal Cases**

5
*In re 610 W. 142 Owners Corp.*,
219 B.R. 363 (Bankr. S.D.N.Y. 1998)......................................................................8

6
*In re ACI-HDT Supply Co.*,
7
205 B.R. 231 (B.A.P. 9th Cir. 1997)....................................................................7, 8

8
*In re Addison*,
240 B.R. 47 (C.D. Cal. 1999) ...............................................................................14
9

10
*In re Align Strategic Partners LLC*,
No. 16-35702, 2019 WL 2524938 (Bankr. S.D. Tex. Mar. 5, 2019)....................10

11
*Bagley v. Locke Lord LLP (In re Desert Capital REIT, Inc.)*,
12
No. 2:13-cv-01114-JAD, 2014 U.S. Dist. LEXIS 28949 (D. Nev. March 6, 2014) .................................................................................................................13

13
*Battle Ground Plaza, LLC v. Ray* (*In re Ray*),
14
624 F.3d 1124 (9th Cir. 2010) ................................................................................7

15
*In re Bellingham Ins. Agency, Inc.*,
16
702 F.3d 533 (9th Cir. 2012) ..................................................................................9

17
*In re Cinematronics, Inc.*,
916 F.2d 1444 (9th Cir. 1990) ........................................................................11, 15
18

19
*In re Double Jump, Inc.*,
No. 19-50102-gs (Bankr. D. Nev. Filed Jan. 30, 2019) ......................................3, 4

20
*In re Eastport Assocs.*,
21
935 F.2d 1071 (9th Cir. 1991) ................................................................................7

22
*Everett v. Art Brand Studios, LLC*,
556 B.R. 437 (N.D. Cal. 2016) .........................................................................14, 15
23

24
*Krohn v. Stipp* (*In re Plise*),
No. 2:13-cv-00169-JAD-PAL, 2015 WL 4997296 (D. Nev. Aug. 19, 2015) ........12

25
*Mahoney v. Sessions*,
26
871 F.3d 873 (9th Cir. 2017) .................................................................................3

27
*Melech v. Polhill (In re American Pacific Financial Corp.)*,
No. 2:13-cv-01113-JCM (PAL) (D. Nev. Feb. 5, 2014).......................................13

28

*Nelson v. XL America, Inc. (In re Ameri-Dream Realty, LLC)*,
 No. 2:16-cv-00060-JAD-GWF, 2016 U.S. Dist. LEXIS 157788 (D. Nev. Nov.
 14, 2016) ...........................................................................................................11, 13

*In re O'Hanneson*,
 No. 5:12-cv-04068 EJD, 2013 WL 655158 (N.D. Cal. Feb. 21, 2013) ...................................14

*Off. Comm.. of Unsecured Creditors v. Marini (In re Windspire Energy, Inc.)*,
 No. 3:13-cv-10-RCJ-WGC, 2013 U.S. Dist. LEXIS 46727 (D. Nev. April 1,
 2013) .............................................................................................................................13

*In re Rosales*,
 No. 13-cv-01316-LHK, 2013 WL 5962007 (N.D. Cal. Nov. 7, 2013)............................14, 15

*Rosenberg v. Harvey A. Bookstein*,
 479 B.R. 584 (D. Nev. 2012) ..............................................................................................12

*Schultze v. Chandler*,
 765 F.3d 945 (9th Cir. 2014) .................................................................................................7

*Sec. Farms v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen &
 Helpers*,
 124 F.3d 999 (9th Cir. 1997) ...........................................................................................6, 10

*SEC v. Bayliss*,
 No. 2:19-CV-2140-JAM-DB (E.D. Cal. filed Oct. 22, 2019) ...................................................5

*SEC v. Carpoff*,
 No. 2:20-CV-00180-JAM-AC (E.D. Cal. filed Jan. 24, 2020).................................................5

*SEC v. Karmann*,
 No. 2:19-CV-2531-JAM-DB (E.D. Cal. filed Dec. 17, 2019)..................................................5

*Shengdatech Liquidating Tr. v. Hansen, Barnett, & Maxwell, P.C.*,
 No. 3:13-CV-00563-RCJ, 2013 WL 6408518 (D. Nev. Nov. 26 2013).......................7, 10, 13

*In re Shoe Pavilion, Inc.*,
 No. 2:13-CV-01245- CJC, 2013 WL 12113232 (C.D. Cal. May 30, 2013)............................10

*In re Solano*,
 No. CV 17-2158 FMO, 2017 WL 8180597 (C.D. Cal. June 19, 2017)....................................7

*Solarmore Mgmt. Servs., Inc. v. Bankr. Est. of DC Solar Sols., Inc.*,
 No. 2:19-cv-02544-JAM-DB (E.D. Cal. filed Dec. 17, 2019)............................................6, 11

*Solarmore Mgmt. Svc., Inc. v. Nixon Peabody, LLP*,
 No. 2:20-cv-02446-JAM-DB (E.D. Cal. filed Nov. 3, 2020) ..............................................6, 12

*Stern v. Marshall*,
 564 U.S. 462 (2011)..............................................................................................................9

*In re Summers*,
320 B.R. 630 (Bankr. E.D. Mich. 2005) ........................................................................8

*In re Transcon Lines*,
121 B.R. 837 (C.D. Cal. 1990) .....................................................................................11

*United States v. 5383 Stonehurst Drive, Martinez, California*,
No. 2:19-CV-00636-JAM-DB (E.D. Cal. filed Apr. 15, 2019) ................................5

*United States v. 725 Main Street, Martinez, California*,
No. 2:19-CV-00247-JAM-DB (E.D. Cal. filed Feb. 8, 2019) ..................................5

*United States v. Approximately $6,567,897.50 Seized from CTBC Bank, Account Number 380019196*,
No. 2:19-CV-00485-JAM-DB (E.D. Cal. filed Mar. 18, 2019)................................5

*United States v. Bayliss*,
19-cr-00182-JAM-2 (E.D. Cal. filed Oct. 21, 2019) ................................................5

*United States v. Guidry*,
20-cr-00003-JAM-1 (E.D. Cal. filed Jan. 6, 2020)....................................................5

*United States v. Hansen*,
20-cr-00016-JAM-1 (E.D. Cal. filed Jan. 21, 2020)..................................................5

*United States v. Jeff Carpoff*,
20-cr-00017-JAM-1 (E.D. Cal. filed Jan. 22, 2020)...............................................3, 5

*United States v. Karmann*,
19-cr-00222-JAM-1 (E.D. Cal. filed Dec. 12, 2019).................................................5

*United States v. Paulette Carpoff*,
20-cr-00018-JAM-1 (E.D. Cal. filed Jan. 22, 2020)..................................................5

*United States v. Roach*,
19-cr-00182-JAM-1 (E.D. Cal. filed Oct. 21, 2019) ................................................5

*USACM Liquidating Trust v. Compass USA SPE* (*In re USA Commercial Mortgage Co.*),
No. 2:14-cv-00455-RCJ-PAL (D. Nev. May 28, 2014) .........................................13

*In re Zante, Inc.*,
No. 3:10-CV-00231-RCJ-RAM, 2010 WL 5477768 (D. Nev. Dec. 29, 2010)................6, 8, 9

**Federal Statutes**

11 U.S.C. § 548 .............................................................................................................8

28 U.S.C. § 157(b)(2)(A), (O) .......................................................................................7

28 U.S.C. § 157(c)(1).................................................................................................10

28 U.S.C. § 157(d) ...................................................................................................1, 6

**Rules**

Fed. R. Bankr. P. 3006 .................................................................................................3

Fed. R. Bankr. P. 7008(a) ............................................................................................4

Fed. R. Evid. 201 .........................................................................................................3

E.D. Cal. Local Rule 123 ...........................................................................................11

D. Nev. Bankr. Local Rule 5011(b) .............................................................................2

D. Nev. Bankr. Local Rule 7026(b) ...........................................................................12

**Constitutional Provisions**

United States Constitution Article III ................................................................... *passim*

## I.    INTRODUCTION

Defendant Nixon Peabody LLP submits this motion under 28 U.S.C. § 157(d) to withdraw reference of an adversary proceeding.  Courts in this district and circuit regularly withdraw bankruptcy references at the pre-trial stage where, as here, the claims that predominate arise under state law and require a jury trial.  Here, the Bankruptcy Court cannot enter final judgment or conduct a jury trial on six of the Trustee's eight claims—including the common law claims that represent over 99% of the damages the Trustee seeks, and which comprise the overwhelming majority of the factual allegations in the complaint.  Thus, all factors for permissive withdrawal of a bankruptcy reference support granting Nixon Peabody's motion.

*First*, considerations of judicial efficiency favor withdrawal.  The Bankruptcy Court may neither enter a final judgment nor preside over a jury trial on the predominant state-law claims.  A District Court is thus better positioned to manage pre-trial matters that will inevitably shape any potential trial.  Moreover, the allegations in the Trustee's complaint encompass conduct far broader than the bankruptcy petitions; the bankruptcy court's prior knowledge regarding DC Solar's assets and bankruptcy petition will have limited value in this matter, which spans eight years of pre-petition conduct and claims and defenses arising under California law that are currently pending before another District Court.  *Second*, withdrawing the bankruptcy reference would conserve costs and avoid delay.  Costs would be saved if the pre-trial matters on non-core matters were consolidated in one forum, rather than bifurcated, avoiding unnecessary appeals to the District Court.  Withdrawal would not create any delay because the Bankruptcy Court has not conducted any pre-trial proceedings.  *Third*, withdrawing the bankruptcy reference would not interfere with administration of the bankruptcy estate, as the core claims are limited and Nixon Peabody consents to the bankruptcy court's enforcement of any potential judgment that would impact the bankruptcy plan.  *Fourth*, withdrawal does not present a forum-shopping problem because only a District Court may enter final judgment, including a jury verdict, on the predominant claims and an appropriate District Court venue already exists.

Ultimately, as also set forth in Nixon Peabody's contemporaneously filed motion to transfer, this case should be heard in the Eastern District of California, where two highly similar

civil suits—as well as the many criminal prosecutions—arising out of DC Solar's fraud are currently being litigated, including a case brought by the other party that Nixon Peabody represented in these same transactions along with DC Solar. In every relevant investment transaction involving DC Solar, Nixon Peabody's limited scope of representation as tax counsel involved only two, related parties: DC Solar and the managing member of the particular investment fund. Nixon Peabody is already litigating in the Eastern District of California against the managing member, Solarmore Management ("Solarmore"), in a case that raises substantially all of the same facts and claims—and identical underlying transactions—as those set forth in the Trustee's complaint. In another related case in the Eastern District of California, Solarmore also brought suit against DC Solar's bankruptcy estate and over 40 other advisors to and entities related to DC Solar. Through all of this litigation arising from DC Solar's Ponzi scheme, the Eastern District has developed significant subject-matter expertise in DC Solar's underlying misconduct and the role that professional advisors, including—but not limited to—Nixon Peabody did (and did not) play in DC Solar's fraud. Concentrating litigation there avoids the risk of inconsistent judgments—a risk that is more than theoretical, given the important legal questions surrounding duty, privilege, knowledge, causation, and *in pari delicto* that will be litigated in each of these actions. And the court in the Eastern District of California, as an Article III court, is empowered to oversee this Adversary Proceeding in a manner that the Bankruptcy Court is not. This matter should thus be transferred, and its reference withdrawn.[1]

## II.    BACKGROUND

### A.    DC Solar's Ponzi Scheme collapses.

DC Solar and its related entities ("DC Solar") were founded around 2009, and its business

---

[1] Because this is fundamentally an Eastern District of California case, Nixon Peabody respectfully suggests that the transfer motion be decided first. The transferee court can then consider the motion to withdraw the reference if necessary. Nixon Peabody brings this motion now, however, to comply with L.R. 5011(b). This motion is timely under that rule and the stipulated order extending the briefing period. Order on Stip. To Extend Deadline for Nixon Peabody LLP to Respond to Compl., Dkt. No. 11 (entered Nov. 22, 2021).

1  model entailed creating investment funds to sell mobile solar generators to investors, who would

2  receive substantial tax benefits.  *See* Adversary Complaint ¶¶ 1–2, 10, 16 ("Compl."), Dkt. No. 1.

3  DC Solar would then lease the generators from the investment funds and to third parties, like

4  arenas and concert venues, from whom DC Solar would collect lease payments.  *Id.* ¶¶ 16–17.

5  DC Solar retained Nixon Peabody for the limited purpose of providing an opinion explaining the

6  tax consequence for investors.  *Id.* ¶¶ 50, 106.

7       DC Solar's scheme collapsed in December 2018 when the FBI raided the company's

8  headquarters.  *Id.* ¶ 39.  Most high-ranking DC Solar employees—including the owners, Jeff and

9  Paulette Carpoff—have since pleaded guilty to wire fraud, money laundering, and similar charges

10  and are currently being sentenced.  *See, e.g.*, Ex. A (Carpoff Plea Agreement, *United States v. Jeff*

11  *Carpoff*, No. 2:20-cr-00017-JAM (E.D. Cal. filed Jan. 22, 2020), Dkt. No. 10).[2]  The Carpoffs

12  admitted in their plea agreements that they "operated DC Solar as a Ponzi-like scheme" and

13  "knowingly misrepresented the existence of lease revenue from third parties."  *Id.* at 23.  They

14  further acknowledged that "[o]ver 90% of the money Distribution claimed as lease revenue . . .

15  was actually derived from transfers of cash contributed to Solutions by later investors in tax-

16  equity and other transactions. . . . Thus, DC Solar merely paid obligations due to older investors

17  with money raised from those investors and later investors."  *Id.*

18       **B.    DC Solar's bankruptcy and the appointment of the Trustee.**

19       Shortly after the FBI raid, the DC Solar entities filed for bankruptcy in this Court. Compl.

20  ¶ 42.  After the cases were converted to Chapter 7 petitions, the Trustee was appointed and

21  stepped into the shoes of the Debtor corporations.  *See id.* ¶ 43; *In re Double Jump, Inc.*, No. 19-

22  50102-gs (Bankr. D. Nev. Filed Jan. 30, 2019), Dkt. Nos. 390, 439.  Nixon Peabody then filed a

23  proof of claim against DC Solar Solutions' estate based on legal services that Nixon Peabody

24  provided prior to the FBI raid.  *See* Ex. B (March 4, 2019 Nixon Peabody Proof of Claim 34-1).

25  Nixon Peabody has since moved to withdraw the claim under Fed. R. Bankr. P. 3006.  *See* Dkt.

[2] Pursuant to Fed. R. Evid. 201, courts "may take judicial notice of court filings and other matters of public record."  *Mahoney v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017).  Nixon Peabody requests that the Court take judicial notice of the filings and pleadings attached to this motion and otherwise cited herein.

No. 2985, *In re Double Jump, Inc.*, No. 19-50102-gs (Bankr. D. Nev. filed Nov. 19, 2021).

Separately—and unrelated to the proof of claim—Nixon Peabody produced its entire DC Solar

case file to the Trustee in 2019 and firm partner Forrest Milder sat for a Rule 2004 examination

the following year. Declaration of Eric MacMichael ("MacMichael Decl.") ¶¶ 2–3.

### C. The Trustee's adversary proceeding against Nixon Peabody.

The Trustee filed the Adversary Complaint against Nixon Peabody on October 25, 2021,

alleging that the law firm somehow should have prevented DC Solar's criminal fraud. The

Trustee asserts four directly non-core, state-law claims—legal malpractice, breach of fiduciary

duty, conspiracy, and aiding and abetting breach of fiduciary duty. The premise of these claims is

remarkable: relying on tort law, the Trustee seeks hundreds of millions of dollars in damages for a

fraud that DC Solar itself committed, on the theory that Nixon Peabody—who was hired for the

limited purpose of providing tax advice—failed to investigate and prevent DC Solar's own

criminal misconduct. Ignoring the limited role Nixon Peabody had in these transactions, the

Adversary Complaint alleges that Nixon breached its professional duties, thereby allowing

Carpoff to encumber his own company with "obligations and liabilities, . . . misuse [] company

assets, . . . loot[ ] company assets, . . . aggravat[e] company insolvency and wrongfully prolong[]

its life." Compl. ¶¶ 260, 273. The scope of the tortious misconduct alleged is vast: The

Adversary Complaint contends that Nixon Peabody is implicated in "[a]ll (or nearly all)" of the

over thirty investment deals, amounting to "more than \$2 billion." *Id.* ¶¶ 3, 122–24. The Trustee

alleges that Nixon Peabody is jointly and severally liable for *all* of the damages DC Solar caused

on the theory that it conspired with Carpoff to perpetrate the DC Solar Ponzi scheme by "staying

silent." *Id.* ¶¶ 301, 304.

The trustee's remaining claims—disallowance, fraudulent transfer, and avoidance—

amount to approximately \$100,000 and do not rely on nearly any of the allegations otherwise

made in the Trustee's 53-page complaint. In the Adversary Complaint, the Trustee "consents to

the entry of final orders and judgments by [the Bankruptcy Court]." Compl. ¶¶ 13–14. The

Adversary Proceeding has not moved past the pleading stage. Pursuant to Fed. R. Bankr.

P. 7008(a), Nixon Peabody does not consent to the entry of final orders or judgments by the

1    bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties,

2    cannot enter final orders or judgments on any or all claims consistent with Article III of the

3    United States Constitution.[3]

4         **D.    Related actions pending in the Eastern District of California**

5         The Ponzi scheme perpetrated by DC Solar has thus far resulted in seven federal criminal

6    prosecutions, all in the United States District Court for the Eastern District of California before

7    Judge John A. Mendez.[4]  Each defendant has pleaded guilty to crimes relating to their role in

8    perpetrating the DC Solar Ponzi scheme, and Judge Mendez is in the process of sentencing those

9    defendants for their pre-petition conduct in perpetrating DC Solar's fraud.[5]  Judge Mendez has

10   also presided over a number of civil actions for forfeiture brought by the United States and the

11   Securities and Exchange Commission against the owners of DC Solar.[6]

12        In addition to those criminal actions, Judge Mendez is presiding over two civil actions that

13   are strikingly similar to this Adversary Proceeding and involve these parties.  The managing

14   member of some of the DC Solar investment funds, Solarmore Management ("Solarmore"), has

15

16   _____

     [3] Nixon Peabody's demand for a jury trial on all eligible claims, including the state law and
17   fraudulent transfer claims, will be filed contemporaneously with this motion.

18   [4] *See United States v. Jeff Carpoff*, 20-cr-00017-JAM-1 (E.D. Cal. filed Jan. 22, 2020); *United
     States v. Paulette Carpoff*, 20-cr-00018-JAM-1 (E.D. Cal. filed Jan. 22, 2020); *United States v.*
19   *Roach*, 19-cr-00182-JAM-1 (E.D. Cal. filed Oct. 21, 2019); *United States v. Bayliss*, 19-cr-
     00182-JAM-2 (E.D. Cal. filed Oct. 21, 2019); *United States v. Karmann*, 19-cr-00222-JAM-1
20   (E.D. Cal. filed Dec. 12, 2019); *United States v. Guidry*, 20-cr-00003-JAM-1 (E.D. Cal. filed Jan.
     6, 2020); *United States v. Hansen*, 20-cr-00016-JAM-1 (E.D. Cal. filed Jan. 21, 2020).
21
22   [5] *J. Carpoff*, 20-cr-00017-JAM-1, Dkt. No. 11; *P. Carpoff*, 20-cr-00018-JAM-1, Dkt. No. 11;
     *Roach*, 19-cr-00182-JAM-1, Dkt. No. 8; *Bayliss*, 19-cr-00182-JAM-2, Dkt. No. 8; *Karmann*, 19-
23   cr-00222-JAM-1 Dkt. No. 12; *Guidry*, 20-cr-00003-JAM-1, Dkt. No. 8; *Hansen*, 20-cr-00016-
     JAM-1, Dkt. No. 17.
24
25   [6] *See, e.g. SEC v. Carpoff*, No. 2:20-CV-00180- JAM-AC (E.D. Cal. filed Jan. 24, 2020; *United
     States v. 725 Main Street, Martinez, California*, No. 2:19-CV-00247-JAM-DB (E.D. Cal. filed
26   Feb. 8, 2019); *United States v. Approximately $6,567,897.50 Seized from CTBC Bank, Account
     Number 380019196*, No. 2:19-CV-00485-JAM-DB (E.D. Cal. filed Mar. 18, 2019); *United States
27   v. 5383 Stonehurst Drive, Martinez, California*, No. 2:19-CV-00636-JAM-DB (E.D. Cal. filed
     Apr. 15, 2019); *SEC v. Bayliss*, No. 2:19-CV-2140-JAM-DB (E.D. Cal. filed Oct. 22, 2019); and
28   *SEC v. Karmann*, No. 2:19-CV-2531-JAM-DB (E.D. Cal. filed Dec. 17, 2019).

sued Nixon Peabody and firm partner Forrest Milder on the same operative facts and many of the same claims regarding the exact same transactions that are at issue here. *See* Ex. C, *Solarmore II* Complaint (*Solarmore Mgmt. Svc., Inc. v. Nixon Peabody, LLP* ("*Solarmore II*"), No. 2:20-cv-02446-JAM-DB, Dkt. No. 1-2 (E.D. Cal. filed Nov. 3, 2020) (Mendez, J.)). As here, Nixon Peabody's former client, Solarmore, alleges that Nixon Peabody should have somehow uncovered and stopped DC Solar's misconduct. *Id.* ¶¶ 137–163. And as here, Solarmore alleges claims under California tort law, including breach of fiduciary duty, malpractice, and misrepresentation. *Id.* ¶¶ 111–121; 137–154.

Additionally, in a separate (and earlier-filed) case likewise pending before Judge Mendez, Solarmore sued the Trustee and over a dozen of DC Solar's other professional advisors. *See* Ex. D, *Solarmore I* Complaint (*Solarmore Mgmt. Servs., Inc. v. Bankr. Est. of DC Solar Sols., Inc.* ("*Solarmore I*"), No. 2:19-cv-02544-JAM-DB (E.D. Cal. filed Dec. 17, 2019) (Mendez, J.), Dkt. No. 1). Although the Trustee is no longer named in the amended complaint, she consented to that suit being filed outside of bankruptcy court; given the existence of the many criminal and SEC matters, the case was filed in the Eastern District of California and also assigned to Judge Mendez. Discovery in *Solarmore I* and *Solarmore II* will overlap substantially with discovery in this case given the overlap in the underlying transactions, allegations, relevant witnesses and document custodians.

## III. ARGUMENT

This Court should exercise its discretion to withdraw the bankruptcy reference. Upon timely motion, this Court "may withdraw, in whole . . . any case or proceeding referred . . . for cause shown." 28 U.S.C. § 157(d). To determine if cause exists, courts look principally to whether the claims asserted are core or non-core. *See, e.g.*, *In re Zante, Inc.*, No. 3:10-CV-00231-RCJ-RAM, 2010 WL 5477768, at *6 (D. Nev. Dec. 29, 2010). Where non-core claims predominate, withdrawal of the reference is favored. *Id.* Courts also consider *inter alia* "[1] the efficient use of judicial resources, [2] delay and costs to the parties, [3] uniformity of bankruptcy administration, [4] the prevention of forum shopping, and [5] other related factors." *Sec. Farms v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers*, 124 F.3d 999, 1008

(9th Cir. 1997). The movant bears the burden of persuasion. *In re Solano*, No. CV 17-2158 FMO, 2017 WL 8180597, at *2 (C.D. Cal. June 19, 2017). Here, all factors favor withdrawal of the reference.

**A.** **Claims That Are Non-Core and Otherwise Not Finally Decidable by a Bankruptcy Court Predominate.**

The central inquiry on a motion to withdraw a reference is whether the bankruptcy court can preside over an eventual trial and render a final judgment. Where claims that must be heard by an Article III tribunal predominate, courts are particularly willing to grant withdrawal. Just so here.

**1.** **The claims at the heart of the Trustee's Complaint are non-core.**

A "core proceeding is one that invokes a substantive right provided by title 11 or a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Battle Ground Plaza, LLC v. Ray* (*In re Ray*), 624 F.3d 1124, 1131 (9th Cir. 2010) (quotations and citation omitted). Core proceedings include "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims." 28 U.S.C. § 157(b)(2)(A), (O). By contrast, "[i]f the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy[,] it is not a core proceeding." *In re Eastport Assocs.*, 935 F.2d 1071, 1076 (9th Cir. 1991) (quoting *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)); *see also Schultze v. Chandler*, 765 F.3d 945, 948 (9th Cir. 2014) (holding that the proper inquiry is whether the claims would have any "existence outside of the bankruptcy").

Four claims—one for legal malpractice (Count I) and three for breach of fiduciary duty (Counts II–IV)—dominate the Trustee's Adversary Complaint and are the sole basis for the Trustee's request for "hundreds of millions of dollars in damages." Compl. at 2. The factual allegations underlying these four claims comprise 45 pages of the 53-page Complaint. These four central claims are all indisputably non-core. *See, e.g.*, *In re ACI-HDT Supply Co.*, 205 B.R. 231, 237 (B.A.P. 9th Cir. 1997); *Shengdatech Liquidating Tr. v. Hansen, Barnett, & Maxwell, P.C.*,

No. 3:13-CV-00563-RCJ, 2013 WL 6408518 at *2 (D. Nev. Nov. 26, 2013) (claims for professional negligence and malpractice focused on pre-petition advice were not core claims). Not only are these legal claims typically considered non-core claims, the factual allegations underlying the claims occurred years before the DC Solar entities filed for bankruptcy and are unrelated to administration of the estate. *See ACI-HDT*, 205 B.R. at 237 (distinguishing between malpractice adversary proceedings concerning post-petition conduct, which may be core, and pre-petition conduct, which is likely non-core); *see also In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 370 (Bankr. S.D.N.Y. 1998) ("Here, these state law causes of action for breach of fiduciary duty and negligence arose prepetition. They do not involve the application of bankruptcy law and are therefore non-core."). All four claims also carry a jury trial right and must be decided by an Article III court.

      The Trustee's remaining claims—disallowance (Count VIII), avoidance (Count VII), and fraudulent transfer (Counts V–VI)—are ancillary at best. The proof of claim that gives rise to the disallowance claim totals just over $100,000 and pales in comparison to the damages the Trustee seeks for her non-core, state-law claims. Moreover, the Trustee's avoidance and fraudulent transfer claims are plagued by irremediable defects that underscore the claims' lack of predominance. ***First***, as Nixon Peabody will explain in its forthcoming motion to dismiss, the Trustee does not have the standing to pursue most of these claims. The transfers underlying these three claims were "for the payment of legal fees," Compl. ¶¶ 310, 317; however, as the Trustee is aware, DC Solar did not directly pay for most of these services and thus cannot recover for payments that it did not make. *See* MacMichael Decl. ¶ 2; *see In re Summers*, 320 B.R. 630, 648–49 (Bankr. E.D. Mich. 2005) (holding that no cause of action exists under 11 U.S.C. § 548 for fraudulent transfer of assets that never belonged to the debtor); *cf. In re Zante, Inc.*, 2010 WL 5477768, at *6 (noting in predominance analysis that the one claim that arises under the bankruptcy code is invalid). ***Second***, even if the Trustee has standing to pursue the avoidance and fraudulent transfer claims, these claims will be miniscule compared to the non-core claims discussed above, for which the Trustee seeks damages that amount to over ***one hundred times*** any arguably core claims.

### 2. Two of the trustee's remaining claims must also be tried before an Article III court, weighing in favor of withdrawal.

Not only are the four claims that will occupy the vast majority of the parties' efforts non-core, but the Trustee's two fraudulent transfer claims are akin to non-core claims.  In *Stern v. Marshall*, the Supreme Court held that Article III prohibits bankruptcy courts from entering final judgements on certain core claims, even where Congress has authorized the bankruptcy court to hear those claims.  564 U.S. 462, 482 (2011).  For such claims—commonly referred to as "*Stern* claims"—the Bankruptcy Court can only issue proposed findings, which are subject to *de novo* review by the District Court.  *See In re Bellingham Ins. Agency, Inc.*, 702 F.3d 533, 565–66 (9th Cir. 2012), *aff'd sub nom. Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014).  The Ninth Circuit has held that *Stern* applies to both state and federal claims for fraudulent transfer, prohibiting bankruptcy courts from entering final judgment on such claims without the consent of all parties.  *See id.*, 702 F.3d at 561–62.  Thus, without Nixon Peabody's consent—which it has not granted—these claims are functionally the same as the non-core claims.  They too confer a jury trial right and are subject to *de novo* review by the District Court, strongly supporting withdrawal of the reference.

### 3. The Trustee's disallowance claim is moot.

Nixon Peabody has moved to withdraw its proof of claim against DC Solar Solutions.  If the Bankruptcy Court allows Nixon Peabody to withdraw its proof of claim, the Trustee's disallowance claim will be moot; even if the Bankruptcy Court does not rule on Nixon Peabody's motion immediately, the act of filing the motion has practically mooted those claims in the Adversary Proceeding already.  Nixon Peabody has neither litigated nor conducted discovery regarding its proof of claim, nor does Nixon Peabody intend to pursue it further.

* * *

As evidenced by the Complaint itself, the crux of the Trustee's allegations involves issues of (California) common law, which constitutionally belong before a jury and thus an Article III court.  Four of the Trustee's seven live claims are decidedly non-core and **six** must be tried to an Article III court.  That "weighs very heavily in favor of withdrawal."  *In re Zante, Inc.*, 2010 WL

5477768, at *6.

**B.    Each factor concerning withdrawal of the bankruptcy reference favors granting Nixon Peabody' motion.**

The remaining factors courts consider on a motion to withdraw the reference likewise favor Nixon Peabody.

**1.    Judicial Efficiency**

Judicial efficiency strongly supports withdrawing the bankruptcy reference.  This Adversary Case has only just been filed; Nixon Peabody has not yet responded to the Complaint; and the Bankruptcy Court has not yet been required to familiarize itself with the California-state-law professional malpractice and breach of fiduciary duty claims that dominate the case or the *in pari delicto* defense that hangs over them.  *See, e.g.*, *In re Align Strategic Partners LLC*, No. 16-35702, 2019 WL 2524938, at *3 (Bankr. S.D. Tex. Mar. 5, 2019) (finding withdrawal warranted where Bankruptcy "Court has not gained any in-depth familiarity with the underlying facts in the Adversary Proceeding").  To be sure, the Bankruptcy Court is familiar with the DC Solar entities and their various bankruptcy petitions.  But that does not preserve judicial resources here, because the conduct underlying *this* case occurred entirely pre-petition and has not been raised in any significant detail in other motions or pleadings filed in the Bankruptcy Court.

Moreover, efficiency is better served when the parties need not resort to District Court review of the Bankruptcy Court's proposed findings of fact and conclusions of law.  Indeed, it would be a poor use of resources for both the Bankruptcy Court and the District Court if Nixon Peabody's Rule 12(b)(6) motion and any possible future Rule 56 motion would need to be considered anew by both courts.  28 U.S.C. § 157(c)(1); *see, e.g.*, *In re Shoe Pavilion, Inc.*, No. 2:13-CV-01245- CJC, 2013 WL 12113232, at *1 (C.D. Cal. May 30, 2013) (adopting bankruptcy court's recommendation to grant defendant's motions for summary judgment).  A court within this district ruled in a similar case involving pre-petition malpractice claims that "judicial efficiency weighs in favor of withdrawal to this Court since the District Court would have to review all dispositive recommendations as to non-core issues de novo, increasing costs and causing delay."  *Shengdatech*, 2013 WL 6408518, at *2; *Sec. Farms*, 124 F.3d at 1008 (district

court appropriately withdraws a bankruptcy reference when "non-core issues predominate"). Similarly, because any jury trial must take place in District Court, judicial efficiency is best served by having the District Court conduct pre-trial proceedings. "[S]everal courts have concluded that where," as here, "a jury trial is required and the parties refuse to consent to bankruptcy jurisdiction, withdrawal of the case to the district court is appropriate." *In re Cinematronics, Inc.*, 916 F.2d 1444, 1451 (9th Cir. 1990). When a "District Court Judge must eventually preside over the jury trial in this matter, it would constitute a ***tremendous waste of judicial resources*** to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation." *In re Transcon Lines*, 121 B.R. 837, 838 (C.D. Cal. 1990) (emphasis added); *Nelson v. XL America, Inc. (In re Ameri-Dream Realty, LLC)*, No. 2:16-cv-00060-JAD-GWF, 2016 U.S. Dist. LEXIS 157788, at *3 (D. Nev. Nov. 14, 2016) (concluding that "[e]ither way, this case is coming back" to the district court, and denying withdrawal "would duplicate [the bankruptcy court's] efforts").

Indeed, as set forth in Nixon Peabody's contemporaneously filed transfer motion, the best use of resources would be for this case to be heard in the Eastern District of California, where two strikingly similar cases are already pending.[7] ***First,*** as to the substance, there's no good reason for two different courts to consider the exact same facts and underlying transactions, and to decide the same legal issues—such as the scope of Nixon Peabody's duty to its clients and its *in pari delicto* defense against DC Solar—especially when there is a chance that the two courts could reach different conclusions on the same question. The issues that will arise in this Adversary Case have been at the heart of the numerous criminal and civil matters pending in the

---

[7] This motion has been filed contemporaneously with a motion to transfer the case to the United States District Court for the Eastern District of California. Should this case be transferred to the Eastern District, Nixon Peabody will immediately file a Notice of Related Case, pursuant to Eastern District of California Local Rule 123, to relate this case to the pending actions in the Eastern District, which will ensure that the case is coordinated with the pending DC Solar cases. To the extent there are any post-trial collection issues, Nixon Peabody agrees that those limited concerns—which are unlikely to arise—could be litigated before the Bankruptcy Court in the District of Nevada, a procedural condition on which the Trustee already predicated her consent to the filing of *Solarmore I* in the Eastern District of California.

MOTION TO WITHDRAW BANKRUPTCY REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1    Eastern District of California.

2         ***Second,*** discovery in the Eastern District of California would increase judicial efficiency,

3    allow for coordination between all relevant parties, and avoid duplicating efforts.  The Trustee

4    will invariably argue that it has filed over 40 adversary proceedings in this Court and this case is

5    no different.  And the Bankruptcy Court here may want to conduct discovery in 180 days, as

6    Local Rule 7026(b) recommends.  But the Trustee's Adversary Complaint against Nixon Peabody

7    is ***entirely unlike*** the conventional, cookie-cutter complaints in her other adversary proceedings,

8    which generally allege fraudulent transfer claims for which six months of discovery would be

9    more than enough.  The Trustee's state-law claims and allegations here are far broader:  The

10   Adversary Complaint spans almost a decade of conduct, alleging that Nixon Peabody either

11   assisted, aided, abetted, or failed to detect the Carpoffs' fraudulent conduct in over 35

12   transactions involving at least nine different investors.  Not only will the *Solarmore* cases involve

13   the exact same facts and underlying transactions, as discussed above, but they will require

14   coordinating discovery with the same 40+ parties to limit discovery disputes and repetitive

15   depositions.  The issues at the core of this Adversary Complaint would be difficult to resolve with

16   only 180 days of discovery, and such a schedule would effectively prohibit coordination of

17   discovery with the *Solarmore* cases and require duplicative discovery.  Moreover, it would be far

18   more efficient for the ***same*** court to manage discovery—and the inevitable discovery disputes—in

19   these similar actions, instead of requiring this court to take a sliver of the *Solarmore* cases and

20   repeat the entire discovery process here.

21        Nixon Peabody acknowledges that courts within this district have reached different

22   decisions regarding whether to withdraw the bankruptcy reference in the early stages or just

23   before trial.  Many of the cases denying an early withdrawal of the reference, however, are easily

24   distinguishable from this Adversary Complaint for three reasons.  ***First***, many of those cases

25   involve only fraudulent transfer claims, which may "routinely arise in the context of bankruptcy,

26   and are often integrally tied to core proceedings."  *Rosenberg v. Harvey A. Bookstein*, 479 B.R.

27   584, 590 (D. Nev. 2012); *see also Krohn v. Stipp* (*In re Plise*), No. 2:13-cv-00169-JAD-PAL,

28   2015 WL 4997296 (D. Nev. Aug. 19, 2015).  Here, not only are there significant non-core claims

1   other than the fraudulent transfer claims, the non-core claims do not predominate and are not

2   integrally tied to the core proceedings.  **Second**, cases denying withdrawal often have virtually

3   identical adversary complaints already pending before the bankruptcy court, frequently for

4   fraudulent transfer claims.  Here, the Trustee's Adversary Complaint against Nixon Peabody is

5   unique in its individualized, tort-based claims and allegations, which comprise almost the entirety

6   of the Complaint.  **Third,** cases denying withdrawal until trial frequently conclude that the

7   bankruptcy court is "the court most familiar with the parties and issues."  *Bagley v. Locke Lord*

8   *LLP (In re Desert Capital REIT, Inc.)*, No. 2:13-cv-01114-JAD, 2014 U.S. Dist. LEXIS 28949, at

9   *8 (D. Nev. March 6, 2014); *see also* Ex. E (Order Denying Motion to Withdraw Reference,

10  *Melech v. Polhill (In re American Pacific Financial Corp.)*, No. 2:13-cv-01113-JCM (PAL) (D.

11  Nev. Feb. 5, 2014), Dkt. No. 34 (same)).  Here, the Eastern District of California—not the

12  bankruptcy court—is "the court most familiar" with the parties, the claims, and the underlying

13  pre-petition conduct at issue.  The very same claims and defenses will be litigated before that

14  court, which already has familiarity with many of the criminal and civil cases related to DC

15  Solar's downfall.

16          The facts here are far more analogous to cases within this district that have withdrawn the

17  bankruptcy reference at an early stage.  *See Shengdatech,* 2013 WL 6408518, at *2–3

18  (withdrawing reference where non-core issues predominated and adjudication would likely not

19  impact the bankruptcy administration); *see also Off. Comm.. of Unsecured Creditors v. Marini (In*

20  *re Windspire Energy, Inc.)*, No. 3:13-cv-10-RCJ-WGC, 2013 U.S. Dist. LEXIS 46727, at *2–3

21  (D. Nev. April 1, 2013) (withdrawing reference in case involving breach of fiduciary duty and

22  fraudulent transfer because of judicial economy and on recommendation of the bankruptcy

23  judge); *Nelson,* 2016 U.S. Dist. LEXIS 157788 (withdrawing reference to avoid duplicating

24  efforts); *see also* Ex. F (*USACM Liquidating Trust v. Compass USA SPE* (*In re USA Commercial*

25  *Mortgage Co.*)*,* No. 2:14-cv-00455-RCJ-PAL (D. Nev. May 28, 2014), Dkt. No. 4 (withdrawing

26  reference on recommendation of the bankruptcy judge because the parties would be litigating the

27  same issues related to another action pending before the District Court)).  Unlike the Trustee's

28  other adversary complaints, this Complaint is different in that it is focused almost entirely on

MOTION TO WITHDRAW BANKRUPTCY REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

individualized, California tort claims that will eventually end up before a District Court. There is no efficiency in having the bankruptcy court adjudicate the very same claims and issues that are already before the Eastern District of California.

Judicial efficiency would best be served by withdrawing the bankruptcy reference and transferring this case.

### 2. Cost and Delay

For similar reasons, considerations of cost and delay also favor withdrawing the reference. The process of repeatedly submitting the Bankruptcy Court's proposed findings of fact and conclusions of law to the District Court for *de novo* review would impose significant costs and could cause repeated delays, neither of which is necessary here. *In re Addison*, 240 B.R. 47, 50 (C.D. Cal. 1999) (granting withdrawal of reference because constant back-and-forth would cause unnecessary delay); *see also In re O'Hanneson*, No. 5:12-cv-04068 EJD, 2013 WL 655158, at *4 (N.D. Cal. Feb. 21, 2013) ("[A]llowing pretrial matters to proceed in [District Court] . . . prevents delay and saves costs since the parties will have dealt with one court rather than two."). And withdrawal would not itself cause delay. The parties have not moved past the pleading stage, and the Bankruptcy Court has not taken any action on the merits of the complaint or scheduled any hearings. Thus, "withdrawal will prevent delay and added costs to the parties by placing the non-core claims in [the district court], which can render final judgment." *Everett v. Art Brand Studios, LLC*, 556 B.R. 437, 445 (N.D. Cal. 2016) (quoting *In re Rosales,* No. 13-cv-01316-LHK, 2013 WL 5962007 at *7 (N.D. Cal. Nov. 7, 2013)).

### 3. Administration of the bankruptcy estate

Withdrawal would not harm the administration of the bankruptcy estate. *See In re Rosales*, 2013 WL 5962007, at *7. Here, however, Nixon Peabody has already moved for leave to withdraw its proof of claim, which it will no longer pursue; thus, the disallowance claim does not weigh heavily on this factor. And as discussed above, the Trustee's avoidance claim suffers from significant standing issues. Any argument that withdrawal of the reference would affect the administration of the bankruptcy estate must take into account the deficiencies of those two claims. Finally, even if withdrawal did result in slight disruption to the administration of the

bankruptcy estate, it "is outweighed by the efficiency that will result in withdrawing the Trustee's non-core claims to this court." *Everett*, 556 B.R. at 446.[8]

### 4. Forum-shopping

Forum shopping is not a concern here as only the District Court has the power to enter final judgment. Even if the Bankruptcy Court adjudicated the Trustee's non-core claims, this Court would have to conduct *de novo* review and oversee a jury trial. *In re Cinematronics, Inc.*, 916 F.2d at 1451. Moreover, as Nixon Peabody's transfer motion shows, the courts should concentrate the suits and claims that go to the conduct of DC Solar's professional advisors before a single court that has developed significant subject-matter expertise regarding such matters—in this case, the Eastern District of California. That's not forum shopping: it's a sensible allocation of the parties' and the judiciary's resources.

All factors therefore favor withdrawal, and this Court should exercise its discretion to withdraw the bankruptcy reference.

## IV. CONCLUSION

For the foregoing reasons, this Court should withdraw the bankruptcy reference of the entire Adversary Proceeding.

---

[8] If this Court prefers to leave the two core claims—avoidance and disallowance—in Bankruptcy Court, the Court can sever the six non-core and *Stern* claims and withdraw the reference only as to those six claims. When "[u]niform administration of the bankruptcy estate is the sole factor that favors not withdrawing the reference," courts have severed non-core claims and allowed only core claims to proceed before the Bankruptcy Court. *In re Rosales*, 2013 WL 5962007, at *7.

1    Dated:  November 24, 2021                    KEKER, VAN NEST & PETERS LLP

2

3                                          By:    /s/ Elliot R. Peters
                                                  ELLIOT R. PETERS
4                                                 ERIC H. MACMICHAEL

5    Dated:  November 24, 2021                    KAEMPFER CROWELL

6

7                                          By:    /s/ Louis M. Bubala III
                                                  LOUIS M. BUBALA III
8
                                                  Attorneys for Defendant Nixon Peabody
9                                                 LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO WITHDRAW BANKRUPTCY REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

# EXHIBIT A

1  McGREGOR W. SCOTT
United States Attorney
2  ANDRÉ M. ESPINOSA
KEVIN KHASIGIAN
3  Assistant United States Attorneys
501 I Street, Suite 10-100
4  Sacramento, CA 95814
Telephone: (916) 554-2700
5
Attorneys for Plaintiff
6  United States of America

**FILED**

**JAN 2 4 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

7

8                 IN THE UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,                CASE NO. 2:20-cr-17 JAM

                    Plaintiff,               PLEA AGREEMENT
12
         v.                                  DATE:   JANUARY 24, 2020
13                                           TIME:   10:00 AM
    JEFF CARPOFF,                             COURT:  HON. JOHN A. MENDEZ
14
                    Defendant.
15

16
                    **I.      INTRODUCTION**
17
    **A.      Scope of Agreement.**
18
         The Information in this case charges the defendant with violations of Title 18, United States
19
    Code, Section 1349—Conspiracy to Commit Wire Fraud ("Count One"), and Title 18, United States
20
    Code, Section 1957(a)— Money Laundering ("Count Two"). This document contains the complete plea
21
    agreement between the United States Attorney's Office for the Eastern District of California (the
22
    "government") and the defendant regarding this case. This Plea Agreement is limited to the United
23
    States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or
24
    local prosecuting, administrative, or regulatory authorities.
25
    **B.      Court Not a Party.**
26
         The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the
27
    discretion of the Court, and the Court may take into consideration any and all facts and circumstances
28

    PLEA AGREEMENT                                1

1 concerning the criminal activities of the defendant, including activities which may not have been
2 charged in the Information.  The Court is under no obligation to accept any recommendations made by
3 the government, and the Court may in its discretion impose any sentence it deems appropriate up to and
4 including the statutory maximum stated in this Plea Agreement.

5     If the Court should impose any sentence up to the maximum established by the statutes, the
6 defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all
7 of the obligations under this Plea Agreement.  The defendant understands that neither the prosecutor,
8 defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will
9 receive.

10 ## II.    DEFENDANT'S OBLIGATIONS

11 ### A.   Guilty Plea.

12     The defendant will plead guilty to violating Title 18, United States Code, Section 1349—
13 Conspiracy to Commit Wire Fraud ("Count One"), and Title 18, United States Code, Section 1957(a)—
14 Money Laundering ("Count Two").  The defendant agrees that he is in fact guilty of those charges and
15 that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

16     The defendant agrees that this Plea Agreement will be filed with the Court and become a part of
17 the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his
18 plea should the Court not follow the government's sentencing recommendations.

19     The defendant agrees that the statements made by him in signing this Agreement, including the
20 factual admissions set forth in the factual basis and those made on January 17, 2020, during the process
21 of negotiating this Agreement, shall be admissible and useable against the defendant by the United
22 States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea
23 pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R.
24 Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement
25 generally.

26     1.    Waiver of Indictment.

27     The defendant acknowledges that under the United States Constitution he is entitled to be
28 indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim.

PLEA AGREEMENT    2

P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of Indictment to the charges set forth in the Information.  The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by Indictment and consent to proceed by Information rather than by Indictment.

        1.     Package Agreement.

The defendant acknowledges and understands that the plea offer made to him here by the government is a "package offer."  That is, the defendant understands that the offer made to him is conditioned on co-defendant Paulette Carpoff pleading guilty according to the terms of her respective plea offer.  The defendant understands that if this co-defendant declines, refuses or fails to plead guilty according to her respective offer, then, at the option of the government, the defendant will not be allowed to enter a plea of guilty to the offer made to him by the government.  Additionally, if co-defendant Paulette Carpoff fails or refuses to enter her plea according to her respective offer and the defendant has already entered his plea, then this Plea Agreement is voidable at the option of the government.  Should that occur, in its sole discretion, the government has the ability to withdraw from the Plea Agreement with the defendant and pursue the original charges as to this defendant.  However, the defendant's waiver of his rights under Rule 11(f) and Fed. R. Evid. 410, as set forth in Section II.A herein, will not operate.

Recognizing that this is a package offer, the defendant confirms that he has not been threatened, pressured, or coerced by any other person, including the co-defendant, to enter into this plea agreement.  The defendant also confirms that he enters into this plea agreement voluntarily because he is in fact guilty of the offenses to which he is pleading guilty.

**B.**    **Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses.  The defendant agrees that his conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by this offense, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the Plea Agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the

PLEA AGREEMENT          3

1 periods through in or about March 2011 and in or about December 2018. The amount of restitution has
2 not yet been determined but will likely be between approximately $800 million and $1.6 billion.

3 Restitution payments shall be by cashier's or certified check made payable to the Clerk of the
4 Court.

5 The defendant further agrees that he will not seek to discharge any restitution obligation or any
6 part of such obligation in any bankruptcy proceeding.

7 **C.    Fine.**

8 The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a
9 fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively
10 prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury
11 to the Probation Officer and the government in advance of the issuance of the draft Presentence
12 Investigation Report, along with supporting documentation. The government retains the right to oppose
13 the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered
14 by the Court, up to the statutory maximum fine for the defendant's offense.

15 **D.    Special Assessment.**

16 The defendant agrees to pay a total special assessment of $200 (comprised of $100 per count of
17 conviction) at the time of sentencing by delivering a check or money order payable to the United States
18 District Court to the United States Probation Office immediately before the sentencing hearing. The
19 defendant understands that this Plea Agreement is voidable at the option of the government if he fails to
20 pay the assessment prior to that hearing.

21 **E.    Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

22 If the defendant violates this Plea Agreement in any way, withdraws his plea, or tries to
23 withdraw his plea, this Plea Agreement is voidable at the option of the government. If the government
24 elects to void the Agreement based on the defendant's violation, the government will no longer be
25 bound by its representations to the defendant concerning the limits on criminal prosecution and
26 sentencing as set forth herein. A defendant violates this Plea Agreement by committing any crime or
27 providing or procuring any statement or testimony which is knowingly false, misleading, or materially
28 incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct

PLEA AGREEMENT                    4

constituting obstruction of justice. Varying from stipulated Guidelines application or agreements regarding arguments as to 18, United States Code, section 3553, as set forth in this Agreement, personally or through counsel, also constitutes a violation of the Plea Agreement. The government also shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this Plea Agreement; and (3) to file any new charges that would otherwise be barred by this Plea Agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this Plea Agreement. The determination of whether the defendant has violated the Plea Agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed. By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects.

PLEA AGREEMENT

5

**F.**   **Forfeiture.**

The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title, and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Those assets include, but are not limited to, the following:

1. Seagrape Villa 1722 at the Four Seasons Resort Estate Nevis, "1722 Stewart's Estate," Federation of St Kitts-Nevis, West Indies, Lot 12, Clarks/Jessups (Stewarts Estate), Parish of St. Thomas, Island of Nevis;
2. All funds maintained at Deltec Bank and Trust, account number 1001021, held in the name of DC Solar International, Inc.;
3. All funds maintained at JP Morgan Chase, account number 371767515, held in the name of Jocarbo, LLC;
4. Any and all interests held by Jeffrey Carpoff in Whetstone Winery, Inc.;
5. Any and all interests held by Jeffrey Carpoff in JPC Group Investments;
6. Any and all interests held by Jeffrey Carpoff in Shift Solutions LLC;
7. Any and all interests held by Jeffrey Carpoff in Panda Bear International Ltd.;
8. Any and all interests held by Jeffrey Carpoff in MTO Cafe;
9. Any and all interests held by Jeffrey Carpoff in JMFC, Inc.;
10. Any and all interests held by Jeffrey Carpoff in PMFC Enterprises LLC;
11. Any and all interests held by Jeffrey Carpoff in LITV Entertainment Group, LLC;
12. Any and all interests held by Jeffrey Carpoff in Yountville Live;
13. 1969 Plymouth Roadrunner, VIN: RM23H9E119339;
14. 2018 Bentley Bentayga, VIN: SJAAC2ZV2JC016871;
15. 1969 Plymouth Roadrunner, VIN: RM21H9G224046;
16. 2015 Dodge Ram 5500 Chassis, VIN: 3C7WRMBL4FG594873;
17. 2018 Dodge Ram 2500 Tradesman, VIN: 3C6UR5CL1JG169183;
18. 2018 Dodge Ram 2500 Tradesman, VIN: 3C6UR5CL7JG169186;
19. 2014 Dodge Ram, VIN: 3C6UR5CL3EG291677;
20. 2014 Dodge Ram, VIN: 3C6UR5CL1EG147612;
21. 2018 Dodge Ram, VIN: 3C6UR5CL9JG169190;
22. 2000 Porsche Boxster, VIN: WP0CA2982YU626068;
23. 2017 Centurion Vessel, VIN: FINS1554F717;
24. Approximately $580,000 in U.S. Currency held by Terry L. Davis and Susan Rush in Las Vegas, Nevada, and described in Case No. A-19-803784-C, filed in Clark County District Court, Jeff and Paulette Carpoff v. Terry L. Davis and Susan Rush;
25. Approximately $200,000 in the form of a promissory note and deed of trust, extended to Terry L. Davis and Susan Rush, residents of Las Vegas, Nevada; and
26. Any and all sales proceeds from the vehicles sold in United States v. 2011 BMW 328I, VIN: WBAPH7C53BE460537, et al., 2:19-MC-00053-TLN-CKD, in the Eastern District of California.

The defendant agrees that the listed assets constitute or are derived from proceeds traceable to a violation of 18 U.S.C. § 1349.

1   The defendant agrees to fully assist the government in the forfeiture of the listed assets and to take

2   whatever steps are necessary to pass clear title to the United States.  The defendant also agrees to

3   execute any and all paperwork required to forfeit additional assets connected to the charges to which he

4   pleaded guilty.  The defendant shall not sell, transfer, convey, or otherwise dispose of any of his assets,

5   including but not limited to, the above-listed assets.

6   The defendant agrees not to file a claim to any of the listed property in any civil proceeding,

7   administrative or judicial, which may be initiated.  The defendant agrees to waive his right to notice of

8   any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a

9   claim in that forfeiture proceeding.

10   The defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of

11   assets.  The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses

12   to the forfeiture of these assets in any proceeding.  The defendant agrees to waive any jeopardy defense,

13   and agrees to waive any claim or defense under the Eighth Amendment to the United States

14   Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States,

15   the State of California or its subdivisions.  The defendant waives oral pronouncement of forfeiture at the

16   time of sentencing, and any defenses or defects that may pertain to the forfeiture.

17   The defendant agrees to sign a Stipulation for Final Judgment of Forfeiture in <u>United States v. 725</u>

18   <u>Main Street, Martinez, California, et al.</u>, Case 2:19−CV−00247-JAM-DB, <u>United States v.</u>

19   <u>Approximately $6,567,897.50 Seized From CTBC Bank, Account Number 3800191916, et al.</u>, Case

20   2:19-cv-00485-JAM-DB, <u>United States v. 5383 Stonehurst Drive, Martinez, California, et al.</u>, Case

21   2:19-cv-00636-JAM-DB, and a Consent Judgment of Forfeiture in <u>United States v. 2011 BMW 328I,</u>

22   <u>VIN: WBAPH7C53BE460537, et al., Case 2:19-MC-00053-TLN-CKD.</u>  The stipulations must be

23   signed concurrently with the signing of this plea agreement.

24   The parties agree that if any portion of the net proceeds from the forfeited assets are paid to victims

25   through the remission or restoration process, that amount will be credited to the defendant's restitution

26   obligation.

27   **G.**   **<u>Asset Disclosure.</u>**

28   The defendant agrees to make a full and complete disclosure of his assets and financial

PLEA AGREEMENT                                   7

1 │ condition, and will complete the United States Attorney's Office's "Authorization to Release

2 │ Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change

3 │ of plea, including supporting documentation.  The defendant also agrees to have the Court enter an order

4 │ to that effect.  The defendant understands that if he fails to complete truthfully and provide the described

5 │ documentation to the United States Attorney's office within the allotted time, he will be considered in

6 │ violation of the Agreement, and the government shall be entitled to the remedies set forth in section II.E

7 │ above, above.

8 │    **H.**    **No Reduction in Sentence for Cooperation.**

9 │        As a condition of the terms of this Plea Agreement, the defendant agreed to full and complete

10 │ debriefs with the government regarding his criminal activities.  Notwithstanding his agreement to

11 │ participate in those debriefs, the defendant understands and acknowledges that the government will not

12 │ make a motion in his case, pursuant to U.S.S.G. § 5K1.1, and the defendant agrees not to seek any

13 │ sentence reduction on the basis of the debriefs.  The defendant agrees that the information he must

14 │ provide in the debriefs must be truthful or the government will have the remedies set forth in Part II.E of

15 │ this Agreement.

16 │    **III.**    **THE GOVERNMENT'S OBLIGATIONS**

17 │    **A.**    **Dismissals/Other Charges.**

18 │        The government agrees not to bring any other charges against the defendant arising from the

19 │ conduct outlined in the Factual Basis attached hereto as Exhibit A.  The government also agrees not to

20 │ reinstate any dismissed count except if this Agreement is voided as set forth herein, or as provided in

21 │ paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Pleas), VI.B (Estimated

22 │ Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

23 │    **B.**    **Recommendations.**

24 │        1.    Incarceration Range.

25 │        The government intends to recommend that the Court sentence the defendant to thirty years in

26 │ custody.

27 │        2.    Acceptance of Responsibility.

28 │        The government will recommend a two-level reduction (if the offense level is less than 16) or a

PLEA AGREEMENT                                8

three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

**C.** **Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

**IV.** **ELEMENTS OF THE OFFENSE**

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty.

**1.** **18 U.S.C. § 1349—Conspiracy to Commit Wire Fraud (Count One).**

Although *not* elements of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, the elements of the underlying criminal offense (Wire Fraud, in violation of 18 U.S.C. § 1343) are:

a. The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

b. The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c. The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

d. The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Thus, to convict the defendant at trial on the charge of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count One), the government would have to prove beyond a reasonable

PLEA AGREEMENT

9

doubt that:

    a.    Beginning at least as early as in or about March 2011, and ending in or about December 2018, there was an agreement between two or more people to commit wire fraud as charged in the Information; and

    b.    Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**2.**    **18 U.S.C. § 1957(a)—Money Laundering (Count Two).**

To convict the defendant at trial on the charge of Money Laundering, in violation of 18 U.S.C. § 1957(a), the government would have to prove beyond a reasonable doubt that:

    a.    The defendant knowingly engaged or attempted to engage in a monetary transaction;

    b.    The defendant knew the transaction involved criminally derived property;

    c.    The property had a value greater than $10,000;

    d.    The property was, in fact, derived from wire fraud, in violation of 18 U.S.C. § 1343; and

    e.    The transaction occurred in the United States.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

### V.    MAXIMUM SENTENCE

**A.**    **Maximum Penalties.**

**1.**    **18 U.S.C. § 1349—Conspiracy to Commit Wire Fraud (Count One).**

The maximum sentence that the Court can impose on Count One is 20 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

**2.**    **18 U.S.C. § 1957(a)— Money Laundering (Count Two).**

PLEA AGREEMENT        10

The maximum sentence that the Court can impose on Count Two is 10 years of incarceration, a fine of $250,000 or twice the value of the property involved in the transaction, a 3-year period of supervised release, and a special assessment of $100.  By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct.  The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty.  The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

**B.**     **Violations of Supervised Release.**

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release imposed on Count One and Count Two and require the defendant to serve up to 3 additional years imprisonment.

**VI.     SENTENCING DETERMINATION**

**A.**     **Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.**     **Stipulations Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

PLEA AGREEMENT                                  11

**(i)** <u>Count One: 18 U.S.C. § 1349—Conspiracy to Commit Wire Fraud.</u>

    **1.** **Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **7**. <u>See</u> U.S.S.G. §§ 2X1.1 and 2B1.1(a)(1).

    **2.** **Specific Offense Characteristics:**

        a.   Thirty levels are added **(+30)** because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his knowing involvement exceeded $550,000,000. <u>Id.</u> at (b)(1)(P).

        b.   Two levels are added **(+2)** because the offense involved 10 or more victims. <u>Id.</u> at (b)(2)(A).

        c.   Two levels are added **(+2)** because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. <u>Id.</u> at (b)(10)(C).

        d.   Two levels are added **(+2)** because the defendant derived more than $1 million in gross receipts from one or more financial institutions as a result of the offense. <u>Id.</u> at (b)(17)(A).

    **3.** **Preliminary Offense Level:** The parties anticipate that the preliminary offense level will be **43**.

    **4.** **Chapter Three Adjustments**:

        a.   Four levels are added **(+4)** because the defendant was an organizer and leader of a criminal activity that involved five or more participants and was otherwise extensive. U.S.S.G. § 3B1.1(a).

        b.   Two levels are added **(+2)** because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and any relevant conduct, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct. U.S.S.G. § 3C1.1.

    **5.** **Adjusted Offense Level:** The parties anticipate the adjusted offense level will be **49**.

**(ii)** <u>Count Two: 18 U.S.C. § 1957(a)—Money Laundering.</u>

    **1.** **Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **7**. <u>See</u> U.S.S.G. §§ 2S1.1(a)(1) and 2B1.1(a)(2).

    **2.** **Specific Offense Characteristics:**

        a.   Thirty levels are added **(+30)** because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his

PLEA AGREEMENT

12

1       knowing involvement exceeded \$550,000,000. Id. at (b)(1)(P).

2     b. Two levels are added (**+2**) because the offense involved 10 or more victims. Id. at
3        (b)(2)(A).

4     c. Two levels are added (**+2**) because the offense involved sophisticated means and the
        defendant intentionally engaged in or caused the conduct constituting sophisticated
5        means. Id. at (b)(10)(C).

6     d. Two levels are added (**+2**) because the defendant derived more than \$1 million in gross
        receipts from one or more financial institutions as a result of the offense. Id. at
7        (b)(17)(A).

8     e. One level is added (**+1**) because the defendant was convicted under 18 U.S.C. § 1957.
9        U.S.S.G. § 2S1.1(b)(2)(A).

10    **3. Chapter Three Adjustments**:

11    a. Two levels are added (**+2**) because the defendant willfully obstructed or impeded, or
        attempted to obstruct or impede, the administration of justice with respect to the
12       investigation, prosecution, or sentencing of the instant offense of conviction and any
13      relevant conduct, and the obstructive conduct related to the defendant's offense of
        conviction and any relevant conduct. U.S.S.G. § 3C1.1.

14
15    **4. Preliminary Offense Level:** The parties anticipate that the preliminary offense level

16 will be **46**.

17    **1. Grouping Multiple Counts:**

18    a. The Counts in the Information to which the defendant is pleading guilty may be
        grouped together under U.S.S.G. § 3D1.2(**d**).

19
20    b. The offense level applicable to the grouped Counts is **49**, which is the offense level
        corresponding to the aggregate quantity of loss, determined in accordance with
21       Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines.
        See U.S.S.G. § 3D1.3(b).

22    **2.** Three levels are subtracted (**-3**) if the defendant pleads guilty, accepts responsibility for
23 his offense, and the Specific Offense Level is above 16. U.S.S.G. § 3E1.1; see also Part III.B.2 above.

24    **3. Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the
25 adjusted offense level will be **46**.

26    **4. Criminal History:** The parties agree and stipulate that the applicable criminal history
27 will be determined by the Court's probation officers. The parties estimate but do not stipulate that the

28

PLEA AGREEMENT          13

1  defendant's criminal history category will be I, and that the Guidelines sentencing range will be no

2  less than Life in prison, subject, however, to the maximum statutory sentence possible for the offenses

3  of conviction (30 years).  The defendant understands that if his criminal history category differs from

4  the parties' estimate, his Guidelines sentencing range may differ from that set forth here.

5       **C.**    **Departures or Other Enhancements or Reductions.**

6       The parties agree that they will not seek or argue in support of any other specific offense

7  characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"),

8  or cross-references, except that the government may move for a departure or an adjustment based on the

9  defendant's post-plea obstruction of justice (§3C1.1).  Both parties agree not to move for, or argue in

10  support of, any departure from the Sentencing Guidelines.

11       The defendant also agrees that the application of the United States Sentencing Guidelines to his

12  case results in a reasonable sentence.  The parties agree, however, that sentencing in this case will be

13  within the sound discretion of the Court.  The defendant may request a sentence within the range of 25

14  years to 30 years and ask that the Court apply the sentencing factors under 18 U.S.C. §3553 to reach a

15  sentence of between 25 years to 30 years.  But the defendant will not request that the Court apply the

16  sentencing factors to arrive at any sentence less than 300 months (25 years) in custody.  The defendant

17  acknowledges that if the defendant requests or suggests in any manner a sentence less than 300 months

18  (25 years) in custody, that will be considered a violation of the Plea Agreement.  The government's

19  remedies and remaining obligations in this Agreement shall be as outlined above in paragraph II.E.

20                         **VII.**    **WAIVERS**

21       **A.**    **Waiver of Constitutional Rights.**

22       The defendant understands that by pleading guilty he is waiving the following constitutional

23  rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to

24  be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative

25  defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of

26  conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to

27  testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be

28  compelled to incriminate himself.

PLEA AGREEMENT              14

**B.**     <u>Waiver of Appeal and Collateral Attack.</u>

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offenses to which he is pleading guilty (30 years), including if the Court imposes consecutive terms on Counts One and Two. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which the defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this Agreement is insufficient to support the defendant's plea of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum for all Counts; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E herein.

**C.**     <u>Waiver of Attorneys' Fees and Costs.</u>

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any

PLEA AGREEMENT        15

charges previously dismissed).

**D.    Impact of Plea on Defendant's Immigration Status.**

The defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including offenses to which the defendant is pleading guilty. The defendant and his counsel have discussed the fact that the charges to which the defendant is pleading guilty is an aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. § 1101(a)(43), and that while there may be arguments that the defendant can raise in immigration proceedings to avoid or delay removal, it is virtually certain that the defendant will be removed. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

## VIII.    ENTIRE PLEA AGREEMENT

Other than this Plea Agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX.    APPROVALS AND SIGNATURES

**A.    Defense Counsel.**

I have read this Plea Agreement and have discussed it fully with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this Plea Agreement.

Dated: 1/24/20

_____
MALCOLM SEGAL
Attorney for Defendant

PLEA AGREEMENT                                  16

41

**B.** **Defendant:**

I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: *1·22·20*

JEFF CARPOFF
Defendant

**C.** **Attorney for United States:**

I accept and agree to this Plea Agreement on behalf of the government.

Dated: *1/24/2020*

McGREGOR W. SCOTT
United States Attorney

ANDRE M. ESPINOSA
Assistant United States Attorney

PLEA AGREEMENT                    17

EXHIBIT "A"
Factual Basis for Plea

### The Carpoffs' Ponzi-like scheme

From December 2009 through January 2019, Jeff Carpoff and Paulette Carpoff, husband and wife, owned and operated two closely related business entities, DC Solar Solutions, Inc. ("Solutions") and DC Solar Distribution, Inc. ("Distribution") (collectively "DC Solar"). While starting as a legitimate business, by at least 2011, DC Solar operated a Ponzi-like scheme that defrauded investors of approximately $1 billion through material misrepresentations and omissions related to the offer and sale of investments designed to generate profit and trigger significant tax benefits for investors. The conspirators induced victims to enter investment transactions organized around the manufacture and sale of solar energy equipment by Solutions, which the investors leased back to Distribution. The transactions imposed debt obligations on the investors in exchange for valuable tax benefits. As part of the transactions, Distribution promised to cover those debt obligations by earning revenue from sub-leasing the solar equipment to others. Yet Distribution never secured significant sub-leases or never earned more than a tiny percentage of the debt obligations it agreed to cover. As a result, the conspirators used Ponzi-like transfers of money paid by new investors to cover the obligations of existing investors, eventually causing massive losses. Between mid-2016 and February 2019, the headquarters for DC Solar was located in Benicia, California, in the Eastern District of California.

Jeff Carpoff ("Jeff") was the owner and operator of Solutions, and the Chief Executive Officer of DC Solar. Jeff organized and directed the conspiracy from its start in approximately March 2011, though December 2018. Jeff personally undertook and directed others to undertake acts intended to mislead investors about material facts, to conceal those lies, and to lull victims of the fraud. Among other things, Jeff: (a) caused the dissemination of materially false information to victims to induce them to invest in transactions with DC Solar and to lull them after those deals closed; (b) caused the use of later investor money to pay existing investor obligations arising out of the fraudulent transactions; (c) participated in an accounting fraud to conceal the Ponzi-like operation of DC Solar's transactions from victims and others; and (d) paid co-conspirators large sums to advance and conceal the conspiracy, including paying two co-conspirators over $1 million each for false contracts to deliver to investors.

Although they were co-conspirators, Jeff sometimes hid transactions related to the fraud from Paulette and sometimes instructed individuals not to discuss certain aspects of the fraud with her.

Paulette Carpoff ("Paulette") was the owner and operator of Distribution, and the Chief Operations Officer of DC Solar. Paulette worked with Jeff to initiate and advance the conspiracy. Paulette personally undertook and directed others to undertake acts intended to mislead investors about material facts, to conceal those lies, and to lull victims of the fraud. Among other things, Paulette: (a) made and directed periodic, Ponzi-like transfers of new investor money to cover the debt obligations for existing investors; (b) managed transfers from Solutions to certain third-party lessees to create the appearance of legitimate lease agreements between those third party lessees and the investor in Fund 9; caused a co-conspirator to make and deliver false Commissioning Reports that certified the existence of some of the solar equipment the conspirators sold to investors but never built; and (c) concealed the false nature of those Commissioning Reports and the true operation of DC Solar's Ponzi-like scheme from investors and others.

Acts by Jeff and Paulette Carpoff, and acts by their co-conspirators, caused the execution of dozens of interstate wire transfers of payments from victims of the fraud to accounts Jeff and Paulette Carpoff controlled, totaling approximately $1 billion. Jeff and Paulette Carpoff used that money to support their lavish lifestyle during the nearly eight-year conspiracy. Among other things, the Carpoffs used proceeds of their fraud to purchase and invest in more than 150 luxury and collector vehicles, luxury real estate in Lake Tahoe, Las Vegas, the Caribbean, Cabo San Lucas, Mexico, and elsewhere, a suite at a professional football stadium, a subscription private jet service, and jewelry. The Carpoffs also used fraud proceeds to pay for a minor-league professional baseball team, a NASCAR racecar sponsorship, a 2018 performance by an internationally known recording artist at a DC Solar holiday party, and to make illicit payments to co-conspirators and others. The Carpoffs not only made victims of their corporate investor clients but also committed tax fraud based on tax benefits the Carpoff caused those investors to pursue, knowing their fraudulent transactions did not support application of those benefits.

///

///

**The Fraud Scheme**

44

1      **A.**     **DC Solar sells MSGs to generate profit and to trigger tax benefits.**

2      Directly and through subcontractors, DC Solar built mobile solar generators ("MSGs"),

3 consisting primarily of solar panels placed on a wheeled-trailer. Distribution purported to lease those

4 MSGs to third parties, including negotiating lease agreements and collecting payments. Jeff Carpoff and

5 others acting at his direction touted the versatility of MSGs, and claimed there was a substantial market

6 demand for MSGs.

7      DC Solar, through Jeff Carpoff, his co-conspirators, and others acting at their direction, solicited

8 money from investors to purchase MSGs. A primary claim made to investors was that the purchase of

9 MSGs carried favorable tax consequences, in addition to a small profit stream. The tax benefits

10 included tax credits available for investment in alternative energy sources that permitted purchasers to

11 claim tax credits of up to approximately 30% of the total investment, and permitted deductions for the

12 depreciation of MSGs over a 5-year period. These tax benefits were significant. DC Solar structured

13 transactions with investors to maximize the tax benefits. Among other deals, DC Solar sold MSGs to

14 limited liability companies created specifically for such transactions. These companies were investment

15 funds, sometimes called tax-equity funds, permitted under the federal tax code ("Funds").

16      **B.**     **Transaction financing structure and the materiality of promised lease revenue.**

17      Through the Funds, investors purchased MSGs from Solutions for $150,000 per MSG.

18 Typically, investors paid approximately $45,000 per MSG in cash—approximately 30% of the overall

19 unit price—and financed the balance with Solutions. The $45,000-per-unit price was the maximum

20 amount of the tax credit investors could claim per unit. The transactions were structured so investors

21 could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to Solutions, per

22 MSG. Investors could also claim depreciation for each MSG, for five years. To complete the

23 transactions, the Funds delivered promissory notes to pay Solutions the remaining approximately 70% of

24 the sales prices over time. DC Solar promised to pay off the investors' note obligations with revenues

25 generated by the lease of MSGs by Distribution to third parties.

26      Pursuant to offers pitched to investors by Jeff Carpoff, his co-conspirators, and others acting at

27 their direction, the Funds leased the MSGs purchased in each transaction to Distribution which, under

28 the management of Paulette Carpoff, purported to lease the MSGs to third parties. Distribution was

supposed to receive money from those third parties through lease payments. After deducting certain

fees, Distribution was to transfer the majority of the lease revenue to accounts for the Funds. The manager of the investment funds was to use the lease revenue sent by Distribution to pay the periodic obligations on the notes held by Solutions, with a small profit paid to investors when applicable.[1]

The purported lease revenue from third parties was a material component of the transactions. First, that projected lease revenue was a factor in valuing the MSGs at $150,000 per unit. Second, the lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the purchase price for the MSGs. Based on sales pitches by Jeff Carpoff, his co-conspirators, and others acting at his direction, investors were primarily interested in the tax benefits offered through each transaction and not actual ownership of the MSGs. However, because the tax credits were capped at 30% of the value of the overall transaction, paying anything more than 30% of that value would diminish the tax benefits—*i.e.*, the investors would pay more than the value of the tax credits. By paying off the 70% balance of the purchase price through revenue generated by leases Distribution promised to generate from third parties, investors maximized the tax benefits without incurring more debt or cost. Failure of that mechanism after investors executed transactions would result in default on the notes, collapse of the transactions, and failure of the tax credits.

   C.   **Purportedly independent certification of the construction and operation of MSGs.**

Because DC Solar promised to lease MSGs associated with each transaction to third parties— through Distribution—with little direct participation from the Funds or investors, the Funds and investors did not take physical possession of those MSGs. Rather, DC Solar represented to the Funds and investors that it built MSGs for each transaction and those MSGs operated in a manner consistent with regulations governing application of the tax credits the investors sought. DC Solar made those representations through written Commissioning Reports, purportedly prepared by an independent engineer after a multi-point inspection of each MSG in each transaction. Jeff Carpoff and Paulette Carpoff, their co-conspirators, and others acting at their direction caused those Commissioning Reports to include materially false information and to be delivered to investors. In some instances, investors

---

[1] DC Solar also closed a variant of these tax-equity transactions that did not include financing through Solutions. Rather, in those sale-leaseback transactions, investors purchased MSGs outright, or relied on outside financing. In other material respects, the transactions mirrored the primary tax-equity transactions, including the management of third-party lease contracts by Distribution, availability of post-transaction tax benefits, and a profit stream. Instead of using third-party lease revenue to pay a note obligation to Solutions, the purported revenue was paid to the investor.

1    required completed Commissioning Reports as conditions for payment to support the transactions.  In

2    other instances, the conspirators caused delivery of the Commissioning Reports after payment to lull

3    investors to believe their MSGs existed and operated as required under the terms of the transactions.

4         **D.     Approximate investments and tax benefit totals associated with the transactions.**

5         Between March 2011 and December 18, 2019, at least twelve investors entered into transactions

6    with DC Solar through approximately thirty-four Funds.  Some investors invested through more than

7    one Fund.  The investors, through the Funds, collectively deposited by interstate wire transfer

8    approximately $759,400,000 into bank accounts for the Funds established for the transactions.  Further,

9    several financial institutions and other investors transferred collectively $152,700,000 to DC Solar as

10   part of related transactions for the purchase and lease of MSGs.  In total, DC Solar closed transactions

11   with Funds and others that contributed an aggregate of more than $912,000,000 to purchase MSGs.

12   Those transactions purportedly involved approximately 17,000 MSGs, at approximately $2.5 billion in

13   purported value.

14        Many investors have claimed tax credits and depreciation in connection with the transactions

15   premised on the revenue allegedly being earned by Distribution's leases of the MSGs to third parties.

16   The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax

17   year, is approximately $902,000,000.  This figure does not account for approximately $167,000,000 that

18   investors paid into tax equity transactions in 2018.

19        **E.     Operation of the "flip" deals that followed the tax equity transactions.**

20        The DC Solar structured nearly all of the tax-equity transaction so the investors owned 99% of

21   the associated Fund and the fund manager owned 1% of the Fund.  After five years, the ownership

22   structure flipped, with the fund manager owning 95% of the Fund and the investors owning 5%.  After

23   five years, investors had the option of selling their 5% ownership interest in the Fund to the fund

24   manager, and divesting their ownership interest in the MSGs.  This appealed to many investors because,

25   after five years, they could extract no further tax benefit from ownership of the MSGs.

26        At the end of a five-year term of a tax-equity transaction, DC Solar would arrange to sell certain

27   existing MSGs from those transactions to buyers in "flip" deals.  In one such transaction, Jeff Carpoff

28   and his co-conspirators, including Paulette Carpoff, and others acting at their direction, brokered a "flip"

     deal with A Group and K Bank.  As part of that transaction, K Bank provided $27 million to A Group, a

1   private equity group, to finance the purchase of approximately 416 MSGs that were owned by two

2   Funds through earlier tax-equity transactions.  The $27 million from K Bank represented approximately

3   80% of the overall transaction.  A Group investors contributed the balance of the purchase price.  The

4   deal was completed through a special purpose entity called S-Sense.

5          Jeff Carpoff and his co-conspirators, including Paulette Carpoff, and others acting at their

6   direction, represented to A Group and K Bank that the 416 MSGs were leased to Telecom Company A

7   as part of an approximately 10-year fixed amount contract between Telecom Company A and

8   Distribution.  After the sale, S-Sense leased the MSGs back to Distribution to continue leasing them to

9   Telecom Company A as part of the purported existing contract between them.  Thereafter, DC Solar

10  assigned purported lease revenue generated by that lease with Telecom Company A to S-Sense as a

11  revenue and profit stream.

12         **F.     DC Solar's tax equity and other transactions were fraudulent.**

13         Jeff Carpoff, Paulette Carpoff, and their co-conspirators operated DC Solar as a Ponzi-like

14  scheme.  The conspirators knowingly misrepresented the existence of lease revenue from third parties—

15  an integral component in all of DC Solar's transactions—and caused others to unwittingly do so.  In

16  particular, the conspirators claimed Distribution generated tens of millions of dollars in lease revenue

17  from third parties, from long-term and short-term agreements with those third parties.  Over 90% of the

18  money Distribution claimed as lease revenue and which it used to pay the Funds' note obligations and

19  other payments to investors was actually derived from transfers of cash contributed to Solutions by later

20  investors in tax-equity and other transactions.  Solutions had nearly no other significant sources of

21  revenue.  Solutions was the primary source of income for Distribution, providing no less than

22  approximately 94% of all of the purported revenue Distribution claimed.  Thus, DC Solar merely paid

23  obligations due to older investors with money raised from those investors and later investors—contrary

24  to representations to investors made by Jeff Carpoff, Paulette Carpoff, their co-conspirators, and those

25  acting at their direction, that third-party lease revenue would pay those obligations.  Certain of

26  Distribution's existing third-party lease agreements were supported with separate side-agreements,

27  pursuant to which Solutions paid investor money to third parties, which the third parties returned in the

28  form of lease revenue.  These payments required approval by Paulette Carpoff.  Specifically, on or about

    July 21, 2015, and on or about November 2, 2015, Paulette Carpoff authorized and caused payments

from Solutions to KMHS, a third-party equipment rental company that purported to be leasing MSGs

sold to the investors in Fund 9. Paulette Carpoff authorized and caused those and other similar

payments to create the appearance of a legitimate third-party lease supporting the Fund 9 tax equity

transactions when she knew there was no such legitimate lease.

The co-conspirators, including Jeff Carpoff and others acting at his direction, concealed the

absence of third-party lease revenue from investors through, among other means, false financial

statements they knowingly shared with investors.

**G.    The A Group/K Bank "flip" deal transaction was fraudulent.**

The A Group/K Bank "flip" deal was also a fraud. Contrary to representation made by Jeff

Carpoff, his co-conspirators, and others acting at their direction, the purported "fixed-term lease"

between Telecom Company A and Distribution that supported the transaction was false. Jeff Carpoff

paid two conspirators $1m each for the false contract. In truth, certain as-needed leases with Telecom

Company A generated only a fraction of the millions in annual revenue Jeff Carpoff and his co-

conspirators claimed supported the A Group/K Bank deal. The overwhelming majority of that purported

revenue derived from intercompany transfers of tax-equity investor money from Solutions to

Distribution. In support of the transaction, and in furtherance of the fraud, Jeff Carpoff and his co-

conspirators knowingly caused a fraudulent estoppel agreement to be delivered to A Group/K Bank in

support of the transaction, which purported to assign lease revenue to A Group/K Bank, when that lease

agreement and the purported revenue associated with it did not exist.

**H.    The December 2018 searches and asset seizures, DC Solar's bankruptcy, and the MSG audit by investor-victims.**

In December 2018, law enforcement agents executed search warrants at DC Solar's headquarters

and elsewhere. Agents also executed over 150 asset seizure warrants, resulting the seizure of

approximately $60,000,000 in personal property and liquid assets derived from the fraud. During

execution of those warrants, agents recovered approximately $1.7 million in cash in Jeff Carpoff's office

safe and over $150,000 in cash in other locations throughout the office suite.

In February 2019, DC Solar entered Chapter 11 bankruptcy. Thereafter, certain investor-victims

financed an independent audit of the existence and location of all MSGs DC Solar sold, based on

information that DC Solar had not built the total number of MSGs it represented to investors were part

1  of the tax-equity and other transactions.  The audit confirmed the existence of approximately only 6,000
2  MSGs from the approximately 17,000 MSGs associated with sales to Funds in approximately thirty-four
3  tax-equity and other transactions.  Among others, none of the approximately 2,280 MSGs associated
4  with Fund 29, involving over $100,000,000 in cash paid by an investor in or about May 2017, were
5  located in the investor-victim audit.  Additionally, only approximately eighty-one of the 2,280 MSGs
6  associated with Fund 33, involving more than $90,000,000 in cash paid by the same investor in or about
7  July 2018, were located in the investor-victim audit.  Between November 30, 2016, and December 2018,
8  DC Solar closed tax equity transactions with investors in ten Funds, which paid more than $400 million
9  for approximately 9,155 MSGs.  The investor-victim audit recovered only 138 of those 9,155 MSGs.  In
10 spring 2018, Jeff Carpoff, in the presence of Paulette Carpoff, discussed with a co-conspirator an "exit
11 strategy" from the consequences of causing thousands of false Commissioning Reports to be delivered
12 to investors, including a plan to conceal the non-existent MSGs through buying them back and selling
13 the parts in false "paper" transactions.

14 **II.    Additional Specific Fast Supporting the Defendant's Guilty Plea**

15 **A.    The fraud conspiracy caused interstate wires transfers.**

16 Jeff Carpoff agrees that his conduct discussed herein, and that of his co-conspirators, caused
17 interstate wire communications in furtherance of the fraud scheme from investors and others, including
18 interstate Fedwire deposits of money from the investor-victim in the Fund 30 transaction, P Company,
19 based in Ohio, to bank accounts in California controlled by DC Solar.  Those interstate wire transactions
20 were reasonably foreseeable and include, among others, those set forth in the below table:

21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

| Company Bank | Account No. | Date | Deposit Amount | Payor |
|---|---|---|---|---|
| H Bank | 5773XXX | 5/17/2017 | $15,063,692 | P Company |
| H Bank | 5773XXX | 7/20/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/24/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/29/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 9/25/2017 | $10,224,225 | P Company |
| H Bank | ending 2481 | 7/31/2017 | $14,744,692.31 | S-Sense related |
| H Bank | ending 2481 | 7/31/2017 | $3,753,307.69 | S-Sense related |
| H Bank | ending 2499 | 7/31/2017 | $12,638,307.69 | S-Sense related |
| H Bank | ending 2499 | 7/31/2017 | $3,201,692.31 | S-Sense related |

**B.    The conspiracy fueled countless monetary transactions in proceed of the fraud.**

Jeff Carpoff agrees that he knowingly engaged in and directed monetary transactions involving proceeds from the fraud conspiracy in amounts greater than $10,000, and that he knew that those transactions were, in fact, derived from the fraud conspiracy in which he participated. Those transactions also occurred in the United States. Those transactions include, among others, those set forth in the below table:

///

///

///

///

///

///

///

///

///

///

///

51

| Approximate Date | Description |
|---|---|
| January 23, 2017 | Deposit of a check (#298) for approximately $1,648,350 from an H Bank account ending in 3202, to support the purchase of luxury and collector vehicles at auction. |
| February 27, 2017 | Wire transfer of approximately $100,406.10 from an H Bank account ending in 2416, to support the purchase of a private jet travel. |
| May 15, 2017 | Deposit of a check (#315) for approximately $49,795 from an H Bank account ending in 2416, to support the purchase of jewelry. |
| June 16, 2017 | Wire transfer of approximately $3,572,979.47 from a CTB Bank account ending in 3430, to support the purchase of real property in Lake Tahoe, California. |
| August 7, 2017 | Wire transfer of approximately $500,000 from an H Bank account ending in 2416, to co-conspirator Ronald Roach. |
| August 7, 2017 | Wire transfer of approximately $500,000 from an H Bank account ending in 2416, to co-conspirator Individual 3. |
| August 11, 2017 | Wire transfer of approximately $350,000 from an H Bank account ending in 2416, to co-conspirator Individual 6. |
| August 22, 2017 | Wire transfer of approximately $350,000 from an H Bank account ending in 2416, to co-conspirator Ryan Guidry. |
| August 23, 2017 | Deposit of a check (#298) for approximately $135,508.88 from an H Bank account ending in 3202, to support the purchase of a 2018 Bentley Continental. |
| November 24, 2017 | Deposit of a check (#105) for approximately $1,000,000 from a JPM Bank account ending in 2373, to support the purchase of a 2007 Ford Shelby Super Snake. |
| December 20, 2017 | Wire transfer of approximately $522,598.07 from a CTB Bank account ending in 2542, to support the purchase of real property in Martinez, California. |
| June 8, 2018 | Wire transfer of approximately $939,208.48 from a CTB Bank account ending in 2732, to support the purchase of real property in Scottsdale, Arizona. |
| July 3, 2018 | Wire transfer of approximately $782,949, from a CTB Bank account ending in 1916, to support the purchase of a private suite at a professional football stadium. |
| August 31, 2018 | Wire transfer of approximately $1,056,562.12 from a CTB Bank account ending in 2542, to support the purchase of real property in Lafayette, California. |
| December 14, 2018 | Wire transfer of approximately $350,000 from a CTB Bank account ending in 1916, to pay an internationally known rapper to perform at a DC Solar holiday party. |

*I have read and carefully reviewed the Factual Basis for Plea with my attorney. I agree that as it concerns my conduct it is correct. I also agree that if this matter proceeded to trial, the United States could establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the offense to which I am pleading guilty.*

Dated: 1-22-20

JEFF CARPOFF
Defendant

# EXHIBIT B


RECEIVED AND FILED
2019 MAR -4 PM 12: 10
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | DC Solar Solutions, Inc |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | _____ District of Nevada _____ |
| Case number | 19-50130 |

## Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1: Identify the Claim

**1. Who is the current creditor?**

Nixon Peabody LLP
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Robert N. H. Christmas, Esq.
Name

Nixon Peabody LLP, 55 West 46th St., 25th Fl.
Number        Street

New York              NY        10036
City                   State      ZIP Code

Contact phone  212-940-3103

Contact email  rchristmas@nixonpeabody.com

Where should payments to the creditor be sent? (if different)

Nixon Peabody LLP (attn.: Diane Gerardi)
Name

50 Jericho Quadrangle, Suite 300
Number        Street

Jericho               NY        11753
City                   State      ZIP Code

Contact phone  516-832-7526

Contact email  dgerardi@nixonpeabody.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____      Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __0__ __5__ __9__ __2__

**7. How much is the claim?**  $ _____ 111,223.95 .  Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Legal services _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410    Proof of Claim    page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3: Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 02 / 25 / 2019
           MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Robert N. H. Christmas, Esq. |
| | First name      Middle name      Last name |
| Title | Partner |
| Company | Nixon Peabody LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 55 West 46th Street, 25th Floor |
| | Number      Street |
| | New York      NY      10036 |
| | City      State      ZIP Code |
| Contact phone | 212-940-3103      Email rchristmas@nixonpeabody.com |

---



**FEDERAL I.D. NO. 16-0764720**

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

677 Broadway
10th Floor
Albany, NY 12207
(518) 427-2650
Fax: (518) 427-2666

DC Solar Solutions MFG, Inc.
4901 Park Road
Benicia, CA 94510

February 22, 2019

Client No.: **059202**
Client Attorney: **Richard M. Cogen**

Chapter 11 Filed 2/3/19
Case#19-50130
District of Nevada

## ACCOUNT STATEMENT

| Invoice Date | Invoice Number | Amount Billed | Paid/Credit | Amount Unpaid |
|---|---|---|---|---|
| 1/14/2019 | 10044073 | 57,653.55 | 0.00 | 57,653.55 |
| 1/14/2019 | 10044076 | 28,926.90 | 0.00 | 28,926.90 |
| 2/13/2019 | 10058971 | 24,643.50 | 0.00 | 24,643.50 |
| **Balance Total:** | | $111,223.95 | $0.00 | $111,223.95 |

THESE INVOICES ARE FOR LEGAL SERVICES, AND THEY ARE CONFIDENTIAL AND SUBJECT TO
ATTORNEY-CLIENT AND OTHER APPLICABLE PRIVILEGES.

# EXHIBIT C

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/26/2020 11:28 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Barel,Deputy Clerk

**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810        Facsimile:  602-606-2811

Brian J. Foster, Arizona Bar Number 012143 (*pro hac vice pending*)
Ross P. Meyer, Arizona Bar Number 028473 (*pro hac vice pending*)
admin@wb-law.com
*Attorneys for Plaintiffs*

Howard King, California Bar Number 77012
John Snow, California Bar Number 280790
**KING, HOLMES, PATERNO & SORIANO, LLP**
1900 Avenue of the Stars
Twenty Fifth Floor
Los Angeles, CA 90067
Phone: 310-282-8989
Email: **JSnow@kphslaw.com**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| **SOLARMORE MANAGEMENT SERVICES, INC., a California corporation; CARL AND BARBARA JANSEN, a married couple,**<br><br>Plaintiffs,<br><br>vs.<br><br>**NIXON PEABODY, LLP, a New York limited liability partnership; FORREST DAVID MILDER, a married individual,**<br><br>**Defendants.** | **Case No.**  20STCV32546<br><br>**COMPLAINT**<br><br>**(Breach of Fiduciary Duty, Breach of Contract, Unjust Enrichment, Negligent Misrepresentation, Legal Malpractice, and Aiding and Abetting)**<br><br>**(Jury Trial Requested)** |

1                                   **PRELIMINARY STATEMENT**

2       Plaintiffs' claims arise from a fraud scheme that eventually resulted in the losses of $2

3 billion to innocent purchasers, who thought they had purchased mobile solar energy generators

4 qualifying for valid and significant tax benefits.

5       One scheme provided that DC Solar Solutions would build and sell mobile solar

6 generators ("MSGs") to Funds, which were invested in by Purchasing Members. The Purchasing

7 Members provided the Funds with money that equaled $150,000 for each MSG the Fund would

8 purchase from DC Solar Solutions. Typically, the Fund would make a thirty percent down

9 payment to DC Solar Solutions, which Nixon Peabody and Forrest Milder stated would qualify

10 for alternative energy tax credits. The Funds would then execute a Promissory Note in favor of

11 DC Solar Solutions, which would be paid over the course of twenty years, during which the

12 Funds would be permitted to depreciate the MSGs on favorable tax terms. However, the sale of

13 the MSGs and resulting tax credits proved to be a sham. In reality, there was no true market for

14 the MSGs sold to the Fund and the $150,000 sale price was grossly overstated.

15       Nixon Peabody and Forrest Milder were directly involved in the DC Solar scheme by

16 providing Tax Opinions to the Funds, including the Purchasing Member, to encourage them to

17 execute the agreements that enabled the transactions described above. As Solarmore

18 Management's attorneys, Nixon Peabody and Forrest Milder owed the Plaintiffs a fiduciary

19 duty. Nixon Peabody and Forrest Milder were aware that the stated value of the MSGs was less

20 than presented to the Funds because the Internal Revenue Service initiated an audit of some of

21 the Funds as early as 2013. However, rather than alert each of the involved parties, including

22 their clients, the Plaintiffs, Nixon Peabody and Forrest Milder, in conjunction with DC Solar

23 Affiliates and the Principals, took steps to ensure Carl Jansen would become the hundred

24 percent owner of Solarmore Management, which was the manager of and held an interest in the

25

1   Funds. The Defendants wanted Jeff Carpoff to no longer be associated with Solarmore

2   Management so the Tax Opinions could state that an uninterested third party, Carl Jansen, was

3   the sole owner of Solarmore Management, rather than Jeff Carpoff or Paulette Carpoff, which

4   were the owners of DC Solar and its affiliates. However, this action did not resolve the issues

5   surrounding the manufactured sales price of the MSGs, the lack of lease revenues, or the

6   inability of the Funds to receive the benefit of the Tax Credits.

7           As a result, Nixon Peabody and Milder were able to continue to generate substantial legal

8   fees as a result of continuing the DC Solar schemes and cause enormous damages to the

9   Plaintiffs. Plaintiffs, for its complaint against Defendants, allege as follows:

10                                      **THE PARTIES**

11          1.      Solarmore  Management  Services,  Inc.  ("**Solarmore  Management**")  is  a

12   California corporation authorized to do and doing business in California in the county of Los

13   Angeles. Solarmore Management is currently owned and managed by Carl Jansen ("**Jansen**")

14   (Solarmore and Jansen are collectively the "**Plaintiffs**").

15          2.      Jansen and Barbara Jansen ("**Jansen's Wife**") are a married couple residing in

16   Illinois and doing business in the state of California in the county of Los Angeles.

17          3.      Until December 12, 2019, Solarmore Management was the managing member of

18   the following California limited liability companies, which are collectively referred to as the

19   "**Solar Funds**" or the "**Purchasers**" and generally referred to as the "**Funds**."

20                  a.   Solar Eclipse Investment Fund V, LLC

21                  b.   Solar Eclipse Investment Fund VI, LLC

22                  c.   Solar Eclipse Investment Fund VII, LLC

23                  d.   Solar Eclipse Investment Fund VIII, LLC

24                  e.   Solar Eclipse Investment Fund X, LLC

25                  f.   Solar Eclipse Investment Fund XI, LLC



g. Solar Eclipse Investment Fund XII, LLC

h. Solar Eclipse Investment Fund XIV, LLC

i. Solar Eclipse Investment Fund XV, LLC

j. Solar Eclipse Investment Fund XVI, LLC

k. Solar Eclipse Investment Fund XVII, LLC

l. Solar Eclipse Investment Fund XVIII, LLC

m. Solar Eclipse Investment Fund XIX, LLC

n. Solar Eclipse Investment Fund XXI, LLC

o. Solar Eclipse Investment Fund XXII, LLC

p. Solar Eclipse Investment Fund XXIII, LLC

q. Solar Eclipse Investment Fund XXIV, LLC

r. Solar Eclipse Investment Fund XXVI, LLC

s. Solar Eclipse Investment Fund XXVIII, LLC

t. Solar Eclipse Investment Fund XXXI, LLC

4.  Solarmore Management is currently the 1% owner in each of the Solar Funds except for Solar Eclipse Investment Fund V, Solar Eclipse Investment Fund VI, Solar Eclipse Investment Fund VII, Solar Eclipse Investment Fund X, Solar Eclipse Investment Fund XI, and Solar Eclipse Investment Fund XII in which Solarmore is the 95% owner.

5.  The Solar Funds are tax-equity funds permitted under the Internal Revenue Code (the "**Code**" or "**IRC**"), created specifically for the purpose of owning mobile solar generators ("**MSGs**").

6.  Along with the managing member of the Solar Funds, which was Solarmore Management up to December 12, 2019, each Fund has a purchasing member or members, which provided money to purchase the MSGs.

7.  As of December 18, 2019, Solarmore Management consented to resignation as managing member of the Funds but remains a member of the Funds.

8.      Nixon Peabody LLP ("**Nixon**") is a New York limited liability partnership doing business in California in the county of Los Angeles.

9.      Forrest David Milder ("**Milder**") is an attorney and partner of Nixon at its Boston, Massachusetts office and doing business in California in the county of Los Angeles.

## JURISDICTION & VENUE

10.     This Court has subject-matter jurisdiction over Plaintiffs' claims because the claims arise under the laws of the State of California.

11.     This Court has personal-matter jurisdiction, as each of the Parties are either California entities or persons doing business in California in the county of Los Angeles.

12.     Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

    a.  Transacted business in California in the county of Los Angeles;

    b.  Contracted to supply or obtain services in California in the county of Los Angeles;

    c.  Availed themselves intentionally of the benefits of doing business in California in the county of Los Angeles;

    d.  Produced, promoted, sold, and/or distributed their products or services in California in the county of Los Angeles, and thereby have purposefully profited from their access to markets in California in the county of Los Angeles; and

    e.  Caused tortious damage by act or omission in California in the county of Los Angeles.

13.     Venue is proper in this Court under Code of Civil Procedure section ("§") 395.5.

. . .

. . .

**FACTUAL ALLEGATIONS**

14.    Mike Silva ("**Silva**") formed DC Solar Solutions Mfg., Inc. on or around July 30, 2009 in California.

15.    Jeff Carpoff ("**Carpoff**") and Paulette Carpoff (collectively the "**Carpoffs**") formed DC Solar Solutions, Inc. on or around September 29, 2010 in California.

16.    The Carpoffs were involved with DC Solar Solutions Mfg., Inc. from its inception.

17.    On or around March 5, 2012, DC Solar Solutions Mfg., Inc. changed its name to DC Solar Solutions, Inc. (each is referred to as "**DC Solar Solutions**") and filed documents with the California Secretary of State stating that Carpoff was its president and Paulette Carpoff was its secretary.

18.    The Carpoffs incorporated DC Solar Distribution, Inc. ("**DC Solar Distribution**") in California on or around September 29, 2010.

19.    In or about 2010, DC Solar Solutions created the first Funds, Solar Eclipse Investment Fund, LLC and Solar Eclipse Investment Fund III, LLC, each California limited liability companies, to own MSGs and solicit MSG purchases for tax benefits.

20.    Solarmore Management Services, Inc. ("**Solarmore Management**") is a California corporation that was formed on or around November 7, 2013, by Carpoff.

21.    Around the time of Solarmore Management's formation, Carl Jansen ("**Jansen**") came to hold a twenty-one percent membership interest, while Carpoff continued to hold the remaining seventy-nine percent.

**1.  Nixon and Carpoff's Method Behind the Solar Eclipse Investment Funds**

**A.  Generally**

22.    The Carpoffs would create investment funds (e.g., Solar Eclipse Investment Fund V-VIII, X-XII, XIV-XIX, XXI-XXIV, XXVI, XXVIII, XXXI) (generally referred to as the

WILENCHIK & BARTNESS
A PROFESSIONAL CORPORATION

"**Fund**"), which would permit the investors to own a significant portion of the Fund ("**Purchasing Member(s)**"), and would purchase MSGs from DC Solar Solutions that were then leased to DC Solar Distribution, which would allegedly re-lease the MSGs to generate revenue, which would pay the Fund for the lease that would repay the loan from DC Solar Solutions.

23.     After the first few Funds were established, Solarmore Management was created to manage the Funds that purchased MSGs.

24.     In managing the Funds, Solarmore Management would own 1% of each Fund, while the Purchasing Member would own the remaining 99% of the Fund. After five years, and the expiration of the tax benefits, the ownership would flip and Solarmore Management would own 95% of the Fund ("**Flip Event**").

25.     For its 1% interest in each Fund, Solarmore Management paid DC Solar Solutions valuable consideration.

### B. **The Process for Ensuring Investment into the Solar Eclipse Investment Funds**

26.     The Purchasing Member would typically make a 30% down payment of the total purchase amount to DC Solar Solutions on the MSG, through the Fund entity, which were sold for $150,000 each. For example, if a $28,800,000 total purchase price was negotiated for the MSGs, the Purchasing Member would originally make a down payment in the amount of $7,200,000 to the individual fund, which was provided to DC Solar Solutions, and then hold a $21,600,000 promissory note, which was payable over different terms to DC Solar Solutions.

27.     Purchasing Members could then, immediately, claim a dollar-for-dollar tax credit based upon 30% of the $150,000 price. Purchasing Members could also claim depreciation for each MSG for the next five years. These tax benefits were significant and amounted to hundreds of millions of dollars across the Funds.

28.     In arranging the transactions, Purchasing Members executed a standard package of agreements, including: (i) a Limited Liability Company Agreement ("**LLC Agreement**"); (ii) a Solar Equipment Purchase Agreement ("**Purchase Agreement**"); (iii) a Secured Promissory Note ("**Promissory Note**"); and (iv) a Mobile Solar Equipment Lease ("**Equipment Lease**") (together the "**Fraud Contracts**").

29.     Nixon prepared tax opinion letters (generally referred to as "**Tax Opinion(s)**") confirming that the MSGs qualified for the "Energy Credit" under IRC § 48 to be provided to the Purchasing Member prior to execution of the Fraud Contracts.

30.     IRC § 48 allows for a thirty percent tax credit for certain energy-related investments (hereinafter, the "Tax Credit" or the "Credit").

31.     Thus, Purchasing Members expected to be able to take a Tax Credit for roughly the same amount as their cash contribution to the Fund.

32.     The Tax Opinions indicated that the proposed structure and agreements would provide the Purchasing Member five years of Tax Credits.

33.     The Tax Opinions each stated "that the allocations of income, gain, deduction, loss and credit as set forth in the Company Agreement, including the shift from 99:1 to 5:95, should be considered neither shifting nor transitory and should pass an 'overall substantiality' test within the meaning of Section 1.704-1(b)(2)(iii) of the Regulations and should therefore be considered to have substantial economic effect and should therefore be respected."

34.     Further, the Tax Opinions provided "we are of the view that such diligent efforts [to lease the MSGs] should ensure that the Mobile Solar Facilities continue to be eligible for the Energy Credits (and thus, not subject to recapture), notwithstanding that such Mobile Solar Facilities are not continuously in use."

35.     Nixon and Milder were aware and knew that the Tax Opinions would be provided to the Purchasing Members to ensure they were comfortable with the prospect of the Tax Credits and to indicate that the benefits were available to the Purchasing Members.

36.     The Tax Opinions provided that "For the period beginning after the Flip Date (the end of the year which is the fifth anniversary of the Company placing all the Mobile Solar Facilities in service), the allocations of profits, losses and tax credits to the [Purchasing Member] will be changed to 5% of profits, losses and tax credits for all income of the Company and 95% to [Solarmore Management]."

37.     The Tax Opinions stated Nixon was counsel or acted as counsel to Solarmore Management, DC Solar Solutions, and DC Solar Distribution.

38.     Nixon and Milder invoiced Solarmore Management at least $608,016 for its preparation of the Tax Opinions.

39.     Solarmore Management paid these invoices to its attorneys at Nixon.

40.     Through the Fraud Contracts, DC Solar Distribution promised that it would arrange to sub-lease the MSGs to end-users.

41.     The revenue from these sub-leases was essential for the Funds to be able to repay the Promissory Notes to DC Solar Solutions and to justify the $150,000 purchase price of each MSG.

42.     While the Fraud Contracts were executed, Carpoff would execute the Purchase Agreement on behalf of DC Solar Solutions, while Paulette Carpoff would execute the Equipment Leases on behalf of DC Solar Distribution.

43.     While certain documents of the Fraud Contracts had minor variations in wording, all of the Fraud Contracts largely contained the same substantive terms.

44. Under the terms of the LLC Agreements, an investor became the Purchasing Member of an individual Fund, a special purpose LLC entity created specifically for the purchase of MSGs.

45. The Fund then purchased MSGs from DC Solar Solutions at a price of $150,000 per MSG under the Purchase Agreement.

46. The Purchase Agreement specified the total number of MSGs being purchased in that specific transaction, as well as the total purchase price.

47. An Exhibit to the Purchase Agreement contained a blank space for the VINs for the MSGs or stated that "VIN for each Generator [MSG] to be Supplied at Delivery."

48. In exchange for the specified payment, DC Solar Solutions agreed to deliver the MSGs by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

49. The delivery dates of the MSGs specified in the Purchase Agreements were occasionally scheduled in tranches.

50. The Purchase Agreements dictated that payments would be due to DC Solar Solutions in tranches according to a schedule in part dictated by capital contributions being made by the Purchasing Member under the terms of the LLC Agreement.

51. Those capital contributions were contingent on the Purchasing Members receiving confirmation that the Generators were "Placed in Service" as evidenced by an "IE [Independent Engineer] Certificate."

52. Purchasing Members generally contributed about thirty percent (30%) of the purchase price in cash and financed the balance pursuant to a Promissory Note(s) executed by the Fund in favor of DC Solar Solutions.

53. The Promissory Note was an exhibit to the Purchase Agreement.

10

**C. Knowledge of the Fraud**

54.     Forrest Milder ("**Milder**") is an attorney of Nixon, based in its Boston, Massachusetts office, and one of its "lead tax partners when it comes to tax credits and other tax-advantaged investments."

55.     Milder works "hard to stay at the forefront of the industries in which [he is] involved. For example [he is] very active in the Solar Energy Industry Association's Tax Committee, and [he] authored part of its recent proposal to the IRS on the solar tax credit regulations."

56.     Milder was often with Carpoff and the DC Solar affiliates in California, including Los Angeles.

57.     During this time in Los Angeles, California, Nixon and Milder worked to determine the best legal course for Carpoff and the DC Solar affiliates.

58.     Starting as early as 2013, red flags began emerging in the DC Solar affiliates' operations.

59.     For example, during this time DC Solar Solutions, the Funds, and the Carpoffs individually became subject of audits by the Internal Revenue Service ("**IRS**") and the State of California regarding income, sales, and franchise taxes.

60.     At the latest, Nixon was made aware of the 2013 IRS Audit in 2013, which raised significant issues with the structure and likelihood of the Purchasing Members and Funds receiving the Tax Credits.

61.     Milder responded to learning this information by stating, "An audit from the IRS? Is this even old enough to be audited?"

62.     In subsequent emails to the Carpoffs and others, (collectively, including Milder, the "**Principals**"), Milder informed the parties that he had spoken with Cherly Meder ("**Meder**")

of the IRS in an attempt to prevent a full fledged audit. Milder expressed that he and Meder had concerns about $25 million of tax deductions, while the company had no income.

63.     As of 2013, Nixon and Milder were aware that DC Solar Distribution had created or reported minimal revenue from the purported leases.

64.     The Principals then scheduled for Meder to visit the DC Solar affiliates' facilities.

65.     After the IRS investigation and 2013 Audit, the IRS issued a report on or around August 18, 2016 (the "**Report**"). The Report provided that "[t]he partnership entity that is the subject of this audit, Solar Eclipse Investment Fund III (Solar Eclipse) is a sham because it does not involve any meaningful risk or opportunity for gains. Similarly, The Sherwin-Williams Company was not a bona fide partner. Under both theories, substantially all items of credit and deduction are re-allocated to the managing partner, Solarmore Investments, Inc."

66.     The Report further provides, "This appraisal presents only a FMV valuation, and does not address cost basis. Because the latter is the only value allowable under these circumstances the A&M appraisal is categorically not applicable for calculating the IRC § 48 Tax Credit. Even if the FMV were allowable in this case, the A&M appraisal is unacceptable. The taxpayer (Solar Eclipse Investment Fund III, LLC) used a related-party circular transaction and an unacceptable appraisal to overstate the value of its energy property. The taxpayer purchased the property from a related party in a non-arms-length transaction. The purported purchase price was seller-financed and the repayment on the loan was financed by leases to parties related to the seller. Taxpayer's repayment of the loan does not represent a genuine economic outlay, and thus does not reflect an arms-length purchase price. The IRS has adjusted the taxpayer's basis in the energy."

67.     In discussing the actual basis, the IRS Report stated, "The taxpayer used its related-party purchase price of $150,000 per unit to calculate the tax credit. An IRS engineer has

made an independent estimate of the taxpayer's costs basis for one of these mobile solar generators. Exam estimates the taxpayer's cost basis of one unit was less than $25,000 per unit in that year. The IRS revenue agent and engineer have also looked for the best information of the property's cost basis, and find a credible cost basis for the set of 152 trailer units to be $2,496,000-or approximately $13,000 each, a lower unit cost due to economies of scale."

68.     While knowing this and that the 2013 Audit was under investigation and ongoing, Nixon and Milder continued to issue Tax Opinions with the same framework as the ones in question under the Report.

69.     For example, on November 29, 2016, Nixon and Milder issued a Tax Opinion with regards to Solar Eclipse Investment Fund XXVI, LLC. Within this opinion, Nixon stated "there is no litigation or governmental proceeding pending or threatened against or involving the Mobile Solar Facilities, the Company, the Managing Member, the Sponsor, the Lessee, the Investor Member, or any Affiliates of the foregoing, that would materially adversely affect the business of the Company or the condition of the Mobile Solar Facilities."

**D.  Nixon and Milder's Sleight of Hand to Skirt the Report**

70.     Nixon and Milder were made aware of significant issues through the 2013 Audit, which required a modification of the parties' relationship. The modification removed Carpoff as a 79% owner of Solarmore Management and had Jansen take this interest. The change permitted the Tax Opinions to state that the sponsor, DC Solar Solutions, Inc., was owned 100% by Carpoff, the Lessee, DC Solar Distribution, Inc., was owned 100% by Paulette Carpoff, and the Managing Member, Solarmore Management Services, Inc., was owned 100% by Jansen, "someone who is completely unrelated to the other parties to the transaction."

71.     On information and belief, Nixon and Milder were critical in ensuring this modification to the Solarmore Management occurred.

1    72.    This change occurred after the 2013 IRS Audit investigation began.

2    73.    Essentially, the Principals, including Nixon, attempted to ensure an unrelated party

3 to the transactions by having Jansen become the hundred percent owner of Solarmore

4 Management, which was the Managing Member of the Funds.

5    74.    On information and belief, Ronald Roach ("**Roach**"), the CPA and Accountant for

6 the DC Solar enterprise, and Nixon and Milder, the attorneys for the DC Solar affiliates,

7 evaluated the investigations of the 2013 IRS Audit and understood the problems associated with

8 Carpoff being associated on nearly all sides of the transactions.

9    75.    On information and belief, Nixon and Milder formulated a plan for a third party,

10 which ended up being Jansen, to become the 100% owner of Solarmore Management so that the

11 Tax Opinions could state, Solarmore Management was owned 100% by Jansen, "someone who

12 is completely unrelated to the other parties to the transaction."

13    76.    Roach approached Jansen in or around December 2014, and indicated that he

14 should take over Solarmore Management, as the one-hundred percent owner.

15    77.    On information and belief, Nixon and Milder were aware of Roach's approach as

16 an attempt for the DC Solar affiliates to skirt the issues presented in the Report.

17    78.    Jansen inquired as to the value of the MSGs because he was aware that Solarmore

18 Management would be responsible for the remaining balance of the Promissory Notes at the Flip

19 Event.

20    79.    Jansen was told that the MSGs would retain a significant amount of their value

21 after the Flip Event, which was above the loan balance still owed to DC Solar Solutions.

22    80.    The Principals ensured that Jansen was informed that the MSGs had a value in

23 excess of the remaining balance on the Promissory Notes plus $10,000 for each MSG.

24

25

81.     Therefore, of the 7,000 units the Funds would own, Jansen expected to be the owner of units, which would have a net value of $70,000,000.

82.     Unbeknownst to Jansen, however, Nixon and Milder were aware that the MSGs were not being leased at the rates as indicated in the Fraud Documents.

83.     Based on the representations made to Jansen by the Principals, Jansen agreed to become the 100% owner of Solarmore Management.

84.     Without payment of these Promissory Notes from true third-party leases, all of DC Solar affiliates would come crashing down, which eventually occurred.

85.     Determining a method in which the Carpoffs could continue deploying their scheme was in the best interest of each of the Principals, but not Jansen, as each of the Principals continued to be paid substantial amounts of their fees as long as new Fraud Documents were executed and new funds were created.

86.     During 2016 and 2017, as some of the Funds began nearing the Flip Event, Jansen, believing Solarmore Management would soon be the majority member of those Funds and effective owner of thousands of MSGs, began asking questions of the Carpoffs and other involved parties regarding potential tax implications and other ownership-related effects.

87.     Nixon and Milder knew the Lease revenues from end-users of the MSGs were critical to the legitimacy of the businesses of DC Solar Solutions and DC Solar Distribution because it was to provide the money that DC Solar Distribution needed to make lease payments to the Funds, and those payments were critical to the Funds' ability to make payments on the Promissory Notes to DC Solar Solutions.

88.     While Jansen was asking questions to Nixon and Milder, Milder responded to Jansen stating, "Now you know why you are the hundred percent owner of Solarmore Management."

89.     Because Jansen had begun asking questions and seeking additional information that he realized he was not being provided, to conceal their actions, the Principals initiated the creation of Halo in 2016, with Roselli as the managing member.

90.     Upon information and belief, Roselli was or is a personal friend of the Carpoffs and had a previous business relationship with Paulette Carpoff.

91.     After Halo was formed, it took the previous place of Solarmore Management, as the managing member of the new funds.

92.     This insured that the Principals could continue perpetuating their scheme and ensuring additional Fraud Documents would be completed and funded.

93.     Although DC Solar Distribution purported to be earning millions each month in lease revenue from end-users of the MSGs, bank records demonstrate that DC Solar Distribution generated minimal lease revenue from subleases to end-users.

94.     Email records demonstrate that the sublease revenue was $138,138.64 for 2012, $278,179.74 for 2013, $321,717.06 for 2014, and $1,419,570.80 for 2015, for a grand total over four years of $2,157,606.24.

95.     The actual cash requirement from the subleases of the MSGs under DC Solar Distribution's lease program over that same four-year period – stated as a percentage of promised utilization – was a dismal 3.78%.

96.     The failure of the sublease program also endangered the touted tax benefits of the MSG transactions.

97.     This failure of the sublease program also invalidated the stated appraisal value of MSGs for ongoing or new purchaser transactions.

98.     On information and belief, Nixon was aware of the lagging sublease revenues while continuing to execute the Tax Opinions, ensuring additional Fraud Documents and Funds were created.

99.     On or about 2017, SolarSense, a solar energy provider, began negotiations to buy MSGs from an existing Fund.

100.    However, rather than taking a promissory note carryback note to DC Solar Solutions, SolarSense attempted to arrange financing for its purchase of MSGs through KeyBank.

101.    During KeyBank's due diligence, KeyBank requested, among other things, a list of end-user/subleases, pro forma financials for DC Solar Distribution, samples of subleases, and DC Solar Distribution's QuickBooks.

102.    On information and belief, SolarSense and KeyBank closed their transaction in reliance on the Principals' representation and promise of information to be delivered.

103.    On information and belief, KeyBank began to suspect, after closing, the claimed subleases and claimed sublease revenues were false.

104.    The Principals informed Jansen of the sale of the MSGs from the existing Fund, which made him ecstatic because it showed that his risk of becoming the 100% owner of Solarmore Management was validated by a third party. However, Jansen and the third-party were not aware of the fraud perpetuated on SolarSense and KeyBank, which made the excitement short lived.

105.    In December 2018, law enforcement agents executed federal search warrants at DC Solar's headquarters and other locations, seizing over $60 million in assets.

106.    On January 30, 2019, the first DC Solar company filed for Chapter 11 bankruptcy.

1    107.    Thereafter, additional DC Solar-affiliated companies filed for Chapter 11

2  bankruptcy.

3    108.    Subsequently all the DC Solar Chapter 11 cases were converted to Chapter 7

4  liquidation.

5    109.    In learning the information that Nixon and Milder were aware of, as early as 2013,

6  the Plaintiffs incurred substantial costs and damages in an attempt to correct the damages caused

7  by Nixon and Milder.

8    110.    For example, the Plaintiffs were required to pay legal fees in order to enter the

9  tolling agreement associated with this action, make advances to and for the benefit of the Funds,

10  operating expenses of Solarmore Management and the Funds, expenses to locate the actual

11  MSGs that existed, attorneys' fees to benefit the Funds, at least one million dollars of penalties

12  and interests to the IRS, which Nixon and Milder determined would be avoided because of the

13  Tax Credits for the benefit Solarmore Management, and the loss of its expectation profits from

14  the sale of the MSGs (the "Additional Damages").

## CLAIMS FOR RELIEF

### COUNT I

### (Breach of Fiduciary Duty)

18    111.    Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation

19  in the preceding paragraphs as if fully set forth herein.

20    112.    Solarmore Management became a client of Nixon and Milder on or around its

21  formation in November 2013.

22    113.    Nixon stated, in each of the Tax Opinions, that it was the counsel for Solarmore

23  Management.

24

25

114.    As an attorney for Solarmore Management, Nixon and Milder owed Solarmore Management a fiduciary duty, which includes a duty of loyalty.

115.    Nixon and Milder owed Jansen a fiduciary duty when Jansen was a twenty-one percent and one-hundred percent owner of Solarmore Management.

116.    Nixon and Milder breached the fiduciary duty by failing to provide Solarmore Management or Jansen, the information it had related to the lack of justification for the Tax Opinions.

117.    Nixon and Milder breached their fiduciary duty by choosing the interests of the Principals, including the Carpoffs, over those of Solarmore Management and Jansen.

118.    Nixon and Milder breached their fiduciary duty by failing to provide Solarmore Management or Jansen information it knew, which caused substantial risk and damage to Jansen in becoming a one hundred percent owner of Solarmore Management.

119.    In addition, upon information and belief, Nixon and Milder breached their fiduciary duties to Solarmore Management and Jansen in ways that are currently unknown to Plaintiffs but will be learned during discovery.

120.    Nixon and Milder's breaches of their fiduciary duty proximately caused the damages suffered by Solarmore and Jansen.

121.    While Solarmore Management and Jansen will prove their damages at trial, their damages include, but are not limited to, attorneys fees paid to Nixon and Milder, costs of acquiring the hundred percent ownership in Solarmore Management, the cost of acquiring one percent in each of the Funds, the Additional Damages, and any damages that result from the personal guarantees that were required in each of the Fraud Documents.

## COUNT II

### (Breach of Contract)

122.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

123.   Solarmore Management and Nixon entered into a contract to provide legal services relating to its interest in each of the Funds.

124.   Solarmore Management paid Nixon's invoices for these legal services under the contract.

125.   Under the contract, Nixon and Milder were to provide Solarmore Management and Jansen legal advice that was accurate and complete, as well as advise their clients on issues relating to the DC Solar affiliates that could effect their interest in the Funds.

126.   Defendants breached the contract by providing legal advice that it knew or should have known was incorrect.

127.   Solarmore Management relied on this legal advice, to its detriment.

128.   Specifically, Nixon and Milder incorrectly advised Solarmore Management and Jansen that the Tax Credits would be authorized and that Solarmore Management would become the owner of numerous MSGs, which had a value in excess of the Promissory Notes that were due by the Funds to DC Solar Solutions.

129.   As a result of Nixon and Milder's breach of the contract, Solarmore Management and Jansen have suffered damages that will be proven at trial, which will include, but not be limited to, attorneys fees paid to Nixon and Milder, costs of acquiring the hundred percent ownership in Solarmore Management, the cost of acquiring one percent in each of the Funds, and any damages that result from the personal guarantees that were required in each of the Fraud Documents.

130. Plaintiff is entitled to an award of its reasonable attorneys' fees and costs pursuant to Code of Civil Procedure §§ 1021, 1717, as the contract between Plaintiffs and Nixon awards attorneys' fees to the prevailing party in an action related to a breach of that contract.

## COUNT III

### (Unjust Enrichment *brought in the alternative*)

131. Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

132. In the alternative to Plaintiffs' breach of contract claim, Plaintiffs' allege Nixon and Milder were unjustly enriched at the expense of Solarmore Management and Jansen.

133. Nixon and Milder benefited from of hundreds of thousands of dollars from Solarmore Management, to continue executing Fraud Documents, which it knew were premised on false assumptions.

134. Solarmore Management and Jansen were deprived of the Solarmore Management funds that were paid to Nixon and Milder.

135. Nixon and Milder knew that if Solarmore Management and Jansen knew the truth, they would not continue participating in the Funds.

136. As a result Solarmore Management and Jansen were damaged in an amount to be proven at trial, which will include, but not be limited to, the attorneys fees paid to Nixon and Milder by Solarmore Management, and any other funds Nixon and Milder acquired related to the Funds, Fraud Documents, and Tax Opinions.

## COUNT IV

### (Negligent Misrepresentation)

137. Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

138.   Nixon and Midler misrepresented significant amounts of representations throughout their representation of Solarmore Management.

139.   Specifically, Nixon and Midler misrepresented the value of the MSGs in the Tax Opinions.

140.   Nixon and Midler misrepresented that the Fraud Documents and transactions related to the Funds were under audit by the IRS and the impact these audits would have on the Funds.

141.   Nixon and Midler were Solarmore Management's attorneys and had a duty to disclose the truth to their clients.

142.   By ensuring that Solarmore Management and Jansen would not believe that there were any significant problems, Nixon and Midler achieved their intent, to prevent Solarmore Management and Jansen from inquiring further about the ongoing transactions, and to ensure that additional Funds were created.

143.   Nixon and Midler knew that Solarmore Management and Jansen did not know the truth about the lease revenues and the audits of the Funds.

144.   Solarmore Management and Jansen had an expectation to believe that their attorneys, they were paying hundreds of thousands of dollars to, would alert them or inform them of concerns relating to the Fraud Documents and audits by governmental agencies.

145.   Because Solarmore Management and Jansen did not know the truth, which Nixon and Midler knew, they continued to operate as the Manager of new Funds, and continued to pay Nixon's attorneys' fees and invoices, and continued to purchase a one-percent membership interest in each of the Funds.

146.   The specific amount of damages will be proven at trial.

**COUNT V**

**(Legal Malpractice)**

147.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

148.   Solarmore Management was a client of Nixon and Milder.

149.   As a client, Nixon and Milder owed a duty to use the skill, prudence, and diligence as commonly exercised by other members of the legal profession.

150.   Nixon and Midler breached this duty by perpetuating the Fraud Documents, including the Tax Opinions, and the Funds' transactions to the detriment of their client, Solarmore Management.

151.   Nixon and Midler further breached this duty by putting their clients', DC Solar Distribution, DS Solar Solutions, and the Carpoffs, interests ahead of Solarmore Management, also their clients.

152.   In putting other clients' interests ahead of Solarmore Management's interest, the Plaintiffs were damaged an amount to be proven at trial, which includes, but is not limited to, attorneys' fees paid to Nixon and Midler for legal services that were not in their best interest, for purchasing and becoming the 100% owner of Solarmore Management when the Principals and Nixon knew that the lease revenues were substantially lower than expected or necessary to create value for the Funds, and for purchasing a one-percent membership interest in each of the Funds.

153.   Had Nixon and Midler performed their duty, as commonly exercised by other lawyers, Nixon and Midler would have advised Solarmore Management and Jansen to seek independent counsel that was not also counsel to the related parties or that had an interest in the Fraud Documents and Tax Opinions.

154.    Further, Nixon and Midler should have been able to advise Solarmore Management and Jansen to ask specific questions related to the sufficiency of the leases of the first operating Funds. Instead, Nixon and Midler concealed information from and ensured that Solarmore Management and Jansen were not informed about certain information, to ensure additional Funds would be created to grow their revenue.

**COUNT VII**

**(Aiding and Abetting Negligent Misrepresentation)**

155.    Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

156.    Nixon and Milder were aware of the problems caused by the relationship between Solarmore Management, the DC Solar affiliates, and the Principals.

157.    DC Solar affiliates and the Principals owed Solarmore Management and Jansen a duty through its contractual relationships and as business partners and investors in the Funds.

158.    Nixon and Milder knew that the execution of the Fraud Documents and the strategy for Jansen to become the one-hundred percent owner of Solarmore Management constituted a breach of these duties by the DC Solar affiliates and the Principals.

159.    Nixon and Milder provided substantial assistance and encouragement by issuing and continuing to issue the Tax Opinions after knowing the structure would not result in the Tax Credits and that the purported lease revenues were significantly lower than originally indicated.

160.    This action caused Solarmore Management to continue to invest in the Funds.

161.    These actions caused Jansen to become the one-hundred percent owner of Solarmore Management.

162.    These actions were done for the benefit of the DC Solar affiliates and the Principals to ensure Nixon and Milder would continue to receive attorneys' fees and revenue

1  from the work related to the DC Solar affiliates and the Principals. Without the creation of new

2  funds, Nixon and Milder knew the DC Solar affiliates would implode.

3      163.    Nixon and Milder owed a duty to Solarmore Management and Jansen to

4  competently advise their clients and put their clients' interests ahead of their own. By

5  encouraging the actions that were taken, Nixon and Milder breached their duties to Solarmore

6  Management and Jansen.

7      **WHEREFORE**, Plaintiffs request this Court to enter judgment in their favor and against

8  the Defendants as follows:

9      **A.**    Awarding the Plaintiffs compensatory damages in an amount to be proven at trial;

10      **B.**    Awarding the Plaintiffs punitive damages in an amount to be proven at trial;

11      **C.**    Awarding the Plaintiffs damages for their pain and suffering in an amount to be

12  proven at trial;

13      **D.**    Awarding the Plaintiffs their attorneys' fees and costs pursuant to Code of Civil

14  Procedure §§ 1021, 1717.

15      **E.**    Awarding the Plaintiffs interest on all sums awarded, said interest calculated at the

16  maximum rate allowed by law from the time of judgment until paid in full; and

17      **F.**    Granting the Plaintiffs such other relief as the Court may deem appropriate under

18  the circumstances.

19      **RESPECTFULLY SUBMITTED** this 26th day of August, 2020.

20      */s/ John Snow*

21      **Howard King, Esq.**
    **John Snow, Esq.**

22      **KING, HOLMES, PATERNO & SORIANO, LLP**
    1900 Avenue of the Stars

23      Twenty Fifth Floor
    Los Angeles, CA 90067

24

25

1

*/s/ Brian J. Foster*

**Brian J. Foster, Esq.**
**Ross P. Meyer, Esq.**
**WILENCHIK & BARTNESS, PC**
2810 N. 3rd Street
Phoenix, Arizona 85004

*Attorneys for Plaintiffs*

**ORIGINAL** electronically filed this _____ day of August, 2020 using the Courts E-Filing Online website.

By: _____

# EXHIBIT D

1   Nathan G. Kanute (CA Bar No. 300946)
    SNELL & WILMER L.L.P.
2   50 West Liberty Street, Suite 510
    Reno, Nevada 89501
3   Telephone: 775-785-5440
    E-Mail: nkanute@swlaw.com
4
    Don Bivens (*pro hac vice pending*)
5   (AZ Bar No. 005134)
    Donald L. Gaffney (*pro hac vice pending*)
6   (AZ Bar No. 005717)
    SNELL & WILMER L.L.P.
7   One Arizona Center, Suite 1900
    400 East Van Buren Street
8   Phoenix, AZ 85004-2202
    Telephone: (602) 382-6000
9   Facsimile: (602) 382-6070
    Email: dbivens@swlaw.com
10           dgaffney@swlaw.com

11  *Attorneys for Plaintiff*

12                  **IN THE UNITED STATES DISTRICT COURT**

13                  **EASTERN DISTRICT OF CALIFORNIA**

14
    SOLARMORE MANAGEMENT
15  SERVICES, INC., a California corporation,        Case No.

16                              Plaintiff,          **COMPLAINT**

17  v.                                              **(JURY TRIAL DEMANDED)**

18  Bankruptcy Estate of DC SOLAR
    SOLUTIONS, INC. dba DC SOLAR
19  SOLUTIONS MFG, INC. dba DC SOLAR
    SOLUTIONS MANUFACTURING, INC., a
20  California corporation; Bankruptcy Estate of
    DC SOLAR DISTRIBUTION, INC., a
21  California corporation; Bankruptcy Estate of
    DC SOLAR FREEDOM, INC., a California
22  corporation; MATTHEW CARPOFF, an
    individual; LAUREN CARPOFF, an
23  individual; ROBERT V. AMATO and
    PRISCILLA AMATO, husband and wife;
24  ROBERT KARMANN, an individual;
    RONALD J. ROACH, an individual;
25  SEBASTIAN JANO, an individual; STEVE
    WILDE, an individual; RYAN GUIDRY, an
26  individual; PATRICK MOORE, an
    individual; HALO MANAGEMENT
27  SERVICES LLC, a Nevada limited liability
    company; SCOTT WENTZ, an individual;
28  RAINA YEE, an individual; MONTAGE

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

SERVICES, INC., a California corporation;
VISTRA INTERNATIONAL EXPANSION
(USA) INC., fka RADIUS GGE (USA),
INC., fka HIGH STREET PARTNERS INC.,
a Maryland corporation; JULIE MURACO,
an individual; Praeditis Group LLC, a
Delaware limited liability company; THE
STRAUSS LAW FIRM, LLC, a South
Carolina limited liability company; PETER
STRAUSS, an individual; DIANA
KERSHAW, an individual; HERITAGE
BANK OF COMMERCE, a California
Corporation; CARSON TRAILER, INC., a
California corporation; DAVID ENDRES, an
individual; ALVAREZ & MARSAL
VALUATION SERVICES, LLC, a Delaware
limited liability company; BARRY
HACKER, an individual; MARSHAL &
STEVENS, INC.; MARCELO BERMUDEZ,
an individual; COHNREZNICK, LLP, a New
Jersey limited liability partnership; RADIUS
GGE (USA), INC., fka HIGH STREET
PARTNERS INC., a Maryland corporation;
PANDA BEAR INTERNATIONAL, LTD., a
Hong Kong corporation; PANDA SOLAR
SOLUTIONS LLC, a Nevada limited liability
corporation; DC SOLAR
INTERNATIONAL, INC., a Nevis
corporation; BAYSHORE SELECT
INSURANCE, a Bahamian Corporation;
CHAMPION SELECT INSURANCE, a
Bahamian Corporation; JPLM DYNASTY
TRUST, a Cook Island Trust; BILLIE JEAN
TRUST, a Cook Island Trust; SOUTHPAC
INTERNATIONAL, INC., a Cook Islands
Corporation, AHERN RENTALS INC., a
Nevada corporation,

                    Defendants.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   PARTIES ................................................................................................ 2

      A.    PLAINTIFF................................................................................. 2

      B.    DEFENDANTS ........................................................................... 3

            1)    THE CORE DEFENDANTS ............................................ 3

            2)    "SCHEME AIDERS/ ABETTORS" ................................ 5

            3)    ASSET HIDERS ............................................................. 8

III.  JURISDICTION & VENUE .................................................................... 10

IV.   FACTUAL ALLEGATIONS ................................................................... 11

      A.    INTRODUCTION ...................................................................... 11

      B.    THE CREATION OF THE MSGS ............................................. 15

      C.    THE FIRST FUNDS ................................................................. 16

      D.    THE BEGINNING OF THE FUNDS ........................................ 17

      E.    THE FUNDS' BASIC STRUCTURE ........................................ 17

      F.    GENERAL BACKGROUND - DEFENDANTS CAUSING OR
            CONTRIBUTING TO PLAINTIFF'S INJURIES ...................... 23

      G.    THE FIRST SIGN OF TROUBLE (THE AUDITS) & THE APPRAISALS ...... 25

      H.    THE PHASEOUT OF SOLARMORE ....................................... 27

      I.    THE COLLAPSE OF DC SOLAR ............................................ 28

      J.    THE CARPOFFS' PREPARATIONS FOR ESCAPE .................. 32

V.    ALLEGATIONS RELATED TO RICO VIOLATIONS ............................. 33

      A.    ENTERPRISE ........................................................................... 33

      B.    OPERATION OF THE RICO ENTERPRISE ............................. 35

      C.    PREDICATE ACTS .................................................................. 35

      D.    VIOLATIONS OF 18 U.S.C. § 1343 ........................................ 36

      E.    PATTERN OF RACKETEERING ACTIVITY ........................... 39

VI.   DAMAGES .......................................................................................... 40

VII.  CLAIMS FOR RELIEF ......................................................................... 40

      COUNT I (FEDERAL RICO - 18 U.S.C. §1962(C) – CORE DEFENDANTS) ............ 40

      COUNT II (FEDERAL RICO - 18 U.S.C. §1962(D) – CORE DEFENDANTS) ........... 42

      COUNT III (FRAUD: INTENTIONAL MISREPRESENTATION – CORE
            DEFENDANTS) ......................................................................... 43

      COUNT IV (FRAUD: INTENTIONAL CONCEALMENT – CORE
            DEFENDANTS) ......................................................................... 44

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| | COUNT V (FRAUD IN THE INDUCEMENT- CORE DEFENDANTS) | 44 |
| | COUNT VI (CONVERSION- CORE DEFENDANTS) | 45 |
| | COUNT VII (CIVIL CONSPIRACY – CORE DEFENDANTS AND SCHEME AIDERS/ABETTORS) | 45 |
| | COUNT VIII (UNJUST ENRICHMENT – CORE DEFENDANTS AND HALO) | 46 |
| | COUNT IX (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP OR BUSINESS EXPECTANCY – CORE DEFENDANTS) | 47 |
| | COUNT X (NEGLIGENCE – ALVAREZ & MARSAL) | 47 |
| | COUNT XI (NEGLIGENT MISREPRESENTATION – ALVAREZ & MARSAL) | 47 |
| | COUNT XII (PROFESSIONAL NEGLIGENCE – ROACH) | 48 |
| | COUNT XIII (BREACH OF FIDUCIARY DUTY – ROACH) | 49 |
| | COUNT XIV (PROFESSIONAL NEGLIGENCE – WENTZ, YEE, MONTAGE, & RADIUS/VISTRA) | 49 |
| | COUNT XV (BREACH OF FIDUCIARY DUTY- WENTZ, YEE, MONTAGE & RADIUS/VISTRA) | 50 |
| | COUNT XVI (NEGLIGENT MISREPRESENTATION – ALL DEFENDANTS) | 50 |
| VIII. | PRAYER FOR RELIEF | 51 |
| IX. | DEMAND FOR JURY TRIAL | 51 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

- ii -

**COMPLAINT**

## I. **PRELIMINARY STATEMENT**

Plaintiff's claims arise from two parallel fraud schemes that wrested over $910 million from innocent purchasers, who thought they had purchased mobile solar energy generators which qualified for valid and significant tax benefits.

Scheme One: From 2011 to 2018, Defendants named below built and sold mobile solar generators ("**MSGs**") to purchasers. Purchasers bought the MSGs for $150,000, with (a) a down payment of $45,000, which supposedly qualified for alternative energy tax credits; and (b) a promissory note for the balance due over twenty years, during which purchasers could depreciate their MSGs on favorable tax terms. But, in reality, the Defendants' sale of MSGs proved a sham.

Scheme Two: The same purchasers were told that Defendants would generate substantial lease revenues from third parties, which would more than cover the balance purchasers owed on their promissory notes. But in reality, the Defendants' promised lease revenues proved to be a sham.

In reality, there was no true market for the MSGs sold to purchasers. Indeed, some purchasers paid for MSGs that were never manufactured. In reality, there was also no true market for the touted leases. The majority of the promised subleases never materialized. In reality, the Defendants perpetrated a fraud on the purchasers, by pretending to have sublease revenue, when in fact the purported sublease revenue was really cash from later purchasers that was transferred from DC Solar to DC Distribution, either directly or through the use of third parties. Defendants' touted sale and leasing transactions of MSGs were business failures that never made money. As a result, the purchasers grossly overpaid for the MSGs and the transactions may not qualify for the promised tax benefits promised. Further, the transactions never generated the promised lease income.

Defendants tried as long as possible to hide and conceal the true facts from purchasers. Among other things, Defendants lied about and tried to conceal that some MSGs sold to purchasers were never manufactured. The Defendants also lied about and tried to conceal that the MSGs failed to generate lease revenues. Among other things, the

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

**COMPLAINT**

1   Defendants moved money between companies in ways intended to disguise the fact that the

2   MSG transactions were fraudulent failures.

3   Defendants fall into three main categories: Defendants who were core schemers,

4   Defendants who were scheme aiders/abettors, and Defendants who facilitated hiding money

5   and MSGs (or lack thereof).

6   Plaintiff, for its complaint against the Defendants, alleges as follows:

## II.   PARTIES

### A.   Plaintiff

9   1.   Solarmore Management Services, Inc. ("**Solarmore**" or "**Plaintiff**") is a

10   California corporation authorized to do and doing business in California. Solarmore is

11   owned and managed by Carl Jansen ("**Jansen**").

12   2.   Until December 12, 2019, Solarmore was the managing member of the

13   following California limited liability companies, which are collectively referred to as the

14   "**Funds**" or the "**Purchasers**."

15   a.   Solar Eclipse Investment Fund V, LLC

16   b.   Solar Eclipse Investment Fund VI, LLC

17   c.   Solar Eclipse Investment Fund VII, LLC

18   d.   Solar Eclipse Investment Fund VIII, LLC

19   e.   Solar Eclipse Investment Fund X, LLC

20   f.   Solar Eclipse Investment Fund XI, LLC

21   g.   Solar Eclipse Investment Fund XII, LLC

22   h.   Solar Eclipse Investment Fund XIV, LLC

23   i.   Solar Eclipse Investment Fund XV, LLC

24   j.   Solar Eclipse Investment Fund XVI, LLC

25   k.   Solar Eclipse Investment Fund XVII, LLC

26   l.   Solar Eclipse Investment Fund XVIII, LLC

27   m.   Solar Eclipse Investment Fund XIX, LLC

28   n.   Solar Eclipse Investment Fund XXI, LLC

2   **COMPLAINT**

Snell & Wilmer
L.L.P.
Law Offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1         o.     Solar Eclipse Investment Fund XXII, LLC

2         p.     Solar Eclipse Investment Fund XXIII, LLC

3         q.     Solar Eclipse Investment Fund XXIV, LLC

4         r.     Solar Eclipse Investment Fund XXVI, LLC

5         s.     Solar Eclipse Investment Fund XXVIII, LLC

6         t.     Solar Eclipse Investment Fund XXXI, LLC

7     3.     Solarmore is currently the 1% owner in each of the Funds except for Fund V

8 and Fund VI, in which Solarmore is the 95% owner.

9     4.     The Funds are tax-equity investment funds permitted under the Internal

10 Revenue Code (the "**Code**"), created specifically for the purpose of owning MSGs.

11     5.     Along with the managing member of the Funds, which was Solarmore up to

12 December 12, 2019, each Fund has a purchasing member or members (as further defined

13 below, the "**Purchasing Member**"), which provided the money to purchase the MSGs.

14     6.     As of December 18, 2019, Solarmore consented to resignation as managing

15 member of the Funds.

16                 **B.**  <u>**Defendants**</u>

17              *1)*  *The Core Defendants*

18     7.     DC Solar Solutions, Inc. (on information and belief, dba DC Solar Solutions

19 MFG, Inc. dba DC Solar Solutions Manufacturing, Inc.) is a California corporation

20 headquartered in Benicia, California ("**DC Solar Solutions**").

21     8.     DC Solar Distribution, Inc. is a California corporation headquartered in

22 Benicia, California ("**DC Solar Distribution**").

23     9.     DC Solar Freedom, Inc. is a California corporation headquartered in Benicia,

24 California ("**DC Solar Freedom**") (together with DC Solar Solutions and DC Solar

25 Distribution, "**DC Solar**"). The DC Solar entities are owned by Jeff Carpoff ("**Carpoff**")

26 and Paulette Carpoff (together, the "**Carpoffs**"), except that Lauer, Muraco, and Roach also

27 owned equity in DC Solar Freedom.

28     10.     The DC Solar entities are currently debtors in the jointly administered Chapter

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

3               **COMPLAINT**

7 bankruptcy proceedings pending in the United States Bankruptcy Court, District of Nevada ("**Bankruptcy Court**") under the lead case styled *In re Double Jump, Inc.,* Case No. 19-50102-gs ("**Bankruptcy Case**"). Christine W. Lovato ("**Lovato**" or "**Trustee**") is the duly appointed Chapter 7 Trustee for the DC Solar entities' bankruptcy estates (the "**Estates**").

11. The Estates are named as Defendants in this Complaint only for purposes of determination of liability, or determination of forms of legal or equitable relief; pursuant to the court-approved stay relief stipulation between the Plaintiff and the Trustee in the Bankruptcy Case filed with the Bankruptcy Court on December 16, 2019. Any enforcement or collection actions against the Estates will occur within the context of the Bankruptcy Case.

12. Matthew and Lauren Carpoff (the "**Carpoff Children**") are the adult children of Jeff and Paulette Carpoff and, upon information and belief, reside in California.

13. The Carpoff Children received funds and/or wages from DC Solar.

14. Upon information and belief, Lauren Carpoff was involved in the process of keeping track of VINs for MSGs that did not exist by assisting in the preparation of a master list of VINs.

15. Robert V. Amato is Paulette Carpoff's brother. Robert worked for DC Solar. Robert's wife is Priscilla Amato (together, the "**Amatos**"). The Amatos were also on DC Solar's payroll, and, upon information and belief, Priscilla managed some of the real properties that were purchased with funds obtained by DC Solar from the Purchasers. Upon information and belief, the Amatos reside in California.

16. According to the DOJ Seizure document (*infra*), Robert V. Amato had planted GPS devices that were supposed to be attached to MSGs in locations so that it appeared that the MSGs existed at these locations on the GPS tracking program.

17. Robert Karmann ("**Karmann**") is an accountant and, upon information and belief, resides in California. Karmann worked for DC Solar as controller or CFO from around 2014 through the companies' closing.

**COMPLAINT**

18.   On December 12, 2019, Karmann was charged by Information with felony charges of conspiracy to commit an offense against the United States and securities fraud. See Case No. 2:19-cr-00222-JAM. Karmann has pled guilty.

19.   Ronald J. Roach ("**Roach**") is an accountant and, upon information and belief, resides in California. Roach runs a company known as Ronald J. Roach Accountancy Corp., and performed accounting services for, among others, DC Solar and Plaintiff.

20.   On October 21, 2019, Roach was charged by Information with felony charges of conspiracy to commit an offense against the United States and securities fraud. On the same day, Joseph Bayliss was charged by Information with a felony charge of conspiracy to commit an offense against the United States. See Case No. 2:19-cr-00182-JAM. Roach and Bayliss pled guilty to those counts on October 22, 2019 and are set for sentencing on January 28, 2020. The charges and guilty pleas are related to their roles in the DC Solar fraud and enterprise.

21.   Sebastian Jano ("**Jano**") is a former employee of DC Solar, and, upon information and belief, resides in California.

22.   Steve Wilde ("**Wilde**") is an accountant the former controller of DC Solar Solutions and, upon information and belief, resides in California.

23.   The Defendants listed in paragraphs 7 through 22, supra, shall hereinafter be referred to collectively as the "**Core Defendants.**"

24.   Additional Defendants may be included as Core Defendants as investigation and discovery proceeds in this or related estates.

### *2) "Scheme Aiders/ Abettors"*

25.   Ryan Guidry ("**Guidry**") was involved in operations of DC Solar from at least early 2012, and, upon information and belief, resides in California.

26.   Upon information and belief, Guidry operated and/or administered the DC Solar sublease scheme which involved the misrepresentation of MSGs, and third party rentals.

27.   Patrick Moore ("**Moore**") is or was the 21% minority owner of Solarmore

5                                      **COMPLAINT**

Snell & Wilmer

L.L.P.

law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Investments, Inc. ("**Solarmore Investments**"), which was the managing member of the first funds purchasing MSGs from DC Solar. Upon information and belief, he resides in California.

28. According to the DOJ Seizure Document (*infra*), an informant tipster contacted the FBI and told the FBI that Moore admitted that he was part of a fraudulent scheme involving MSGs with the Carpoffs.

29. Halo Management Services LLC ("**Halo**") is a Nevada limited liability company which is or was managed by Peter Roselli ("**Roselli**"). Halo was the managing member of the final funds purchasing MSGs from DC Solar.

30. Alvarez & Marsal Valuation Services, LLC is a Delaware limited liability company with its principal place of business in New York, NY ("**Alvarez & Marsal**").

31. Alvarez & Marsal completed appraisals of MSGs for DC Solar validating the alleged value of the MSGs, which were presented to Purchasers.

32. Barry Hacker ("**Hacker**") was a broker and sometimes senior officer at Marshall & Stevens, Inc. and, upon information and belief, resides in California.

33. Hacker brokered some MSG purchases, worked directly with Alvarez & Marsal in establishing value for the MSGs, promoted DC Solar as a potential borrower, and assisted in the Carpoffs activities to move assets and and/or operations to Nevis Island.

34. Upon information and belief, Marcelo Bermudez ("**Bermudez**") is a broker at Shokunin, Inc. and, upon information and belief, resides in California who assisted Hacker and DC Solar.

35. Upon information and belief, Bermudez brokered some MSG purchases and may have worked directly with Alvarez & Marsal in establishing value representations for the MSGs.

36. CohnReznick LLP ("**CohnReznick**") is New Jersey limited liability partnership and consulting firm with its principal place of business in New York, NY.

37. CohnReznick and its employees brokered some MSG purchases and worked directly with Alvarez & Marsal in establishing value for the MSGs.

6                                    **COMPLAINT**

38.     Scott Wentz ("**Wentz**") is an accountant and another Defendant who resides in California.

39.     Wentz performed tax work, oversaw or participated in an audit or financial compilation, and acted directly and helped DC Solar create international companies built to keep assets and income outside of the United States.

40.     Raina Yee ("**Yee**") is an accountant and, upon information and belief, resides in California. Yee was in charge of handling many of the various taxing authority audits of DC Solar, the Funds, and/or the Carpoffs individually.

41.     Vistra International Expansion (USA) Inc., fka Radius GGE (USA), Inc., fka High Street Partners Inc., is a Maryland corporation headquartered in Massachusetts ("**Vistra**") that acquired Radius GGE (USA).

42.     Radius GGE (USA), Inc., fka High Street Partners Inc., is a Maryland corporation headquartered in Massachusetts ("**Radius**").

43.     Radius was acquired by Vistra on or about May 2018. Radius and Vistra provided, among other things, tax work and other services to DC Solar, Solarmore, and the Funds.

44.     Montage Services, Inc. is a California corporation based in San Francisco ("**Montage**").

45.     Some of Montage's assets were acquired by Radius on or about June 2016 and entered into contractual agreements with Montage including the cooperative sharing of employees and, facilities, and equipment.

46.     Heritage Bank of Commerce (**"Heritage"**) is a California Corporation primarily operating in California.

47.     Diana Kershaw ("**Kershaw**") is or was an officer or employee or former employee of Heritage Bank and, upon information and belief, resides in California.

48.     Upon information and belief, as an officer or employee Kershaw cooperated with the Carpoffs to conceal or restrict information from Solarmore regarding its bank accounts at Heritage.

49. Carson Trailer, Inc. ("**Carson**") is a California corporation with its principal place of business in Gardena, California. Carson produced and sold the physical trailers upon which the MSGs were built.

50. Ahern Rentals, Inc. is a Nevada corporation headquartered in Las Vegas ("**Ahern**").

51. David Endres ("**Endres**") is a former employee of Carson and DC Solar and, upon information and belief, resides in California.

52. Upon information and belief, Endres cooperated with the Carpoffs and DC Solar to provide VINs without corresponding trailers, and began working directly for DC Solar in the summer of 2018.

53. The Defendants listed in paragraphs 25 through 52, supra, shall hereinafter be referred to collectively as the "**Scheme Aiders/Abettors.**"

54. Additional Defendants may be included as Scheme Aiders/Abettors as investigation and discovery proceeds in this or related estates.

### 3) Asset Hiders

55. Julie Muraco ("**Muraco**") is a financial advisor at Praeditis Group LLC, and, upon information and belief, resides in New York.

56. Muraco is or was an owner and on the board of directors of DC Solar Freedom and provided investment advice to the Carpoffs and/or DC Solar, as well as the direction of assets to offshore companies.

57. Praeditis Group LLC ("**Praeditis**") is a Delaware limited liability company that was utilized by Muraco in her activities for DC Solar, some of the DC solar affiliates, and the Carpoffs in concealing and/or of assisting in the movement of assets.

58. The Strauss Law Firm ("**Strauss Firm**") is a law firm located in Hilton Head, South Carolina. The Strauss Firm helped the Carpoffs and/or DC Solar to conceal or move assets.

59. Peter Strauss ("**Strauss**") is an attorney and, upon information and belief, resides in South Carolina. Strauss is the principal/owner of the Strauss Firm.

60. Panda Bear International, Ltd. ("**Panda International**") is an international

Snell & Wilmer
━━━━━━━━
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

8                                           **COMPLAINT**

1   Hong Kong corporation. That was utilized in the movement of funds in and out of Hong

2   Kong and the China Bank and Trust.

3        61.     Panda Solar Solutions LLC ("**Panda Solutions**") is a Nevada limited liability

4   company, and entirely owned by the Carpoffs.

5        62.     Upon information and belief, Panda International was formed by DC Solar

6   with assistance from Wentz supposedly for the purpose of purchasing batteries for MSGs,

7   to keep profits out of the United States and avoid U.S. income taxation.

8        63.     Panda Solutions was the sole owner of Panda International.

9        64.     DC Solar International, Inc. ("**DC Solar International**") is an international

10  Nevis corporation. DC Solar International was formed by DC Solar with assistance from

11  Lauer, Strauss and Hacker, among others, to be the seller in certain sale-leaseback deals,

12  designed to move profits out of the United States and tax-free.

13       65.     Bayshore Select Insurance is a Bahamian company, and acts as a captive

14  insurance company for DC Solar.

15       66.     Champion Select Insurance is a Bahamian company, and acts as a captive

16  insurance company for DC Solar.

17       67.     JPLM Dynasty Trust is a Cook Island trust administered in the Cook Islands

18  with Southpac Trust International, Inc. a Cook Island corporation as its Trustee.

19       68.     Billie Jean Trust is a trust administered in the Cook Islands with Southpac

20  Trust International, Inc. a Cook Island corporation as its Trustee

21       69.     The Defendants listed in paragraphs 55 through 68, *supra*, are described

22  collectively as the "**Asset Hiders**."

23       70.     The Core Defendants, Scheme Aiders/Abbetors, and the Asset Hiders shall

24  hereinafter be referred to collectively as the "**Defendants**."

25       71.     Additional Defendants may be added to these categories as further

26  investigation or discovery proceed in this or related cases.

27

28

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

9             **COMPLAINT**

### III. JURISDICTION & VENUE

72.     This Court has subject-matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, because the claims arise under the laws of the United States, including the Racketeer Influenced and Corrupt Organization Act ("**RICO**"), 18 U.S.C. § 1961 *et. seq.*

73.     This Court has supplemental jurisdiction over Plaintiff's claims arising out of state law pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as Plaintiff's claims brought under federal law.

74.     Plaintiff also asserts that jurisdiction is also present due to 28 U.S.C.157.

75.     Personal jurisdiction comports with due process under the United States Constitution, the long-arm statutes of California, and the provisions of 18 U.S.C. § 1965(b) and (d).

76.     Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

      a.  Transacted business in California;

      b.  Contracted to supply or obtain services in California;

      c.  Availed themselves intentionally of the benefits of doing business in California;

      d.  Produced, promoted, sold, marketed, and/or distributed their products or services in California and, and thereby, have purposefully profited from their access to markets in California;

      e.  Caused tortious damage by act or omission in California;

      f.  Caused tortious damage in California by acts or omissions committed outside California while (i) regularly doing business or soliciting business in California, and/or (ii) engaging in other persistent courses of conduct within California, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in California;

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

10                    **COMPLAINT**

g.  Committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in California to Plaintiff while (i) regularly doing or soliciting business in California, and/or (ii) engaging in other persistent courses of conduct within California , and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in California;

h.  Engaged in a conspiracy with others doing business in California that caused tortious damage in California; and/or

i.  Otherwise had the requisite minimum contacts with California such that, under the circumstances, it is fair and reasonable to require Defendants to come before this Court to defend this action.

77.  Pursuant to 11 U.S.C. § 362 and to allow and Plaintiff to pursue its claims the Trustee has stipulated to relief from the automatic stay in the Bankruptcy Case to allow Plaintiff to liquidate the nature and amount of its claims against the Estates as a Defendant; however, Plaintiff may not proceed with any collection or other enforcement of any such determination except through the Bankruptcy case.

78.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Benicia, California, which is located in this judicial district.

## IV.  **FACTUAL ALLEGATIONS**

### A.  **Introduction**

79.  This case involves two parallel fraud schemes which bilked purchasers out of nearly a billion dollars (together, the "**Schemes**").

80.  The Carpoffs orchestrated the Schemes through companies they controlled (DC Solar), and the Carpoffs used the Schemes to enrich themselves personally at Plaintiff's expense.

81.  The Defendants in this action each played an important role in the Schemes.

82.  In 2011, the Carpoffs began the selling of MSGs through their privately-held

Snell & Wilmer

L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1    alternative energy company, DC Solar Solutions.

2          83.    Through December 2018, DC Solar raised around $910 million from sales of

3    MSGs. DC Solar described the sales to interested parties as transactions that qualified for

4    alternative energy tax credits.

5          84.    To that end, Purchasers purchased MSGs from DC Solar Solutions and then

6    immediately leased the MSGs to DC Solar Distribution.

7          85.    DC Solar Distribution then supposedly sub-leased the MSGs to end-users.

8          86.    The sale price for east MSG was $150,000.

9          87.    Purchasers typically made a 30% cash down payment to DC Solar Solutions

10   on the MSGs, which were sold for $150,000 apiece, because the associated tax credits were

11   based upon 30% of the $150,000 sales price.

12         88.    This down payment was typically made by the Purchasing Member.

13   Purchasers could immediately claim a dollar-for-dollar tax credit for the total they paid in

14   cash to DC Solar Solutions per MSG.

15         89.    Thereafter, the Purchasers could also claim depreciation for each MSG for

16   five years.

17         90.    These cumulative tax benefits were significant to Plaintiff and the

18   Purchasers.

19         91.    To complete the transactions, Purchasers paid the remaining amount owed to

20   DC Solar Solutions for the MSGs by a carryback promissory note with a twenty (20) year

21   term.

22         92.    The Carpoffs and other Defendants told Purchasers that the cash to pay the

23   note payments was supposed to be generated by lease revenues received by DC Solar

24   Distribution from its supposed subleases of the MSGs to end users.

25         93.    Additionally, the Purchasers (and the LLC members) were to receive some

26   income from the subleases, over and above amounts needed to pay the carryback notes.

27         94.    The sublease revenue payable to Purchasers from DC Solar Distribution was

28   a critical component of the transactions, maximizing the tax benefits while minimizing debt

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

12                    **COMPLAINT**

and expenses.

95. Without the mechanism, the alleged $150,000 value of the MSGs would be difficult to sustain, thus jeopardizing the maximum value of the tax credits.

96. When the Funds were created, Solarmore owned 1% of each Fund, with the primary Purchasing Member owning the remaining 99% interest.

97. After five (5) years, which was the recapture period for the MSG tax credit, the equity ownership in the Funds would flip, with Solarmore owning 95% and the Purchasing Member owning 5%.

98. After the 5-year period, Solarmore had a call option to acquire the Purchasing Member's equity in the Funds for an amount that is significantly less than the amount of the Purchasing Member's downpayment.

99. DC Solar touted itself as a major player in its industry, with thousands of MSGs in the field, lucrative contracts with big customers yielding a track record of major revenues, and extensive experience in making and maintaining the MSGs, and finding customers to lease or purchase MSGs.

100. The sublease program and the major lease revenue promotion were a sham.

101. DC Solar manufactured and put into service far fewer MSGs than it claimed to Purchasers, and DC Solar made hardly any of its revenue from leasing MSGs.

102. In fact, DC Solar Solutions did not actually manufacture or receive about two-thirds of the MSGs that it purportedly sold to Purchasers.

103. Intensive efforts by Plaintiff to locate the MSGs have identified roughly 6,800 of the approximately 18,400 MSGs that DC Solar sold to Purchasers.

104. Simply put, Purchasers paid over one billion dollars for MSGs that never existed or been delivered.

105. Further, legitimate lease income from actual end-users of the MSGs represented a tiny fraction -- less than 5% -- of DC Solar Distribution's alleged revenue.

106. The vast majority of DC Solar Distribution's revenue was actually comprised of money transferred from DC Solar Solutions derived from downpayments from later

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

13                **COMPLAINT**

1   purchasers.

2   107.   In reality, the vast majority of DC Solar's money was used to manufacture,

3   place into service, or to maintain the thousands of MSGs that the DC Solar "sold" to

4   Purchasers.

5   108.   Instead the Carpoffs pilfered the money to cover-up losses by DC

6   Distribution, and to support a lavish lifestyle that included buying numerous luxury and

7   collector vehicles, a baseball team, a NASCAR Raceteam, expensive real estate within and

8   without the United States, and the use of private jets.

9   109.   Generally, the Defendants perpetrated two fraud Schemes, the first relating to

10   the existence of MSGs.

11   110.   The second relating to the movement of money from DC Solar to DC

12   Distribution to hide the failed sublease program.

13   111.   A later third fraud scheme developed from the first two in the after-the-fact

14   effort to prop up bogus $150,000 valuation of MSGs sold to Purchasers.

15   112.   In the first Scheme, the Defendants falsely certified and represented to

16   Purchasers the existence of non-existent or undelivered MSGs.

17   113.   Plaintiff relied on Defendants' certificates and representations, although the

18   claimed MSGs never existed or were delivered.

19   114.   In the second Scheme, the Defendants tried to hide the lack of legitimate lease

20   revenue by moving money between and among different Defendants to conceal the failed

21   sublease program.

22   115.   Defendants made representations to Plaintiff that the subleasing of the MSGs

23   started slowly, but then became robust, resulting in the sublease of most of the MSGs and

24   the generation of significant rental revenue.

25   116.   Defendants showed Plaintiff a few leases for a large number of MSGs to third

26   parties.

27   117.   Then, Defendants represented to Plaintiff that Defendants had many other-

28   such leases that produced significant revenue for DC Distribution.

14                    **COMPLAINT**

Snell & Wilmer

L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

118. In reality, the overwhelming majority of DC Distribution's supposed "revenue" consisted of cash transfers from DC Solar Solutions to DC Solar Distribution derived from initial down payments of later Purchasers.

119. Between March 2011 and December 18, 2019, approximately thirty-four (34) Funds entered into transactions with DC Solar Solutions to purchase MSGs, resulting in the deposit of approximately $759,000,000 by interstate transfer into the Funds' bank accounts by Purchasing Members for Defendants' MSG transactions.

120. Other Purchasers transferred approximately $136,000,000 to DC Solar Solutions as part of related transactions for the purchase and lease of MSGs.

121. In total, DC Solar Solutions closed transactions with Funds and others involving approximately 18,400 MSGs at approximately $2.7 billion in purported value.

122. These deals had face values of more than $2.7 billion because Purchasers financed approximately 70 percent of the amount of the MSGs' purchase price through promissory notes.

123. DC Solar, directly and indirectly, solicited purchasers through brokers and salespeople using various methods, including email, conference calls and in-person meetings. DC Solar offered and sold Fund Contracts (defined below) through interstate commerce to purchasers across the United States.

124. The Core Defendants were in the process of attempting to close additional large transactions by the end of 2018 on in early 2019 but were stopped by the federal government's raid and seizures.

**B. The Creation of the MSGs**

125. Carpoff started DC Solar Solutions in or about 2009, when he began designing and creating the first MSGs.

126. Carpoff wholly owned the company after the departure of John Messer, a former 21% owner.

127. A typical MSG consisted of photovoltaic ("**PV**") modules, PV inverters, batteries, a trailer and other miscellaneous ancillary components.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

15                                                     **COMPLAINT**

128.    According to an appraisal of 1,140 MSGs dated August 19, 2015 ("**GEICO Appraisal**") by Alvarez & Marsal, which is nearly identical to the other Appraisals (defined below) provided to all of the Funds, DC Solar Solutions "is a clean energy company that designs, manufactures and deploys solar energy solutions which are eligible for federal, state and local renewable energy incentives."

129.    Alvarez & Marshall initially was requested to produce retroactive appraisals to bolster an earlier appraisal by a less prestigious appraiser.

130.    The GEICO Appraisal describes the MSGs as DC Solar Solutions' "signature product… available in 5, 10, 15, 20 and 25.5 kW power capacities… in use throughout the United States where an MSG is a more desirable alternative than a diesel-powered generator. MSGs are capable of operating anywhere they can be transported…"

131.    The GEICO Appraisal further describes the MSGs as follows: "The MSGs utilize two PV arrays of Talesun Solar USA panels made up of a total of ten PV modules.

132.    The PV modules are framed or attached together by struts in a panel structure. Each panel structure contains five solar modules which are about 16 feet in length.

133.    The PV Arrays are grouped so that the panels can be deployed at multiple angles for maximum exposure to the Sun.

134.    The MSGs also contained a battery backup system, a battery management system and a charge controller.

135.    At the beginning, the cost of production for one MSG was purportedly approximately $78,000, however this "cost" was comprised largely of overhead and labor costs.

### C. The First Funds

136.    In or about 2010, DC Solar Solutions created the first fund to own MSGs and solicit MSG purchases for tax benefits.

137.    The early funds created by the Carpoffs to own MSGs were managed by Solarmore Investments, an entity controlled by Carpoff and owned by Carpoff and Moore.

138.    Purchasers typically made a 30% down payment to DC Solar Solutions on the

16                                          **COMPLAINT**

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

MSGs, which were sold for $150,000 apiece.

139.    Purchasers could then immediately claim a dollar-for-dollar tax credit based upon 30% of the $150,000 price. Purchasers also claim depreciation for each MSG for five (5) years. These tax benefits were significant and amounted in hundreds of millions of dollars.

### D.  The Beginning of the Funds

140.    Solarmore was formed in 2013 by Lauer and was initially owned 79% by Carpoff and 21% by Jansen.

141.    Currently, Jansen owns 100% of Solarmore.

142.    Solarmore was formed to manage certain of the Funds who purchased MSGs.

143.    As compensation for Solarmore's management of certain Funds, Defendants promised a payment equal to 1% of the tax credits for the Funds, and the later ability to indirectly own through Solarmore entity 95% of the MSGs after the ownership of the Funds "flip" after 5 years.

144.    Defendants represented to Jansen that the MSGs would retain significant value after 5 years that exceeded the loan balance still owed to DC Solar at such time.

145.    Nixon Peabody LLP ("**Nixon**"), is a law firm headquartered in New York and operating in additional states and issued tax opinion letters to Plaintiff Purchasers, and the Funds opining to the valid tax benefits to Purchasers of MSGs.

### E.  The Funds' Basic Structure

146.    The basic structure of the MSG sales was as follows: DC Solar offered Purchase Agreements and Equipment Leases (defined below), under which Purchasers paid to purchase MSGs from DC Solar Solutions, while in turn simultaneously leasing them to DC Solar Distribution.

147.    DC Solar Distribution then promised that it would arrange to sub-lease the MSGs to end-users.

148.    Purchasers executed a standard package of agreements, including: (i) a Limited Liability Company Agreement ("**LLC Agreement**"); (ii) a Solar Equipment

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Purchase Agreement ("**Purchase Agreement**"); (iii) a Secured Promissory Note ("**Promissory Note**"); and (iv) a Mobile Solar Equipment Lease ("**Equipment Lease**") (together the "**Fund Contracts**").

149.   The documents were executed at or around the same time, with Jeff Carpoff signing the Purchase Agreements on behalf of DC Solar Solutions and Paulette Carpoff typically signing the Equipment Leases on behalf of DC Solar Distribution.

150.   While certain contracts had minor variations in wording, all of the Fund Contracts largely contained the same substantive terms.

151.   Under the terms of the LLC Agreements, an investor became the Purchasing Member of an individual Fund, a special purpose LLC entity created specifically for the purchase of MSGs.

152.   The Fund then purchased MSGs from DC Solar Solutions at a price of $150,000 per MSG under a Purchase Agreement.

153.   The Purchase Agreement specified the total number of MSGs being purchased in that specific transaction, as well as the total purchase price.

154.   An Exhibit to the Purchase Agreement contained a blank space for the Vehicle Identification Numbers ("**VINs**") for the MSGs or stated that "VIN for each Generator [MSG] to be Supplied at Delivery."

155.   In exchange for the specified payment, DC Solar Solutions agreed to deliver the MSGs by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

156.   The delivery dates for tranches of MSGs specified in the Purchase Agreements were occasionally scheduled in stages.

157.   Likewise, the Purchase Agreements dictated that payments would be due to DC Solar Solutions in stages according to a schedule in part dictated by capital contributions being made by the Purchasing Member under the terms of the LLC Agreement.

158.   Those capital contributions were contingent on Purchasers receiving confirmation that the Generators were "Placed in Service" as evidenced by an "IE

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

18                                                                    **COMPLAINT**

1 [Independent Engineer] Certificate."

2      159.   Purchasing Members generally contributed about thirty percent (30%) of the

3 purchase price in cash and financed the balance pursuant to a Promissory Note or Notes

4 executed by the Fund in favor of DC Solar Solutions.

5      160.   The Promissory Note was an exhibit to the Purchase Agreement.

6      161.   The physical location of all of The Promissory Notes is currently under

7 investigation.

8      162.   DC Solar told Purchasers, and arranged for a tax opinion letter from Nixon

9 confirming, that the MSGs qualified for the "Energy Credit" under Internal Revenue Code

10 § 48.

11      163.   IRS Code § 48 allows for a thirty percent tax credit for certain energy-related

12 investments (hereafter, the "**Tax Credit**" or the "**Credit**").

13      164.   Thus, Purchasing Members expected to be able to take a Tax Credit for

14 roughly the same amount as their cash contribution to the Fund.

15      165.   Under the Fund Contracts, the MSG business was left entirely to DC Solar.

16      166.   At the same time the Funds executed the Purchase Agreements with DC Solar

17 Solutions, the Funds also executed Equipment Leases with DC Solar Distribution for at

18 least the first batch of MSGs being purchased.

19      167.   Depending on the size of the transaction, as additional tranches of MSGs were

20 manufactured, additional Equipment Leases were executed.

21      168.   Under the Equipment Leases, the Funds leased their MSGs to DC Solar

22 Distribution for terms ranging up to 120 months.

23      169.   The Equipment Leases provided that DC Solar Distribution shall use "the

24 Solar Equipment in a careful and proper manner" and "shall comply with all laws,

25 regulations and ordinances."

26      170.   Moreover, the Equipment Leases stated that DC Solar Distribution shall be

27 "solely responsible for the maintenance and repair of the Solar Equipment" and "shall

28 ensure the Solar Equipment is operational and capable of producing solar energy at all

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

times."

171.   The Equipment Leases required DC Solar Distribution to "obtain, maintain and keep" insurance coverage on the MSGs in the amount of the replacement cost as well as "liability insurance."

172.   In addition, the Equipment Leases required DC Solar Distribution to "promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes" imposed upon the MSGs.

173.   The Equipment Leases further provided for a set amount of "Base Rent" to be paid to the Fund in advance in monthly installments for the term of the lease as well as payment to the Fund of "Additional Rent" or "Variable Rent" to the extent DC Solar Distribution received revenue from subleasing the MSGs in excess of a certain amount.

174.   The amount of additional or variable rent due to the Fund varied depending on the deal and the calculation was specified in the Equipment Lease.

175.   The Fund Contracts were structured such that there was a flow of money between the Funds and DC Solar, all of which, in a legitimate business model, would have been contingent on the MSGs generating significant sub-lease revenue from legitimate end-users.

176.   DC Solar Distribution owed monthly lease payments to the Funds purportedly to be paid with the sub-lease revenue it received from third-party customers.

177.   The Funds would then use the lease payments they received from DC Solar Distribution under the terms of the Equipment Leases to make monthly payments due to DC Solar Solutions under the terms of the Promissory Notes.

178.   Purchasers expected several benefits under the arrangement, including the 30% Tax Credit and the ability to claim significant depreciation on the MSGs.

179.   In addition, Purchasers were entitled to receive some cash distributions from the Funds.

180.   In general, the LLC Agreements stated that "Distributable Cash," defined as the amount of cash from lease revenue remaining after loan payments and operating

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

20                                        **COMPLAINT**

expenses, would be paid out to Purchasers on an annual basis.

181.    Specifically, Purchasers expected to, and promised by DC Solar and other Defendants that they would, profit from the Fund Contracts due to Tax Credits, depreciation on the MSGs, lease payments, and ownership of the MSGs.

182.    Purchasers thus played an entirely passive role under the DC designed structure.

183.    The success of the venture, and thus the profits to Purchasers and DC Solar, turned entirely on the efforts of DC Solar to make, maintain, market, and lease the MSGs.

184.    DC Solar marketed itself as having extensive experience and capabilities in the renewable energy field and in executing successful transactions for purchasers.

185.    For example, pitch-books for Purchasers, which were prepared by, among others, Hacker, Bermudez and CohnReznick, and other brokers working on behalf of DC Solar using information provided by DC Solar, emphasized that DC Solar had thousands of MSGs deployed and manufacturing capabilities of 900 MSGs per month.

186.    These brokers and other parties highlighted that DC Solar had closed many prior funds with "headline" or "notable" Purchasing Members, including funds with fair market values near or over $100 million, and that the "performance of each of the funds remains in good standing."

187.    In addition, the materials claimed DC Solar had "customer relationships with leading companies in the telecommunications, entertainment and construction industries" and provided case studies of the established leasing arrangements with many of those customers.

188.    Finally, certain of the pitch-books provided a "Summary of Investor Returns" with estimated internal rates of return ranging from 40 to as high as 50 percent.

189.    One such lease touted, was a lease with Ahern Rentals, which purchasers were not told was backstopped by an agreement from DC Solar Solutions in favor of Ahern.

190.    For example, in an email dated July 11, 2018 from Bermudez to Karmann, Hacker and Carpoff, an attached lease schedule claims a 94.31% MSG "utilization rate",

**COMPLAINT**

1   with 12,164 units allegedly being subleased as of December 31, 2017 out of 12,898 Fund-

2   owned MSGs.

3       191.   By design, Purchasers never physically took possession of the MSGs that they

4   purchased because the MSGs were leased to DC Solar Distribution upon purportedly being

5   placed in service.

6       192.   Pursuant to the terms of the Purchase Agreements and LLC Agreements,

7   Purchasers made payments to DC Solar Solutions for the MSGs in installments after

8   receiving proof that the MSGs had been placed in service as evidenced by the delivery of

9   the "IE Certificate."

10       193.   The LLC Agreements defined "IE Certificate" as "a certificate to be issued

11   by the Independent Engineer" with respect to the MSGs "upon achievement of Placement

12   in Service." Beginning in 2014, the LLC Agreements further stated that "'Independent

13   Engineer' means "Joseph Bayliss of Bayliss Innovative Services."

14       194.   Jeff Carpoff arranged for Bayliss and his firm to serve as the "Independent

15   Engineer."

16       195.   The Bayliss arrangement deceived Purchasers, because Bayliss was neither

17   independent nor an engineer.

18       196.   While Bayliss holds general contractor and electrical licenses from the State

19   of California, he was never a licensed engineer.

20       197.   Bayliss has known Jeff Carpoff and Paulette Carpoff since high school.

21       198.   In fact, the Company and Jeff Carpoff hired Bayliss to perform various

22   projects for DC Solar and other businesses owned by Jeff Carpoff.

23       199.   DC Solar purported to sell more than 18,400 MSGs from its inception.

24       200.   Bayliss executed IE Certificates, titled "IE Commissioning Reports," for

25   nearly all of the sold MSGs from 2014 through 2018.

26       201.   In thousands of instances, Bayliss admittedly signed IE Commissioning

27   Reports for MSGs without inspecting them, and without any basis for making the

28   representations in the IE Certificates.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

22   **COMPLAINT**

202. Further, Purchasers routinely requested financial statements from DC Solar Distribution and DC Solar Solutions before purchasing MSGs.

203. In response, DC Solar and Defendants often provided Purchasers with putative financial statements.

204. Roach issued "Accountants' Compilation Reports" for DC Solar Distribution and DC Solar Solutions covering various periods between 2011 through July 2018.

205. Roach signed these reports on the letterhead of his firm, Ronald J. Roach Accountancy Corporation.

206. The financial statements accompanying Roach's compilation reports included a statement of income in each.

207. Roach prepared these reports at the direction of the Carpoffs and provided them to Lauer, despite knowing of the circular flow of funds between DC Solar Solutions and DC Solar Distribution.

## F.  General Background - Defendants Causing or Contributing to Plaintiff's Injuries

208. On information and belief, Wilde knew or should have known of the financial failure of the sublease program and the lack of existence or continued production of MSGs. On information and belief, Wilde assisted in presenting false or misleading information to Plaintiff and others or concealing information from Plaintiff and others.

209. On information and belief, Guidry knew or should have known of the financial failure of the sublease program and the lack of existence or continued production of MSGs. On information and belief, Guidry assisted in presenting false or misleading information to Plaintiff and others or concealing information from Plaintiff and others.

210. On information and belief, Moore knew of the substantial problems with DC Solar and acted as a party who collected money for the Carpoffs from difficult individuals.

211. Montage, Wentz, Yee, on information and belief, performed tax work, oversaw or participated in an audit or financial compilation, and acted directly and helped DC Solar create international companies built to keep assets and income outside of the United States.

23                                    **COMPLAINT**

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

212.    Upon information and belief, among other work, Montage audits of DC Solar, the Funds, and/or the Carpoffs were performed by Montage through its employees and the employees of Radius.

213.    Upon information and belief, Montage, Wentz, Yee, Radius, and Vistra knew or should have known of misrepresentations regarding the financial status of DC Solar.

214.    Montage, Wentz, Yee, Radius, and Vistra, however, performed tax work and audits or financial compilations for DC Solar and provided that information to Plaintiff and others with knowledge that it would be relied upon.

215.    At some point Yee, Wentz, and Montage learned of significant transfers of cash from DC Solar Solutions to DC Solar Distribution in multiple years as part of preparation of certified audited financial statements for DC Solar Solutions.

216.    Despite this information, the certified audited financial statements for DC Solar Solutions did not reflect or accurately reflect these payments

217.    On information and belief, Ahern assisted DC Solar in the creation of an invalid or improper sublease that it knew or should have known would be presented to Plaintiff and others to rely upon.

218.    Upon information and belief, Carson only made approximately 6,800 trailers, but gave DC Solar over 17,000 VINs used by DC Solar to falsify commissioning reports with non-existent MSGs and corresponding VINs, even after it became clear that DC Solar had no intent to acquire more trailers.

219.    On information and belief, Carson knew or should have known that DC Solar was providing the VINs to Plaintiff and other purchasers and that Plaintiff and other purchasers would rely upon the existence of a VIN to establish the existence of an MSG.

220.    On information and belief, Endres knew or should have known that DC Solar was providing the VINs to Plaintiff and other purchasers and that Plaintiff and other purchasers would rely upon the existence of a VIN to establish the existence of an MSG.

221.    On information and belief, Alvarez & Marsal did not have a sufficient basis upon which to base its appraisals, the appraisals were negligently prepared, the appraisals were not

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1 properly adjusted over time, and the appraisals did not meet professional and industry standards.

2  222. Halo, despite being the managing member of multiple funds, took no actions to

3 protect or preserve the MSGs owned by the funds it was managing.

4  223. Plaintiff, at the request of members in Halo-managed funds and at its own expense,

5 assisted by advancing money or services relating to the Halo-managed funds and Halo has not

6 provided compensation to Plaintiff for those efforts.

7 **G.** **The First Sign of Trouble (the Audits) & the Appraisals**

8  224. Starting as early as 2013, red flags began emerging in the DC operations.

9  225. DC Solar, the Funds and the Carpoffs individually became subject of audits

10 by the Internal Revenue Service ("**IRS**") and the State of California regarding income, sales

11 and franchise taxes.

12  226. As of 2018, the potential tax liability with respect to these audits was hundreds

13 of millions of dollars.

14  227. Specifically, the IRS questioned the $150,000 valuation of each MSG.

15  228. The IRS also determined that DC Solar was not properly recognizing the

16 income from the "sale" of the MSGs.

17  229. On information and belief, DC Solar only paid taxes on the 30% down

18 payment received from the Purchasers for the MSGs. DC Solar did not pay taxes on the

19 Promissory Notes held by DC Solar Solutions.

20  230. Over the course of the IRS audit, the aggregate amount owed on the notes

21 held by DC Solar Solutions was approximately $1.2 billion, resulting in a significant tax

22 liability to the Carpoffs.

23  231. DC Solar was taxable as an S corporation for federal income tax purposes.

24  232. This corporation status meant that DC Solar did not pay federal income tax,

25 but rather passed through the taxable income to the Carpoffs as shareholders of DC Solar.

26  233. The IRS was contesting the $150,000 valuation of the MSGs in at least 5

27 separate federal income tax audits of tax equity funds.

28  234. To support the $150,000 claimed value of each MSG, DC Solar retained

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Alvarez & Marsal, a well-known valuation firm, to create appraisals (collectively, the "**Appraisals**") validating that price.

235.   The brokers sometimes worked directly with Alvarez & Marsal in producing a final draft of the Appraisals.

236.   The Appraisals were based on the Carpoffs' and other Core Defendants' representations of a 95% sublease utilization rate, average rents of $700-$1000/month per unit, and projections for additional long term leases and related future cash flow.

237.   Alvarez and Marsal continued to use its initial valuation of the MSGs for years, even after learning of the IRS fund audits, without following up on the accuracy of the Appraisals or the underlying data that purportedly supported the Appraisals.

238.   Upon information and belief, Alvarez and Marsal never changed its $150,000 initial valuation to include new information about actual leases, nor did Alvarez and Marsal investigate to determine if the valuation should change for a number of reasons including obsolete technology.

239.   Upon information and belief, Alvarez and Marsal never received actual copies of the subleases, and did not investigate if alleged lease revenue was legitimate or even existed.

240.   Upon information and belief, Alvarez & Marsal never questioned the exorbitant markup of the MSGs over the cost of production.

241.   Upon information and belief, DC Solar initially retained Montage, Wentz and Yee in 2013, to respond to the California sales tax audits.

242.   Wentz and Yee learned about the structure whereby DC Distribution was supposed to sublease the MSGs as part of representing DC Solar with respect to the California sales tax audit.

243.   Wentz and Yee sent information regarding the subleases to the State of California demonstrating small amounts of sublease revenue.

244.   Wentz and Yee expanded their workload beyond the California sales tax audits by providing certified audited financial statements for DC Solar, Solarmore, and

26                                          **COMPLAINT**

certain Funds.

245.   Montage was later acquired by Radius in 2016, and Radius in turn acquired by Vistra.

246.   Plaintiff also retained Wentz and Montage to complete tax returns and certified audited financial statements.

247.   Upon information and belief, in cooperation with the Carpoffs and DC Solar, Montage, and Wentz concealed requested financial and tax documents and information from Solarmore.

248.   Some key employees of Montage or "Legacy Montage" worked for both Montage, and Radius or Vistra, simultaneously during 2016 through 2018.

### H.   The Phaseout of Solarmore

249.   Halo was created in 2016, with Roselli as the managing member.

250.   Upon information and belief, Roselli was or is a personal friend of the Carpoffs, and had a previous business relationship with Paulette Carpoff.

251.   During 2016 and 2017, as some of the Funds began nearing the five-year equity flip benchmark, Jansen, believing Plaintiff would soon be the majority member of those Funds and effective owner of thousands of MSGs, began asking questions of the Carpoffs and other Core Defendants regarding potential tax implications and other ownership-related effects on Plaintiff.

252.   Further, Jansen attempted to ask Kershaw questions on behalf of Plaintiff about the Plaintiff's bank account at Heritage Bank. Upon information and belief, Kershaw acting in her capacity as an officer of Heritage Bank would not give the requested information to Jansen, and would instead email the Carpoffs informing them of Jansen's contact and questions even though Jansen was the primary account signer and party.

253.   Soon thereafter, in or about 2017, rather than reveal the ongoing Schemes to Jansen and Plaintiff, the Carpoffs stopped using Solarmore and instead used Halo as the manager of funds created from that point forward from late 2016 through 2018.

27                                    **COMPLAINT**

# I.  **The Collapse of DC Solar**

254.   As early as mid-2016, the Core Defendants knew that the sublease program was a huge financial failure, and that DC Solar had a massive cash shortfall from lack of real lease revenues.

255.   Lease revenue from end-users of the MSGs was critical to the legitimacy of the businesses of DC Solar Solutions and DC Solar Distribution because it was supposed to provide the money that DC Solar Distribution needed to make lease payments to the Funds, and those payments were critical to the Funds' ability to make payments on the Promissory Notes to DC Solar Solutions.

256.   Although DC Solar Distribution purported to be earning millions each month in lease revenue from end-users of the MSGs, bank records demonstrate that DC Solar Distribution generated minimal lease revenue from subleases to end-users.

257.   To further illustrate, in an email dated July 18, 2016 from Roach to Carpoff and Lauer, Roach attached five spreadsheets summarizing the sublease activity for DC Solar from 2012-2015.

258.   The 2016 Roach documents reflect sublease revenue of $138,138.64 for 2012, $278,179.74 for 2013, $321,717.06 for 2014, and $1,419,570.80 for 2015, for a grand total over four years of $2,157,606.24.

259.   The actual cash requirement from the subleases of the MSGs under DC Solar's lease program over that four-year time period – stated as a percentage of promised utilization-- was a dismal 3.78%.

260.   This failure of the sublease program also endangered the touted tax benefits of the Defendants' MSG transactions.

261.   This failure of the sublease program also invalidated the stated appraisal value of MSGs for ongoing or new purchaser transactions.

262.   In an email dated March 2, 2017 from Roach to Lauer and various individuals at Nixon and major accounting firms Hays, Foley and Deloitte, provides the same information for 2013-2015 , adding the $2,071,664.85 in sublease revenues for 2016.

Snell & Wilmer

L.L.P.

law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

263.    Roach also stated in his 2017 email that following amounts were paid by DC Solar Solutions to DC Solar Distribution on a "re-rent" basis for each of those years:

>2013 - $1,595,370
>
>2014 - $13,975,770
>
>2015 - $30,562,024
>
>2016 - $61,545,737

264.    On information and belief, the Core Defendants knew about the foregoing.

265.    Over the time periods, the Core Defendants began taking drastic measures to conceal the financial failure of the MSG transactions, and to conceal the fact that the Core Defendants had masked that financial failure by moving money received from new purchasers from DC Solutions to DC Distribution, and falsely representing the new purchasers' money as revenues received from subleases of MSGs to end users.

266.    The Core Defendants created fake subleases, circular subleases, and dummy third party sublessors to make the sublease program appear legitimate.

267.    To hide the fact that insufficient money was coming in from subleases, the Core Defendants circulated new monies received by DC Solar Solutions to DC Solar Distribution, which then paid the Funds with alleged "lease revenues." Most of the supposed lease revenue paid to the Funds were actually recirculations of later down payments paid by later Purchasing Members under later Purchase Agreements.

268.    For example, during the period of January 2013 through December 2018, a total of about $409,930,000 was deposited to DC Solar *Distribution's* bank accounts.

269.    Of that amount, approximately $383,347,000 -- or 93.5% -- consisted of transfers from DC Solar *Solutions'* bank accounts. And, another $8,268,000 -- or 2.0% -- consisted of transfers from the bank accounts of different Funds.

270.    At most, $18,316,000 -- or 4.5% -- of the deposits to DC Solar Distribution's bank accounts during the time period represented sub-lease payments from end-users of the MSGs.

271.    Yet, during this period, DC Solar Distribution paid about $347,800,000 to

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

29                              **COMPLAINT**

1  various Funds and purchasers, mostly of which took the form of circular "lease payments"

2  owed by DC Solar Distribution under the operative Equipment Leases.

3      272.   Accordingly, DC Solar Distribution's payments were not funded by

4  legitimate sub-lease revenue, but instead by investor funds cycled through DC Solar

5  Solutions.

6      273.   Wentz and Yee were informed of these large payments prior to the completion

7  of the 2017 certified audited financial statements, and on information and belief as early as

8  2016.

9      274.   The Core Defendants prepared and disseminated false financial statements

10  and compilation reports falsely stating that DC Solar Distribution generated hundreds of

11  millions of dollars of revenues in "Rental Income."

12      275.   In reality, the overwhelming majority of purported "Rental Income" consisted

13  of intercompany transfers from DC Solar Solutions.

14      276.   The cash infusions of hundreds of millions of dollars from DC Solar Solutions

15  to DC Solar Distribution were hidden in the "Direct Costs" category of DC Solar Solutions'

16  income statements.

17      277.   These putative Direct Cost payments had nothing to do with the costs of

18  manufacturing the MSGs.

19      278.   The Core Defendants began storing and stashing away MSGs they failed to

20  sublease, which were stacking up, in some cases incurring significant storage costs.

21      279.   The Core Defendants started giving away MSGs for free through DC Solar

22  Freedom and essentially using the MSGs as advertising props in an attempt to attract

23  attention.

24      280.   Starting in 2016, DC Solar stopped buying and manufacturing MSGs

25  altogether.

26      281.   In fact, DC Solar never manufactured or received delivery of the majority of

27  the MSGs that it "sold" to Purchasers.

28      282.   Recent intensive efforts by Plaintiff to locate those MSGs turned up roughly

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

30                                              **COMPLAINT**

6,800 MSGs of the approximately 18,400 MSGs for which Bayliss provided IE Commissioning Reports.

283. The Core Defendants began putting new VIN numbers on old units, or misrepresenting VINs in order to conceal the fact that new MSGs were not being produced and older units were never subleased.

284. The VIN subterfuge was made possible by Carson's willingness to provide DC Solar Solutions with reserved VINs before building the associated trailers reserved for the VINs.

285. At times, DC Solar Solutions sold the same MSG to different Purchasers, but with changed VINs, with no awareness of either the old or new Purchasers.

286. The Core Defendants made false representations to Plaintiff and others regarding production of MSGs, alleged lease revenue, and other lies or misrepresentations as part of the Schemes.

287. The Core Defendants knew when making those representations that MSGs were no longer being produced or received, and that the Core Defendants did not intend to produce or receive MSGs on any timely basis.

288. The Core Defendants directed each other, and others including but not limited to the other Defendants, to lie and present false information to perpetuate and/or cover up the Schemes.

289. On or about 2017, SolarSense, a solar energy provider, began negotiations to buy MSGs from DC Solar Solutions.

290. However, rather than taking a promissory note carryback note to DC Solar Solutions (as was the usual structure for most of the DC Solar tax equity transactions)-SolarSense attempted to arrange financing for its purchase of MSGs through KeyBank.

291. During KeyBank's due diligence review for the deal, KeyBank requested, among other things, a list of end-user/sublessees, pro forma financials for DC Solar Distribution, samples of subleases, and DC Solar Distribution's' QuickBooks.

292. On information and belief, KeyBank began to suspect, after closing, the

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

31                                                    **COMPLAINT**

1  claimed subleases and claimed sublease revenues were false.

2      293.    On information and believe, Carpoff and Lauer instructed Jano, a former

3  employee of DC Solar who was putting together the SolarSense/Keybank deal, to shut down

4  the deal, knowing that the KeyBank's requested data would reveal the fraud underlying the

5  Schemes.

6      294.    On information and belief, SolarSense and KeyBank closed their transaction

7  in reliance on Defendants representation and promise of information to be delivered.

8      295.    Jano subsequently resigned his employment with DC Solar, and sent a letter

9  through counsel to the Carpoffs in February 2018, providing specific details about the

10  Schemes, and threatening to expose the Schemes if he was not paid $5 million.

11      296.    In December 2018, law enforcement agents executed federal search warrants

12  at DC Solar Solutions' headquarters and other locations, seizing over $60 million in assets.

13      297.    On January 30, 2019, the first DC Solar company filed for Chapter 11

14  bankruptcy.

15      298.    Thereafter, additional DC Solar-affiliated companies filed for Chapter 11

16  bankruptcy.

17      299.    Subsequently all of the DC Solar Chapter 11 cases were converted to Chapter

18  7 Liquidation Bankruptcy cases.

19                    **J.   The Carpoffs' Preparations for Escape**

20      300.    In or about 2018, the Carpoffs in various ways began withdrawing large

21  amounts of money from DC Solar, including a payment of $20,000,000 to Panda.

22      301.    In May 2018, the Carpoffs held extensive discussion with Strauss about

23  obtaining citizenship in Nevis Island, a well-known asset shelter in the Caribbean.

24      302.    Later in August 2018 the Carpoffs bought property in Nevis for $5 million

25  and used DC Solar International, a Nevis affiliation to undertake a sale leaseback

26  transaction.

27      303.    Upon information and belief, The Carpoffs also started making plans to flee

28  the United States if necessary which included an expedited renewal of their passports.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

304.   Strauss, the Strauss Firm, Muraco, and Praeditis, assisted in the creation of the Nevis transactions and had already created offshore accounts, offshore trusts, and captive insurance companies such as Bayshore and Champion Select that permitted the Carpoffs to hide assets outside of the United States. [expand]

305.   For example, the Carpoffs created a Cook Islands trust in 2016, utilizing Wentz, the Strauss Firm, Muraco, and Praeditis.

306.   As part of this scheme, the Carpoffs were to execute a statement of solvency, which was at that time, completely untrue.

307.   The Carpoffs also instructed Wentz to create Panda, a company located in Hong Kong, to purportedly purchase batteries for the MSGs, which allowed for funds to be effectively parked outside of the United States.

308.   Upon information and belief, the over $20,000,000 that had been placed in the Panda account was removed by the Asset Hiders.

309.   With assistance from Lauer, the Strauss Firm, Strauss and Hacker, among others, the Carpoffs also created DC Solar International a Nevis Island International Corporation in Nevis, a notorious off-shore tax shelter, to be party to certain sale-leaseback deals rather than DC Solar Solutions, in order to keep income out of the United States.

310.   During the time that the Carpoffs were setting up offshore, in August 2018, Jeffrey Carpoff pushed to collect more funds and involved Moore in a collection matter where the debtor feared for his family's safety.

## V.   ALLEGATIONS RELATED TO RICO VIOLATIONS

311.   Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

312.   At all times relevant hereto, Plaintiff and the Defendants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

### A. Enterprise

313.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

314.   In this case, the enterprise ("**RICO**") for RICO purposes consists of DC Solar

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Companies.

315.   These Defendants individually and through their agents represented to their victims that these purchases qualified for an "Energy Credit" under Internal Revenue Code § 48, as well as depreciation.

316.   However, on information and belief, these purchases' qualifications for the Tax Credit under the Code is unclear, as most of the MSGs purportedly sold to Purchasers were never manufactured or delivered to the RICO Enterprise.

317.   The Schemes were devised solely to generate significant funds thereafter consumed by the Core Defendants for personal purposes or to pay off earlier Purchasers, rather than to manufacture or pay for delivery of the promised new MSGs.

318.   Because the terms of the Fund Contracts tied the fortunes of the Purchasers to those of DC Solar and its ability to manufacture and then sub-lease them at optimal or above true-market value rates, Purchasers were investing in a common enterprise.

319.   Because the terms of the Fund Contracts made Purchasers entirely dependent on DC Solar to manufacture, operate and maintain their purported MSGs, DC Solar and the Core Defendants' efforts were essential to the failure or success of the common enterprise.

320.   Purchasers also had an expectation of profits from the tax benefits and payment stream to be generated from the enterprise.

321.   The Core Defendants engaged in a common plan, transaction and course of conduct described herein in connection with the solicitation of purchases of MSGs, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon the Plaintiff, the primary purpose and effect of which was to generate significant income by fraudulently selling and subleasing MSGs.

322.   The Core Defendants sought out large, prominent Purchasing Members with high visibility and high taxable income in order to carry out the Schemes.

323.   While the Core Defendants participated in the RICO Enterprise and were a part of it, the Core Defendants also had an existence separate and distinct from the Enterprise.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

34                                    **COMPLAINT**

324. The Core Defendants maintained an interest in and control of the RICO Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

325. The Core Defendants' control and participation in the RICO Enterprise were necessary for the successful operation of the Core Defendants' Schemes.

326. The RICO Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Core Defendants engaged.

**B. Operation of the RICO Enterprise**

327. The Core Defendants perpetrated the Schemes described in detail above.

328. Each of the Core Defendants were vital to the implementation of the Schemes, played an important role in the RICO Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise.

329. The Core Defendants intended to commit wire and/or mail fraud in connection with the promotion and operation of the Schemes based on the significant evidence uncovered in this case.

330. The Core Defendants' racketeering activity in creating, designing, establishing, promoting, and vouching for the Schemes involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

331. Plaintiff relied on the Core Defendants' representations in perpetrating the Schemes, and have been damaged by the Core Defendants' actions.

**C. Predicate Acts**

332. With respect to the activities alleged herein, the Core Defendants acted at all times with malice toward the Plaintiff, intending to engage in the conduct complained of for the benefit of Defendants and with knowledge that such conduct was unlawful.

333. The conduct of the Core Defendants was done with actionable wantonness and reckless disregard for the rights of Plaintiff, as well as the laws to which the Core Defendants are subject, the same amounting to actionable wantonness.

334. With respect to the activities alleged herein, each Core Defendant agreed to

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

the operation of the transaction or artifice to deprive Plaintiff of property interests.

335.   In furtherance of these agreements, each Core Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Core Defendants were not entitled.

336.   With respect to the overt acts and activities alleged herein, each Core Defendant conspired with each other to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

337.   Each Core Defendant also agreed and conspired with each other Core Defendant to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Core Defendants were not entitled.

338.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by the Core Defendants designed to defraud the Plaintiff of money and property interests under false pretenses.

339.   As a victim of these unlawful patterns of illegal activity, Plaintiff has and continues to suffer losses as a result of these activities. The acts which caused injuries to the Plaintiff were performed for financial gain.

340.   In carrying out the overt acts and fraudulent transactions described above, the Core Defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*.

341.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

### D. **Violations of 18 U.S.C. § 1343**

342.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

343.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the

Snell & Wilmer
L.L.P.
50 West Liberty Street
Suite 510
Reno, Nevada 89501

36                                                              **COMPLAINT**

Core Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, funds, and other interstate transmittals and transfers.

344. The Core Defendants' violations of 18 U.S.C. § 1343 are subject to continuing investigation and revaluation.

345. However, the acts described *supra,* provide, by way of illustration but not limitation, representative examples of the Core Defendants' 18 U.S.C. § 1343 violations.

346. Each of the documents, invoices, letters, emails, applications, and/or tax forms that the Core Defendants sent by wire and/or mail to Plaintiff served at least two roles in the RICO Enterprise.

347. First, these documents, standing alone, were fraudulent. The Core Defendants knew that the vast majority of MSGs allegedly being sold were not in existence or being subleased.

348. Second, in addition to being fraudulent standing alone, these documents were used to advance the fraudulent Schemes that the Core Defendants perpetrated on Plaintiff.

349. In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail the Core Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiff as described above, in violation of 18 U.S.C. § 1343.

350. The Core Defendants' fraudulent statements and omissions include insufficient demand in the market for the MSGs, i.e., that the MSGs would all be leased and would retain sufficient value after five years to repay the Promissory Notes to DC Solar Solutions and return additional revenue to the relevant Fund.

351. The Core Defendants' fraudulent statements and omissions include that DC Solar had subleased thousands of MSGs to legitimate third-party lessees for amounts that would support each MSG's $150,000 valuation.

352. The Core Defendants' fraudulent statements and omissions includes that DC Solar Solutions, or one of the other Core Defendants, had separate agreements with the

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1  major sublessees which negated or paid the lease payments that DC Solar Distribution

2  owed.

3      353.  The Core Defendants' fraudulent statements and omissions include that all

4  MSGs sold had been built and were "placed in service" as of the closing date of each

5  Purchase Agreement, or any subsequent dated provided therein.

6      354.  The Core Defendants' fraudulent statements and omissions include that

7  Bayliss was an independent engineer who had viewed and tested all of the MSGs sold.

8      355.  On information and belief, the predicate acts, including the predicate acts of

9  wire fraud, are continuing.

10      356.  The Core Defendants, on their own and as part of a common fraudulent

11  scheme and conspiracy, defrauded Plaintiff as set out above.

12      357.  The Core Defendants intentionally and knowingly made these material

13  misrepresentations and intentionally and knowingly suppressed material facts from

14  Plaintiff, for the purpose of deceiving it and thereby obtaining financial gain.

15      358.  The Core Defendants either knew or recklessly disregarded that the

16  misrepresentations and omissions described above were material. Plaintiff was injured as a

17  result of the misrepresentations.

18      359.  The Core Defendants made continual use of wire transmissions, in addition

19  to communications made outside the interstate wire systems, to effectuate their fraudulent

20  Schemes. In addition to using in person, telephonic, and other means of communication to

21  make fraudulent statements, the Core Defendants transmitted numerous specific fraudulent

22  statements to Plaintiff through the mail, by fax, and/or by email.

23      360.  The Core Defendants intentionally and knowingly made these material

24  misrepresentations and intentionally and knowingly suppressed material facts from

25  Plaintiff, for the purpose of deceiving it and thereby obtaining financial gain.

26      361.  The Core Defendants either knew or recklessly disregarded that the

27  misrepresentations and omissions described above were material. Plaintiff was injured as a

28  result of the misrepresentations.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

38                                    **COMPLAINT**

362.    As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire fraud, committed by the Core Defendants pursuant to their transactions to defraud Plaintiff.

363.    Plaintiff has therefore been injured in its business or property as a result of the Core Defendants' overt acts and racketeering activities.

## E.  Pattern of Racketeering Activity

364.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

365.    As set forth above, the Core Defendants have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years.

366.    Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiff.

367.    The multiple acts of racketeering activity committed and/or conspired to by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5). Plaintiff alleges that the course of conduct engaged in by the Core Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5).

368.    Plaintiff can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the schemes so that the Core Defendants could defraud Plaintiff. Plaintiff alleges that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses

Snell & Wilmer

L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1  extended since at least 2011 (a substantial period of time).

2       369.    Moreover, the continuity of the pattern of racketeering can also be established

3  under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular

4  way of doing business, and the predicates are attributed to the Core Defendants' operations

5  as part of a long-term association that existed for criminal purposes. Further, the last act of

6  racketeering activity that is alleged as the basis of Plaintiff's claims occurred within four

7  years of a prior act of racketeering.

8       370.    Three key individuals that assisted with the operations of the RICO Enterprise

9  have plead guilty to federal felonies.

10       371.    Plaintiff therefore has been injured in its business or property as a result of

11  the Core Defendants' overt acts and racketeering activities as described above and

12  throughout this Complaint.

13  **VI.**     **DAMAGES**

14       372.    Plaintiff was damaged by all Defendants in various ways.

15       373.    First, Plaintiff suffered costs for the presumptive value of the MSGs

16  purchased by Funds but never delivered.

17       374.    Second, Plaintiff incurred significant costs related to closing the deals to

18  purchase the MSGs, as well as to locate and store MSGs after the Schemes were uncovered.

19       375.    Third, Plaintiff was deprived of the benefit of its bargain, specifically the

20  value of promised Tax Credit, depreciation, rental, and management income.

21       376.    Fourth, Plaintiff paid for services not rendered, and those amounts should be

22  disgorged.

23  **VII.**     **CLAIMS FOR RELIEF**

24  **Count I**

25  **(Federal RICO - 18 U.S.C. §1962(c) – Core Defendants)**

26       377.    Plaintiff repeats, realleges and incorporates each and every prior factual

27  allegation in the preceding paragraphs as if fully set forth herein.

28       378.    Section 1962(c) of RICO provides that it "shall be unlawful for any person

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

40     **COMPLAINT**

employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

379. Plaintiff incorporates, as though fully set out herein, its allegations regarding Enterprise.

380. Plaintiff incorporates, as if fully set forth herein, its allegations that the Core Defendants have engaged in a pattern of racketeering activity.

381. The Core Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint.

382. Through the fraudulent and wrongful conduct described in this Complaint, the Core Defendants seek and have sought to deprive Plaintiff of money and property rights.

383. To successfully execute their Schemes in the manner set forth in this Complaint, the Core Defendants must have a system that allows Core Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

384. With respect to the activities alleged herein, the Core Defendants have acted at all times with malice toward Plaintiff in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

385. In carrying out the overt acts and fraudulent scheme described above, the Core Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1343 and 1346, and 18 U.S.C. §1961, *et seq*. as set forth more fully above.

386. Therefore, the Core Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under any of the following provisions of 18 U.S.C. §1343 (relating to wire fraud) ...."

387. As a proximate result of the Core Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiff has been injured in its business or property

Snell & Wilmer

L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

41                                              **COMPLAINT**

1   as described above.

## **Count II**

### **(Federal RICO - 18 U.S.C. §1962(d) – Core Defendants)**

388.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

389.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Core Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

390.   Plaintiff incorporates, as if fully set forth herein, its allegations regarding the Enterprise. Plaintiff incorporates, as if fully set forth herein, its allegations that the Core Defendants have engaged in a pattern of racketeering activity. Absent the Core Defendants' conspiracy and joint efforts, the Core Defendants' Schemes would not be successful. Acting jointly, the Core Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

391.   The Core Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

392.   As demonstrated in detail above, the Core Defendants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Plaintiff of money and other property interests.

393.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Core Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. The Core Defendants have

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

42      **COMPLAINT**

engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by the Core Defendants from such pattern of racketeering activity, including:

394. Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

395. Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

396. As a proximate result of the Core Defendants' conduct as described above, Plaintiff has been injured in its business or property as described above.

## Count III

### (Fraud: Intentional Misrepresentation – Core Defendants)

397. Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

398. In perpetrating the Schemes, the Core Defendants represented to the Plaintiff that the Funds would receive certain tax and other monetary benefits, and obtain title to MSGs, from the Funds' purchase of MSGs from DC Solar Solutions.

399. The Core Defendants' representation was false.

400. The Core Defendants knew that the representation was false when they made it.

401. The Core Defendants intended that the Plaintiff rely on the representation.

402. Plaintiff reasonably relied on the Core Defendants' representation.

403. Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the representations of the Core Defendants.

404. Plaintiff was harmed.

405. Plaintiff's reliance on the Core Defendants' representation was a substantial factor in causing Plaintiff's harm.

Snell & Wilmer

L.L.P.

law offices

50 West Liberty Street

Suite 510

Reno, Nevada 89501

43                                    **COMPLAINT**

## Count IV

### (Fraud: Intentional Concealment – Core Defendants)

406.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as fully set forth here.

407.   In perpetrating the Schemes, the Core Defendants intentionally failed to disclose certain facts to Plaintiff, i.e., that the MSGs were not being manufactured or subleased, and that the alleged lease revenues paid to the Funds by DC Solar Distribution were in reality circulated Purchaser monies paid to DC Solar Solutions for new MSGs.

408.   The Core Defendants intentionally failed to disclose these and other material facts to Plaintiff, which were known only to the Core Defendants, and prevented Plaintiff from discovering these facts.

409.   Plaintiff did not know the concealed facts.

410.   The Core Defendants intend to deceive Plaintiff by concealing the facts.

411.   Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the concealment of the Core Defendants.

412.   If the omitted information had been disclosed to Plaintiff, Plaintiff would have reasonably acted differently.

413.   Plaintiff was harmed.

414.   The Core Defendants' concealment was a substantial factor in causing Plaintiff's harm.

## Count V

### (Fraud in the Inducement- Core Defendants)

415.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

416.   In perpetrating the Schemes, the Core Defendants represented to the Plaintiff that the Funds would receive certain tax and other monetary benefits, and obtain title to MSGs, from the Funds' purchase of MSGs from DC Solar Solutions.

417.   Further, the Core Defendants represented to the Plaintiff that there were sufficient

**COMPLAINT**

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

lease revenues and third-party leases to lease the MSGs being sold to the Funds.

418.   Further, the Core Defendants represented to the Plaintiff that the MSGs for each Fund were built and would exist at the end of the five to seven years, when Plaintiff would become the 95% owner of each Fund.

419.   The Core Defendants' representation was false.

420.   The Core Defendants knew that the representation was false when they made it.

421.   The Core Defendants intended that the Plaintiff rely on the representation.

422.   Plaintiff reasonably relied on the Core Defendants' representation.

423.   Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the representations of the Core Defendants.

424.   Plaintiff was harmed.

425.   Plaintiff's reliance on the Core Defendants' representation was a substantial factor in causing Plaintiff's harm

## Count VI

### (Conversion- Core Defendants)

426.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

427.   As a member of the Funds, Plaintiff holds an ownership interest in the MSGs and/or the money paid to DC Solar Solutions for the purchase of the purportedly-existing MSGs.

428.   The Core Defendants substantially interfered with Plaintiff's property.

429.   Plaintiff did not consent.

430.   Plaintiff was harmed.

431.   The Core Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## Count VII

### (Civil Conspiracy – Core Defendants and Scheme Aiders/Abettors)

432.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

in the preceding paragraphs.

433.	The Core Defendants acted in combination.

434.	The Core Defendants intended to accomplish an unlawful objective together.

435.	The Core Defendants, through their acts or omissions, sought to fraudulently induce Plaintiff to take actions and undertake obligations relating to the Funds, to make fraudulent misrepresentations to Plaintiff, or to fraudulently conceal information from Plaintiff relating to the Funds, the MSGs, and DC Solar.

436.	The Core Defendants agreed to a concert of actions to accomplish the objective.

437.	The Core Defendants each committed the acts set forth in the preceding paragraphs to accomplish the objective.

438.	The Core Defendants intended to accomplish an unlawful objective for the purpose of harming Plaintiff and others.

439.	The Core Defendants committed unlawful acts in furtherance of the agreement.

440.	Plaintiff suffered damages as a result of the act or acts.

## Count VIII

### (Unjust Enrichment – Core Defendants and Halo)

441.	Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as fully set forth here.

442.	The Core Defendants were enriched as a result of the Plaintiff's management services, services in locating and moving MSGs, and/or monetary participation in the Core Defendants' businesses.

443.	Halo was enriched by Plaintiff advancing funds and incurring costs by which Halo benefitted, but refused or failed to reimburse for or pay to Plaintiff.

444.	The Plaintiff was impoverished as a result of these services and/or participation without promised compensation from the Core Defendants.

445.	If no adequate remedy at law is available for Plaintiff's impoverishment, the Plaintiff is entitled to recover under a theory of unjust enrichment.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

## **Count IX**

## **(Intentional Interference with Contractual Relationship or Business Expectancy – Core Defendants)**

446. Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

447. There was a contract or contracts between Plaintiff and third parties, or a business expectancy between Plaintiff and third parties.

448. The Core Defendants knew of the contract or business expectancy.

449. The Core Defendants' conduct prevented performance under the contracts or business expectancy, or made performance more expensive or difficult.

450. The Core Defendants intended to disrupt the performance of this contract or business expectancy, and/or knew that disruption of performance was certain or substantially certain to occur.

451. Plaintiff was harmed.

452. The Core Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## **Count X**

## **(Negligence – Alvarez & Marsal)**

453. Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

454. Alvarez & Marsal owed a duty to the Plaintiff in preparing the Appraisals.

455. Alvarez & Marsal breached its duty and was negligent in preparing the Appraisals.

456. Plaintiff was harmed.

457. Alvarez & Marsal's conduct caused Plaintiff's harm.

## **Count XI**

## **(Negligent Misrepresentation – Alvarez & Marsal)**

458. Plaintiff repeats, realleges and incorporates each and every prior factual

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

137

allegation in the preceding paragraphs as if fully set forth here.

459. Alvarez & Marsal represented to the Plaintiff that the Appraisals were true and accurate representations of the value of the MSGs.

460. Alvarez & Marsal's representation was not true.

461. Alvarez & Marsal had no reasonable grounds for believing the representation was true when it made it.

462. Alvarez & Marsal intended that Plaintiff rely on this representation.

463. Plaintiff reasonably relied on Alvarez & Marsal's representation.

464. Plaintiff was harmed.

465. Plaintiff's reliance on Alvarez & Marsal's representation was a substantial factor in causing Plaintiff's harm.

### Count XII

### (Professional Negligence – Roach)

466. Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

467. Plaintiff retained Roach to provide accounting services and counsel to Plaintiff with respect to the Funds, MSG purchases and related deals.

468. As accountant for Plaintiff, Roach had a duty to exercise reasonable care, skill, and diligence in performing services and providing advice to Plaintiff.

469. Plaintiff reasonably relied on the skill and expertise of Roach to provide advice and counsel consistent with the standards other members of the accounting profession commonly possess and exercise.

470. Roach breached the duty of care owed to Plaintiff by failing to use the skill and care that a reasonably careful accountant would have used in providing services and advice in similar circumstances.

471. Plaintiff was harmed by this breach.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

48                                                                    **COMPLAINT**

**Count XIII**

**(Breach of Fiduciary Duty – Roach)**

472.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

473.   Roach was Plaintiff's accountant, and acted on behalf of Plaintiff with respect to the Funds, MSG purchases and related deals.

474.   Roach failed to act as a reasonably careful accountant would have acted under the same or similar circumstances.

475.   Plaintiff was harmed by this failure.

476.   Roach's conduct was a substantial factor in causing Plaintiff's harm.

**Count XIV**

**(Professional Negligence – Wentz, Yee, Montage, & Radius/Vistra)**

477.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

478.   Plaintiff retained Wentz, Yee, Montage and Radius/Vistra employees to provide accounting services and counsel to Plaintiff with respect to the Funds, MSG purchases and related deals.

479.   As accountants for Plaintiff, Wentz, Yee, Montage and Radius/Vistra employees had a duty to exercise reasonable care, skill, and diligence in performing services and providing advice to Plaintiff.

480.   Plaintiff reasonably relied on the skill and expertise of Wentz, Yee, Montage and Radius/Vistra employees to provide advice and counsel consistent with the standards other members of the accounting profession commonly possess and exercise.

481.   Wentz, Yee, Montage and Radius/Vistra employees breached the duty of care owed to Plaintiff by failing to use the skill and care that a reasonably careful accountant would have used in providing services and advice in similar circumstances.

482.   Plaintiff was harmed by this breach.

49                                      **COMPLAINT**

### Count XV

### (Breach of Fiduciary Duty- Wentz, Yee, Montage & Radius/Vistra)

483.  Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

484.  Wentz, Yee, Montage, and Radius/Vistra employees were Plaintiff's accountants, and acted on behalf of Plaintiff with respect to the Funds, MSG purchases and related deals.

485.  Wentz, Yee, Montage, and Radius/Vistra employees failed to act as reasonably careful accountants would have acted under the same or similar circumstances.

486.  Plaintiff was harmed by these failures.

487.  Wentz, Yee, Montage, and Radius/Vistra employees conduct was a substantial factor in causing Plaintiff's harm.

### Count XVI

### (Negligent Misrepresentation – All Defendants)

488.  Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

489.  All Defendants represented to Plaintiff that certain information was true.

490.  All Defendants representations were not true.

491.  All Defendants had no reasonable grounds for believing the representations were true when they made it or within the time periods of their involvement.

492.  All Defendants intended that Plaintiff rely on these representations.

493.  Plaintiff reasonably relied on All Defendants' representations.

494.  Plaintiff was harmed.

495.  Plaintiff's reliance on all Defendants' representations was a substantial factor in causing its harm.

496.  All Defendants failed to disclose information that was known, or should have been known, to be important to the Plaintiff and Purchasers in their transactions.

497.  **Reservation of Rights.** Solarmore hereby reserves and does not waive:

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

a.  Any and all rights, claims, or remedies against other individuals and/or entities currently the subject of tolling agreements with Plaintiff;

b.  To the extent applicable, any and all claims or remedies that are asserted through Plaintiff's instant suit, and which might benefit any other Purchasers, Fund LLCs, and/or other Court-appointed representatives for said Purchasers, and/ or Fund LLC's; and/or

c.  the right to name additional individuals and/or entities and seek additional claims and/or further remedies based upon ongoing investigations.

## VIII.   PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants as follows:

A.  For damages against all Defendants in an amount in excess of $75,000 to be proven at trial.

B.  For treble damages under RICO.

C.  For an award of Plaintiff's reasonable attorneys' fees in an amount to be proven at trial.

D.  For such other relief as the Court may determine.

## IX.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues in this litigation that are triable to a jury.

DATED: December 17, 2019

SNELL & WILMER L.L.P.

By: _/s/ Nathan G. Kanute_
Nathan G. Kanute
50 W. Liberty Street, Suite 510
Reno, NV  89501

Don Bivens (*pro hac vice pending*)
Donald L. Gaffney (*pro hac vice pending*)
One Arizona Center, Suite 1900
400 East Van Buren Street
Phoenix, AZ 85004-2202
*Attorneys for Plaintiff*

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

# EXHIBIT E

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

2:13-CV-1113 JCM (PAL)

8

In Re:

9

AMERICAN PACIFIC FINANCIAL
CORPORATION,

10

11

Debtor.

_____

12

13

DOTAN Y. MELECH, not individual
but as Chapter 7 trustee of the above
debtor,

14

15

Plaintiff(s),

16

v.

17

LARRY POLHILL, et al.,

18

19

Defendant(s).

20

**ORDER**

21

Presently before the court is movant Larry Polhill's motion to withdraw reference.  (Doc. #

22

1-1).  The appointed trustee, Dotan Melech, has filed an opposition (doc. # 1-1, p. 109-120) and

23

Polhill has filed a reply (doc. # 3).

24

This motion arises out of an adversary action in the underlying bankruptcy proceedings. The

25

complaint contains eleven causes of action for: (1) breach of fiduciary duty; (2) aiding and abetting

26

breach of fiduciary duty/civil conspiracy; (3) conversion; (4) avoidance of preferential transfers; (5)

27

avoidance of fraudulent transfers; (6) turnover; (7) unjust enrichment; (8) constructive trust; (9)

28

James C. Mahan
U.S. District Judge

1    equitable lien; (10) breach of contract; and (11) breach of covenant of good faith and fair dealing.

2    Polhill asserts that the matter is subject to withdrawal of reference pursuant to 28 U.S.C. §

3    157(d).  That section provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

8    Polhill has not filed a proof of claim and has asserted a jury demand.  Polhill asserts that the

9    causes of action in the underlying complaint are not listed in 28 U.S.C. §157(b)(2) as core

10   proceedings.  In particular, he maintains that " each [cause of action] involves state law issues and

11   thus is beyond the reach of the bankruptcy court to hear and determine.  Such claims should be

12   adjudicated by an Article III court independent of whether a proof of claim has been filed."  (Doc.

13   # 1-1, p. 67) (citing *In re Castlerock Properties*, 781 F.2d 159, 162 (9th Cir. 1986)).

14   Polhill further asserts that, "[b]ecause this Court will be required to review the bankruptcy

15   court's proposed findings and conclusions of law de novo, judicial efficiency is promoted by

16   withdrawing the reference and holding one hearing instead of two to resolve factual issues." (*Id.*).

17   Melech opposes the motion on the grounds that it is "premature" despite conceding the inevitability

18   of the matter being brought to this court.

19   With respect to "non-core" claims, the default practice is for the bankruptcy court to hold

20   proceedings and make proposed findings of fact and conclusions of law, which in turn are reviewed

21   by the District Court.  *See* LR 1001(a); 28 U.S.C. § 157.  The Ninth Circuit has held that in

22   considering withdrawal, a "district court should consider the efficient use of judicial resources, delay

23   and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping,

24   and other related factors." *Sec. Farms v. Int'l Brotherhood of Chauffers, Warehousemen* & *Helpers,*

25   124 F.3d 999, 1008 (9th Cir. 1997).

26   The court finds judicial efficiency and the uniformity of bankruptcy administration would

27   be better served by having the bankruptcy court continue to decide the pre-trial motions, including

28

James C. Mahan
U.S. District Judge

- 2 -

1  discovery related ones, prior to removing the case to this court.

2      The bankruptcy court is well-versed in the history and procedural posture of this action. It

3  has managed these proceedings over the last several years, and there is no legitimate reason to

4  withdraw at this juncture. As the court most familiar with this case, the bankruptcy court is in the

5  position to most efficiently manage its course while minimizing delay and costs. *Sec. Farms*, 124

6  F.3d 999. In sum, Polhill has not met his burden of demonstrating why this case warrants immediate

7  withdrawal.

8      Accordingly,

9      IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the motion to withdraw

10  reference (doc. # 1) be, and the same hereby is, DENIED.

11      DATED February 5, 2014.

12

13  _____

14  **UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F

1
2
3
4

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

5
6

_____
                                    )
In re USA COMMERCIAL MORTGAGE      )
CO.,                                )
                                    )
          Debtor.                   )
_____    )         Case No. 2:14-cv-00455-RCJ-PAL
                                    )         Adv. No. 08-ap-01066-LBR
USACM LIQUIDATING TRUST,           )         Bankr. No. 06-bk-10725-LBR
                                    )
          Plaintiff,                )
                                    )         **ORDER**
     vs.                            )
                                    )
COMPASS USA SPE, LLC et al.,        )
                                    )
          Defendants.               )
_____    )

7
8
9
10
11
12
13
14
15
16
17
18

     The Bankruptcy Court has recommended withdrawal of the reference in this post-

judgment adversary proceeding.  No party has timely objected.  For the reasons given herein, the

Court withdraws and stays the proceeding.

19

## I.       FACTS AND PROCEDURAL HISTORY

20
21
22
23
24

     In February 2008, USACM Liquidating Trust ("USACMLT") brought a core adversary

proceeding in this district based on the consolidated USA Commercial Mortgage Co.

("USACM") bankruptcy case against, _inter alia_, Republic Title of Texas, Inc. ("RTT"), seeking

an order that RTT turn over to USACMLT a total of $2,153,000 to which it was allegedly

entitled under two escrow agreements as successor to the rights of Debtor USACM. (_See_ Adv.

147

Compl., ECF No. 1 in Adv. No. 08-ap-1066). USACMLT also asked the Bankruptcy Court for certain relief against Compass USA SPE, LLC and Compass Partners, LLC (collectively, "Compass"). (*See id.*).

In September 2009, the Bankruptcy Court permitted Debt Acquisition Co. of America V, LLC ("DACA V") to intervene, file a complaint in intervention, and substitute itself as Plaintiff in place of USACMLT. (*See* Order, ECF No. 67 in Adv. No. 08-ap-1066). The court noted that once DACA V filed a complaint in intervention, that pleading would be the "sole extant complaint" in the adversary proceeding. (*See id.*). DACA V filed the Complaint in Intervention ("CI") later that month; the Court will refer to the CI as the Amended Complaint ("AC"), because DACA V has been substituted as the Plaintiff, not merely permitted to intervene, because the pleading is entered as an "Amended Complaint" in the electronic docket, and because the AC is the sole operative complaint. (*See* Am. Compl., ECF No. 69 in Adv. No. 08-ap-1066). In the AC, DACA V sought a money judgment against Compass in the amount of $476,677.92 plus interest, turnover of a $237,023.29 check held by USACM LT otherwise payable to Compass, and a declaratory judgment that any attorney's lien of Milbank, Tweed, Hadley & McCloy, LLP ("Milbank") against the check was inferior to DACA V's rights to the check. (*See id.*). When Compass defaulted and Milbank stipulated to split the check with DACA V, the Bankruptcy Court entered judgment, accordingly. (*See* J., ECF No. 124 in Adv. No. 08-ap-1066).

In August 2013, the Clerk of the Bankruptcy Court issued a writ of execution (the "Writ") to the U.S. Marshal to execute on DACA V's judgment in the amount of $422,120.54. (*See* Writ Exec., ECF No. 128 in Adv. No. 08-ap-1066). In January 2014, Platinum Financial Trust, LLC ("PFT"), to whom DACA V has assigned its judgment in May 2013, applied to the

1  Bankruptcy Court for a judgment against Donna Cangelosi and Margarita Annex SPE for failing

2  to comply with writs of garnishment. (*See* Appl., ECF No. 133 in Adv. No. 08-ap-1066).  PFT

3  asked the Bankruptcy Court to reopen the adversary proceeding for post-judgment proceedings

4  under Bankruptcy Rules 7069 and 7070. (*See* Mot., ECF No. 134 in Adv. No. 08-ap-1066).  The

5  Bankruptcy Court granted the motion. (*See* Order, ECF No. 135 in Adv. No. 08-ap-1066).  The

6  Bankruptcy Court then issued an order *sua sponte* recommending withdrawal of the reference,

7  which is now pending before the Court.

8  **II.  LEGAL STANDARDS**

9         The Supreme Court has ruled that a bankruptcy court—the judges of which are not

10 afforded the protections of life tenure and irreducible salary given to judges under Article III of

11 the Constitution—cannot enter final judgments on matters traditionally decided by Article III

12 judges, such as contract disputes. *See Dunmore v. United States*, 358 F.3d 1107, 1114 (9th Cir.

13 2004) (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U .S. 50 (1982)).

14 Congress amended the Bankruptcy Code to conform to this ruling, distinguishing "core"

15 bankruptcy proceedings from "non-core" proceedings. *Id.*  Congress has enumerated what it

16 considers to be core proceedings, *see id.* (citing 11 U.S.C. § 157(b)(2)), but it has not enumerated

17 non-core proceedings, *see id.*  "Non-core" proceedings are those that "do not depend on the

18 Bankruptcy Code for their existence and ... could proceed in another court." *Id.* (citing *Sec.*

19 *Farms v. Int'l Bhd. of Teamster*s, 124 F.3d 999, 1008 (9th Cir. 1997)).

20        A bankruptcy court may hear and finally determine bankruptcy cases under Title 11 and

21 proceedings arising under Title 11 or arising in a case under Title 11. *See* 11 U.S.C. § 157(b)(1).

22 A bankruptcy court may hear a non-core proceeding but must submit proposed findings of fact

23 and conclusions of law to the district court for final determination de novo. *Id.* § 157(c)(1).  The

24

Ninth Circuit has adopted the Fifth Circuit's reasoning in distinguishing three types of proceedings: (1) those "arising under" Title 11; (2) those "arising in" a case under Title 11; and (3) those "related to" a case under Title 11, which are the three categories of cases over which district courts have subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b):

> 28 U.S.C. § 157(b) defines core proceedings as ones "arising under title 11, or arising in a case under title 11," and gives a nonexhaustive list of types of core proceedings. "Arising under" and "arising in" are terms of art. They are two of the three categories of cases over which district courts have jurisdiction under 28 U.S.C. § 1334(b). The third category includes cases "related to" a case under title 11. As the Fifth Circuit has explained,
>
> > Congress used the phrase "arising under title 11" to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11 . . . . The meaning of "arising in" proceedings is less clear, but seems to be a reference to those "administrative" matters that arise only in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.
>
> The court concluded: "If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but . . . it is an 'otherwise related' or non-core proceeding."

*In re Eastport Assocs.*, 935 F.2d 1071, 107677 (9th Cir. 1991) (citations omitted) (quoting *In re Wood*, 825 F.2d 90, 9697 (5th Cir. 1987) (footnotes omitted)).

Upon motion or *sua sponte*, a district court may withdraw, in whole or in part, any case or proceeding under § 157. 11 U.S.C. § 157(d). A district court must upon timely motion withdraw a proceeding if it determines "that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce ." *Id.* The party moving for withdrawal has the burden of persuasion. *See In re First Alliance Mortg. Co.*, 282 B.R. 894, 902 (C.D.Cal. 2001).

Although a bankruptcy court may not finally determine non-Title 11 issues, the presence of such an issue does not mandate withdrawal of the reference. *In re Vicars Ins. Agency*, 96 F.3d

949, 953 (7th Cir. 1996).  Rather, withdrawal is mandatory "in cases requiring material consideration of non-bankruptcy federal law." *Sec. Farms*, 124 F.3d at 1008.  Put differently, "mandatory withdrawal is required only when those issues require the interpretation, as opposed to mere application, of the non-title 11 statute, or when the court must undertake analysis of significant open and unresolved issues regarding the non-title 11 law." *Id.* at 954.  Permissive withdrawal is allowed, however, "for cause shown," 11 U.S.C. § 157(d), which a district court determines by considering "the efficient use of judicial resources (which is enhanced when non-core issues predominate), delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Sec. Farms*, 124 F.3d at 1008.

## III.    ANALYSIS

The Bankruptcy Court noted that the garnishees had filed an interpleader complaint in this Court (previously pending before Judge Gordon, but since transferred to this Court) as to funds sought to be garnished and reasoned that withdrawal of the reference would be appropriate because the parties will be litigating over the same funds in the present adversary proceeding and in the interpleader action.  Both the efficient use of judicial resources and the avoidance of inconsistent rulings counseled in favor of withdrawal.  The Court agrees.  The Court will therefore grant the motion to withdraw the reference and stay the case pending the outcome of the interpleader action.  The interpleader device is the more efficient method by which to resolve the rights of all parties to the disputed funds.  Once the Plaintiff in Interpleader deposits the funds and is dismissed, the garnishment issue will become moot.  On the other hand, an earlier judgment against the garnishees in the present action could leave them facing rival claims to the same common funds from other Defendants in Interpleader.

///

///

///

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Motion to Withdraw the Reference (ECF No. 1) is

3   GRANTED.

4          IT IS FURTHER ORDERED that the case is STAYED.

5          IT IS SO ORDERED.

6    Dated this 28th day of May, 2014.

7

8                                          _____

9                                          ROBERT C. JONES
                                           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

| | |
|---|---|
| Jeffrey L. Hartman, Esq. | Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice* |
| Nevada Bar No. 1607 | Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice* |
| **HARTMAN & HARTMAN** | Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice* |
| 510 W. Plumb Lane, Suite B | **MELAND BUDWICK, P.A.** |
| Reno, NV 89509 | 3200 Southeast Financial Center |
| T: (775) 324-2800 | 200 South Biscayne Boulevard |
| F: (775) 324-1818 | Miami, Florida 33131 |
| notices@bankruptcyreno.com | T: (305) 358-6363 |
| | F: (305) 358-1221 |
| | mbudwick@melandbudwick.com |
| | sgenet@melandbudwick.com |
| | gbenezra@melandbudwick.com |

Attorneys for Christina W. Lovato, Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>    Debtor. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br>Substantively Consolidated with: |

| | |
|---|---|
| 19-50130-gs | DC Solar Solutions, Inc. |
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

 X Affects DC Solar Solutions, Inc.
 X Affects DC Solar Distribution, Inc.
 X Affects DC Solar Freedom, Inc.
 X Affects Double Jump, Inc.

| | |
|---|---|
| CHRISTINA W. LOVATO,<br><br>    Plaintiff,<br><br>v.<br><br>NIXON PEABODY LLP,<br><br>    Defendant. | Adversary No.: 21-05072-gs<br><br>**TRUSTEE'S RESPONSE IN OPPOSITION TO MOTION TO WITHDRAW REFERENCE [ECF No. 17]**<br><br>Hearing:   February 18, 2022<br>Time:      9:30 a.m. |

Christina Lovato, the trustee ("***Trustee***" or "***Plaintiff***") for the chapter 7 estates of DC Solar Solutions, Inc., DC Solar Distribution, Inc., DC Solar Freedom, Inc., and Double Jump, Inc. ("***DC Solar***") responds in opposition to Nixon Peabody LLP's ("***Nixon***") motion to withdraw the reference ("***Motion***") [ECF No. 17]. Nearly three years ago, Nixon consented to the Bankruptcy Court's exclusive equitable jurisdiction to enter final orders in this adversary proceeding ("***Nixon AP***"). Nixon's efforts to forum shop should be rejected.

## I.      The Trustee's Claims Against Nixon Peabody

Nixon attempts to distract by challenging the merits of the Trustee's complaint ("*Nixon Complaint*"). Motion, pgs. 3-4. While the merits are not at issue in the Motion, the Trustee responds in part as follows.

First, the Ninth Circuit in *F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (adopting in relevant part its opinion at 969 F.2d 744 (9th Cir. 1992)) ruled that a receiver for an entity stated a claim against the entity's former law firm for malpractice where the law firm's professional services included assisting the entity in raising money from investors through syndications and PPMs. The Ninth Circuit held that even though the entity's insiders were wrongdoers, "[p]art and parcel of effectively protecting a client, and thus discharging the attorney's duty of care, is to protect the client from the liability which may flow from promulgating a false or misleading offering to investors." 969 F.2d at 749. "[The entity] was the client here, not [the wrongdoing insiders]," and the law firm failed to protect its entity-client. *Id.* at 750.

Second, in *Donell v. Nixon Peabody LLP*, 2012 WL 3839402 (C.D. Cal. Sept. 5, 2012), the district court ruled that the receiver for an entity stated a claim against the entity's former law firm, Nixon Peabody, for breach of fiduciary duty and malpractice. The receiver alleged that Nixon failed to perform proper due diligence and wrongly helped the entity's insider raise money from investors in a manner which violated the law and representations to investors, causing the entity damages including by: (1) incurring liabilities to investors; (2) deepening the entity's insolvency; and (3) helping the entity violate the law. *Id.* at *1, 5-6.

Third, Nixon claims that the Trustee alleges that it merely kept silent about the Carpoff Ponzi Scheme, that other professionals also acted wrongfully, and Nixon's misconduct should be pardoned because of the affirmative defense of *in pari delicto*. This is all wrong. Nixon did not simply remain silent - Nixon closed hundreds of millions of dollars in transactions knowing they would harm its client DC Solar and help Carpoff deceive third parties. Moreover, any misconduct by others does not condone Nixon's misconduct. And finally, *in pari delicto* does not excuse Nixon's misconduct and in any event is inapplicable for multiple legal and factual reasons that the Trustee will address in detail in due course.

## II.    Introduction

In March 2019, Nixon filed claim number 34-1 ("**Nixon POC**") to seek an affirmative recovery from the DC Solar bankruptcy estate for the value of the pre-petition "legal services" it provided to DC Solar. The Trustee met Nixon's POC with counterclaims seeking disallowance of the Nixon POC, recovery of fraudulent transfers, and damages in tort. The Trustee's claims are intertwined with and logically related to those for which Nixon seeks to recover from the estate.

The Nixon AP is statutorily core. Nixon consented to this Bankruptcy Court's entry of final orders. Nixon waived any jury trial right. And notwithstanding Nixon's dismissive statements,[1] this Bankruptcy Court has years of experience regarding the Carpoff Ponzi Scheme (defined below) and the matters in these Bankruptcy Cases, including other adversary proceedings. The Trustee and the DC Solar estate will suffer delay and expense if the reference is withdrawn.

Nixon has failed to meet its burden and the Motion should be overruled.

## III.    The Nevada District Court's LBA Order is Instructive

Nixon is not the first in these Bankruptcy Cases to seek to withdraw the reference. The Nevada District Court recently denied that relief sought by another adversary-defendant ("**LBA Order**"). *See* **Exhibit 1**.[2] While not directly on-point, the district court's analysis is instructive.

In *LBA,* the Trustee brought a fraudulent transfer action against a defendant that did <u>not</u> file a proof of claim. The defendant sought to withdraw the reference immediately and the Trustee argued that withdrawal was appropriate when the proceeding was trial-ready. In the LBA Order, the district court discussed *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014), which approved of the "division of labor" between bankruptcy courts and district courts.[3] Noting first that the Trustee had brought a *Stern* claim, *i.e.,* a claim which is statutorily core but cannot be adjudicated to final judgment by the bankruptcy court without consent, the Nevada District Court

---

[1] Nixon claims that: "the bankruptcy court's prior knowledge regarding DC Solar's assets and bankruptcy petition will have **limited value** in this matter…" Motion, 1:14-15 (emphasis added).
[2] *Lovato v. LBA Realty Fund II-Company I, LLC*, 21-00134 (D. Nev) [ECF No. 13].
[3] n.8; *see also In re Swift Air, LLC,* 2019 WL 1266100, *4 (Bankr. D. Ariz. Mar. 15, 2019) ("The Court in *Stern* made clear that the question presented in that case (a bankruptcy court's authority to rule on state law counterclaims) was narrow and that the holding did not meaningfully alter the division of labor between district courts and bankruptcy courts under the current statute.").

found that the reference should remain until the adversary is trial-ready. The Nevada District Court reasoned in part that:

> **[B]ankruptcy judges are particularly adept at adjudicating core bankruptcy claims, and the Article III court benefits from their expertise**. *See In re EPD Inv. Co. LLC*, Case No. CV 13-05536 SJO, 2013 WL 5352953, at *6 (C.D. Cal. Sept. 24, 2013) ("Having the bankruptcy court submit proposed findings of fact and conclusions of law in fraudulent conveyance cases 'promotes judicial economy and efficiency by making use of the bankruptcy court's unique knowledge of Title 11 and familiarity with the actions before them.'" (*quoting In re Heathcentral.com*, 504 F.3d 775, 787-88 (9th Cir. 9007)). **While there may ultimately be some duplication of efforts by leaving the reference in place until the Adversary is ready for final adjudication, there are also considerable benefits for the fair administration of the Adversary for core matters to be handled in the bankruptcy court**.[4]

The Nevada District Court continued that: (1) overlapping issues in the LBA adversary and other adversaries pending before the Bankruptcy Court; and (2) the policies of uniformity of bankruptcy proceeding and centralization of disputes; weigh in favor of denying withdrawal of the reference until the LBA adversary is trial-ready.

### IV.  General Background

#### A.  The Carpoff Ponzi Scheme

From no later than CY 2012 through December 2018, Jeff Carpoff perpetrated a billion-dollar *Ponzi* scheme through and upon DC Solar ("**Carpoff Ponzi Scheme**").[5] Carpoff perpetrated the Carpoff Ponzi Scheme in connection with tax advantaged transactions, where DC Solar offered investors the opportunity to "buy" – without taking possession – certain mobile solar generators ("**MSGs**") in exchange for an eight-or-nine figure investment.[6]

#### B.  Nixon's Role as Counsel to DC Solar, Generally

---

[4] LBA Order, pg. 5 (emphasis added).

[5] Nixon Complaint, ¶ 27; Order Granting Trustee's Motion for Substantive Consolidation [Main Bankruptcy Case, ECF No. 2613] ("**Sub-Con Order**"), ¶¶13-15 (finding a Ponzi-like scheme).

[6] Nixon Complaint, ¶¶ 15-31; Sub-Con Order, ¶¶3-4.

4

From October 2010 to December 2018, Nixon was DC Solar's outside counsel[7] with a broad scope of representation.[8] Among other things:

> From October 2010 to December 2018, Nixon continuously served as Solutions' and Distribution's outside counsel closing more than $2 billion in transactions. Led by senior partner Mr. Milder, a nationally recognized expert in the billion-dollar marketplace for renewable energy transactions, Nixon educated, counseled, and directed Solutions and Distribution in connection with Solutions' sponsoring over thirty tax equity transactions, and related matters.

> Solutions and Distribution relied heavily on Nixon, given their lack of meaningful experience in sophisticated business transactions, let alone the specialized area of tax equity. Nixon: (1) taught Solutions and Distribution what to do and how to do it, including structuring the investments and transactions; (2) performed tax, corporate, and securities-related professional services; (3) marketed the investment opportunity to potential investors; and (4) vouched for Solutions, Distribution, Carpoff, and the investment in the marketplace.[9]

The Trustee further alleges in her Nixon Complaint (in summary and in part) that:

> (1) Arising from the attorney-client relationship, Nixon owed DC Solar fiduciary duties and duties of good faith and care, and otherwise.[10]

> (2) Nixon breached those duties, including by failing to protect its clients, harming its clients, and violating mandatory Rules of Professional Conduct.[11]

> (3) Nixon identified Red Flags and should have known and then actually knew (by no later than a series of events from April 2016 - March 2, 2017) that Carpoff was injuring DC Solar – its clients – through the complex tax equity transactions which Nixon structured, taught DC Solar to implement, and managed and oversaw.[12]

> (4) Nixon committed, assisted, and joined Carpoff's wrongdoing by representing DC Solar in and closing tax equity transactions which Nixon knew would harm DC Solar and misleading other parties related to the transactions.[13]

---

[7] The Trustee's complaint alleges that Nixon's clients included Solutions and Distribution (and other Carpoff-affiliated entities). In its court papers, Nixon identifies its clients as "DC Solar." [*See e.g.*, ECF No. 2985, pg. 2:17.] In the interests of brevity and consistency, the Trustee uses Nixon's language and identifies Nixon's client as "DC Solar".

[8] Nixon Complaint (defined below), Heading E and ¶¶ 73-124; ¶¶ 252, 264, & 278.

[9] Nixon Complaint, ¶¶ 3 & 4.

[10] Nixon Complaint, ¶¶ 5, 7, 248, 253-55, 265-68, 283, 285, 292-95, 311, 318, & 327.

[11] Nixon Complaint, ¶¶ 5, 7, 61, 75, 227, 248, 257, 270, 283-84, 301, 311, 318, & 327.

[12] Nixon Complaint, ¶¶ 5-6; Headings V.F & V.G; ¶¶ 125-211; 257, 270, 281, & 296.

[13] Nixon Complaint, ¶¶ 5-7; Heading V.H & V.I; ¶¶ 212-23; 257, 270, 282, & 301.

C.  The Bankruptcy Cases

Following a December 2018 law enforcement raid[14] and the removal of Carpoff from any decision-making role, in early 2019 DC Solar filed voluntary petitions commencing the bankruptcy cases ("***Bankruptcy Cases***"). On March 20, 2019, this Court converted the cases to chapter 7.[15] On March 22, 2019, the Trustee was appointed.[16]

The Bankruptcy Court has presided over numerous matters during the past three years, including: (1) conversion of these cases; (2) discovery disputes;[17] (3) DC Solar's interests in thousands of MSGs;[18] (4) sale of MSGs and allocation of the sale proceeds;[19] (5) establishment of a protocol to take F.R.B.P. 2004 examinations remotely due to COVID-19;[20] (6) liquidation and allowance of hundreds of millions of dollars of claims of investors; and (7) consideration and approval under F.R.B.P. 9019 of the Trustee's settlements of tort or avoidance claims against: (i) financial institutions; (ii) accountants; and (iii) DC Solar investors.[21] And the Bankruptcy Court considered and ordered the substantive consolidation of the DC Solar estates pursuant to 11 U.S.C. § 105, making wide ranging findings of fact and conclusions of law in the process.[22]

D.  The Nixon POC, the Nixon Complaint, and Other Adversary Proceedings

1.  The Nixon POC

Nearly three years ago, Nixon filed its POC to obtain an affirmative recovery of $111,223.95 from the DC Solar estate. Nixon states in its POC (part 2 question 8) that the "*basis of the claim*" is Nixon's pre-petition "*legal services*" to DC Solar.

Nixon completed part 2 question 8 of its Nixon POC by attaching documentary support pursuant to F.R.B.P. 3001. Nixon attached its account statement ("***Account Statement***"),

---

[14] Nixon Complaint, ¶ 39; Sub-Con Order, ¶16.
[15] Main Case, ECF Nos. 377 & 389; *see also*, docket and *e.g.,* ECF Nos. 106 and 239.
[16] Main Bankruptcy Case, ECF No. 439.
[17] Main Bankruptcy Case, ECF Nos. 2181, 2217, 2222 & 2313.
[18] *See e.g.,* Main Bankruptcy Case, ECF Nos. 773, 930, 1391, 1471, 1933, 1958, 2019 & 2020.
[19] Main Bankruptcy Case, ECF No. 2614.
[20] Main Bankruptcy Case, ECF Nos. 1734, 1770, 1778, 1781, 1790, 1795 & 1831.
[21] Main Bankruptcy Case, ECF Nos. 2444, 2537, 2481, 2530, 2614, 2803, 2790.
[22] Main Bankruptcy Case, ECF Nos. 2324, 2415, 2417 & 2613 (Sub-Con Order).

6

identifying: (1) three invoices sent to Solutions; (3) the amounts billed and due and owing for each of the three invoices; (4) Nixon's "*Client Attorney*" – Richard Cogen, Esq.; and (5) Nixon's "*Client No.*": 059202. Nixon's Account Statement states that (emphasis in original): "THESE INVOICES ARE FOR LEGAL SERVICES …".

Nixon never had any engagement agreement with DC Solar.[23]

### 2. The Trustee's Nixon Complaint

On October 25, 2021, after investigating the legal services Nixon provided to DC Solar, the Trustee filed her Nixon Complaint based on Nixon's misconduct in providing those legal services and its attorney-client relationship. The Trustee sets forth specific allegations detailing Nixon's duties and breach of duties, including: (1) how and when Nixon acquired actual knowledge that Jeff Carpoff was deceiving investors and harming DC Solar; and (2) how and when Nixon knowingly and actively assisted Jeff Carpoff in his misconduct.

### 3. The Trustee's Other Adversary Proceedings

To date, the Trustee has filed 40+ adversary proceedings before the Bankruptcy Court and in the Bankruptcy Cases.[24] The Trustee intends to file additional claims sounding in tort and avoidance. In most of the filed adversary proceedings, the Trustee's claims sound in avoidance but some include tort claims.[25] All of the Trustee's adversary proceedings involve overlapping factual issues, such as (1) the Carpoff Ponzi Scheme and its breath, purpose, and scope; (2) DC Solar's financial position at different times; (3) the roles of Carpoff and other wrongdoing (and innocent) insiders and outsiders; and (4) the roles of outside professionals and advisors.

Defendants have asserted a wide variety of defenses. Some avoidance-defendants argue that their "good faith" is evidenced by the DC Solar's professionals' (*e.g.*, Nixon) involvement in the tax equity transactions.[26]

---

[23] Nixon Complaint, ¶¶ 5, 60.
[24] *See generally*, docket.
[25] *See e.g.,* Adv. Case No. 21-5031-gs (Count I for breach of fiduciary duty); Adv. Case No. 21-5040-gs (Count V for conversion).
[26] *See e.g.,* Main Case ECF No. 2995, pg. 7:9-13.

7

## V.    **The Reference Should Not Be Withdrawn**

### A. Nixon's POC is Not Merely Analogous to, But in Fact Exceeds, Nixon's Filing of a Complaint Against the DC Solar Bankruptcy Estate

"By filing its Nixon POC, Nixon "asserted a right to bankruptcy estate assets."[27] Nixon's POC is analogous to Nixon having filed a civil complaint against the DC Solar bankruptcy estate, and the Trustee's Nixon Complaint is analogous to an answer and counterclaim.[28]

But "[f]iling a proof of claim is not merely a series of allegations based on information and belief, which if true, might support the relief requested (such as when filing a complaint). The filing of a proof of claim is much more significant and the statements therein are provided with, and subject to, higher standards."[29]

Nixon's POC well exceeds a simple complaint because: (1) it was sworn-to, akin to a verified complaint;[30] and (2) Nixon attached documentary support, *i.e.,* the Account Statement, satisfying its prima facie burden to prove the validity and amount.[31] Nixon took advantage of the Bankruptcy Rules (F.R.B.P. 3001) to secure an evidentiary presumption of entitlement to recovery from the estate, shifting the burden to the Trustee.[32] And Nixon took advantage of the Bankruptcy Code to secure allowance of the Nixon POC, unless and until objected-to. 11 U.S.C. § 502(a).

### B. The Standard

The U.S. District Court for the District of Nevada refers all cases arising under, in, or related to the Bankruptcy Code cases under the Bankruptcy Code to the U.S. Bankruptcy Court.[33] Here, Nixon seeks permissive withdrawal, *i.e.,* for "cause," under 28 U.S.C. §157(d).

---

[27] *In re Legendary Field Exh., LLC*, 2020 WL 211409, *4 (Bankr. W.D. Tex. Jan. 13, 2020).
[28] *In re Brosio*, 505 B.R. 903, 912 (B.A.P. 9th Cir. 2014) (citing cases).
[29] *In re Borre*, 2019 WL 1012788, *12 (Bankr. E.D. Cal. Mar. 1, 2019); *see also Matter of Wood*, 825 F.2d 90, 97 (5th Cir. 1987) ("The filing of the proof [of claim] invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution.").
[30] *In re Garner*, 246 B.R. 617, 622 (B.A.P. 9th Cir. 2000) ("In short, a proof of claim executed by an attorney has an evidentiary effect similar to that of a verified complaint.")
[31] F.R.B.P. 3001; *Garner*, 246 B.R. at 622.
[32] *Id*. at 620 & 622.
[33] Local Rules of Bankruptcy Practice, D. Nev. ("***Local Rules***") §1001(b)(1).

8

"In determining whether cause exists, a district court should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors."[34] Although courts had traditionally begun the analysis by determining whether a claim is "core" or "non-core," post *Stern*, "the more relevant question is whether the bankruptcy court has the constitutional authority to enter final judgment on the claim at issue."[35]

### C. Nixon Bears The Burden on its Motion

Nixon bears the burden to show that the reference should be withdrawn.[36] The standard is "high," and relief is granted only "in a limited number of circumstances."[37]

### D. The Nixon AP is a Core Proceeding, and the Bankruptcy Court Has the Constitutional Authority to Enter Final Orders Due to Nixon's Consent

In the Nixon AP, the Trustee seeks to (1) disallow the Nixon POC; (2) avoid and recover fraudulent transfers; and (3) recover for state law claims arising from wrongdoing in connection with Nixon's legal services. These are all "core" matters.

- The Trustee's claim to disallow the Nixon POC (Count VIII) is core.[38]

- The Trustee's avoidance claims (Counts V-VII) are statutorily core.[39]

- The Trustee's tort claims (Counts I-IV) are statutorily core.[40]

---

[34] *Hoffman v. Sonoma Specialty Hosp., LLC*, 2020 WL 3402230, *3 (N.D. Cal. June 19, 2020), rec'd denied, 2020 WL 9422402 (N.D. Cal. Aug. 5, 2020).

[35] *In re Hoku Corp.*, 2015 WL 7295445, *2 (D. Idaho Nov. 18, 2015); *see also In re White Star Petroleum Holdings, LLC, et al.*, 2021 WL 5875441, *11 (Bankr. W.D. Okla. Dec. 10, 2021).

[36] *EPD*, 2013 WL 5352953, *6.

[37] *Id.* at *5; *Mortg. Store*, 464 B.R. at 428.

[38] 28 U.S.C. § 157(b)(2)(B).

[39] 28 U.S.C. § 157(b)(2)(A), (B), (C), & (H); *see also White Star*, 2021 WL 5875441, *5 (fraudulent transfer claims under Section 548 of the Code and state law analog are core).

[40] 28 U.S.C. § 157(b)(2)(A), (B), (C), & (O); *see also In re Venoco, LLC*, 596 B.R. 480, 490 (Bankr. D. Del.2019), aff'd, 610 B.R. 239 (D. Del. 2020), aff'd sub nom. 998 F.3d 94 (3d Cir. 2021) ("**Estate counterclaims against persons filing claims is a category enumerated as providing core 'arising in' jurisdiction**.") (emphasis added).

9

As a constitutional matter, the Trustee's statutorily core claims for avoidance and tort are *Stern* claims and may be finally adjudicated by this Bankruptcy Court with consent.[41] Here, Nixon consented by filing its Nixon POC. *See In re EPD Inv. Co., LLC*, 821 F.3d 1146, n.2 (9th Cir. 2016) (Relying on the Supreme Court's decision in *Wellness*, "Poshow filed a proof of claim on behalf of the trust and has, accordingly, consented to bankruptcy court jurisdiction.").[42]

In *In re CBI Holding Co., Inc*., 529 F.3d 432 (2d Cir. 2008), the Second Circuit held that the trustee's claims (*e.g.,* professional negligence) against the debtors' pre-petition professional were "core" because the trustee's claim for disallowance of the pre-petition professional's proof of claim directly implicated whether the firm's proof of claim against the estate should be allowed or disallowed, and further, the trustee's claims were related to the professional services rendered for which firm sought compensation in its proof of claim.[43]

Similarly, in the Ninth Circuit the scope of the claimant's consent to Bankruptcy Court jurisdiction is guided by the scope of the claimant's proof of claim. *See In re G.I. Indus., Inc.*, 204 F.3d 1276 (9th Cir. 2000); *In re PNP Holdings Corp*., 184 B.R. 805, 806 (B.A.P. 9th Cir. 1995), aff'd, 99 F.3d 910 (9th Cir. 1996) ("It is well settled that a creditor consents to jurisdiction over related counterclaims by filing a proof of claim.") (citing cases).

> **This power to allow or to disallow claims includes full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is based. This is essential to the performance of the duties imposed upon it**.

*Katchen v. Landy*, 382 U.S. 323 (1966) (citations and quotations omitted, emphasis added).

In *G.I. Indus.*, the Ninth Circuit ruled that a claimant's proof of claim attaching the agreement between the claimant and the debtor converted a non-core breach of contract claim into a core proceeding.[44] The claimant triggered the claims-allowance process, an exercise of the

---

[41] *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

[42] *See also S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007) ("[T]he parties may consent to jurisdiction through … filing a proof of claim in a bankruptcy proceeding …) (citations omitted); *In re MacGibbon*, 2006 WL 6810964, *9 (B.A.P. 9th Cir. Oct. 4, 2006) ("Once a creditor files a proof of claim, he voluntarily submits himself to the core jurisdiction of the bankruptcy court.").

[43] *See also In re McClelland*, 332 B.R. 90 (Bankr. S.D.N.Y. 2005); *In re Frost, Inc*., 145 B.R. 878 (Bankr. W.D. Mich. 1992).

[44] 204 F.3d 1276.

bankruptcy court's core jurisdiction, to determine the claim's validity and amount which extended to "examining the contract itself and the circumstances surrounding its formation."[45]

> Thus, the district court correctly concluded that the determination of the validity of the contract for the purposes of disallowing the 502(g) based claim, **is basically a non-core issue of state breach of contract being subsumed into a core proceeding (regarding allowance of claim) and thereby coming under the jurisdiction of the bankruptcy court.**

204 F.3d at 1280 (emphasis added); *see also Ta Chong Bank Ltd. v. Hitachi High Techs. Am., Inc.*, 610 F.3d 1063, 1068 (9th Cir. 2010) ("If the creditor submits an agreement with its proof of claim to provide evidentiary support of the claim, then that agreement is subject to the bankruptcy court's jurisdiction."); *Maring v. PG Alaska Crab Inv. Co., LLC*, 2007 WL 9775428, *2 (W.D. Wash. Oct. 2, 2007) ("When [the defendant] filed proofs of claim with the bankruptcy court, asserting claims based on both the Loan Agreements and the failed Settlement Agreement, it voluntarily subjected the question of the validity of those claims to the jurisdiction of the bankruptcy court," and thus the defendant "has no Seventh Amendment right to a jury trial in the bankruptcy court on the validity of the Agreements and the circumstances surrounding their formation. *Langenkamp*, 498 U.S. at 45; *Katchen*, 382 U.S. at 336–37; *In re G.I. Industries, Inc.*, 204 F.3d at 1279–80.").[46]

Here, Nixon filed its Nixon POC, sworn-to and with the Account Statement, seeking an affirmative recovery from the DC Solar bankruptcy estate based on its attorney-client relationship with and legal services rendered to DC Solar. Nixon consented to the Bankruptcy Court entering final orders on this subject matter, which encompasses the Trustee's Nixon AP.

E. Nixon's Motion Ignores Nixon's Consent to Bankruptcy Court Jurisdiction

Nixon's Motion ignores its consent. If Nixon's reply seeks for the first time to address this plain deficiency, the Trustee reserves the right to respond. While Nixon asserts that the Trustee's four tort claims "are all indisputably non-core" (Motion, pg. 7:26-27), Nixon disregards 28 U.S.C. §157(b)(2)(A), (B), (C) & (O) and the long line of jurisprudence addressing consent.

---

[45] *G.I. Indus.*, 204 F.3d at 1280.
[46] *See also In re Roman Catholic Archbishop of Portland*, 2005 WL 196477, *1 (Bankr. D. Or. Jan. 28, 2005) ("[T]he effect of filing the proof of claim was to turn this into a core proceeding.").

11

Nixon argues that the Trustee's avoidance claims are "ancillary at best." Motion, pg. 8: 12-13. This is disingenuous at best. <u>First</u>, Nixon was advised by sophisticated bankruptcy counsel and could not have considered the claims-allowance process (including 11 U.S.C. § 502(d)) to be merely "ancillary" when it filed its POC under oath seeking estate assets. Nixon's bankruptcy counsel that signed the POC has litigated these issues.[47] Nixon knew the claims allowance process is an essential function of the Bankruptcy Court.

_Second_, Nixon's argument that the Trustee's counterclaims seek a larger recovery from Nixon than Nixon seeks from the bankruptcy estate is a red herring. A quantitative argument has no place in this qualitative (jurisdictional and consent) analysis.[48] Indeed, in _CBI_, discussed above, the Second Circuit considered and rejected defendant-claimant-E&Y's argument that the estate's eight-figure counterclaims were "disproportionate to E&Y's $210,850 fees claim" and thus affected the analysis in some way.[49]

In short-form, Nixon cites to the Supreme Court's decisions in _Stern_ and _Exec. Benefits_ in its section regarding the Trustee's fraudulent transfer claims. Motion, pg. 9:1-16. Ignoring the facts and law, Nixon boldly states it has not consented to final adjudication by this Bankruptcy Court: "_Nixon's consent – which it has not granted._" Motion, pg. 9:13-14. But nearly three years ago Nixon filed its POC and has stood behind and maintained it since.

_____

[47] _See In re CHC Grp. Ltd._, 2017 WL 1380514, *8-11 (Bankr.N.D.Tex. Mar. 28, 2017) (identifying Nixon's counsel, Robert Christmas, Esq. as defendant's counsel, and Attorney Christmas' brief in support of a motion to dismiss for lack of jurisdiction acknowledging: "_Courts recognize that by filing a proof of claim a creditor may submit itself to personal jurisdiction for counterclaims asserted by the debtor._" Adv. Case No. 16-3151 (Bankr. N.D. Tex.) [ECF No. 25, pg. 21] (emphasis added); _see also_ Reply brief [ECF No. 81, pg. 6, n. 6 & 7].

[48] _In re NW Terr. Mint, LLC_, 2017 WL 568821, *4 (W.D. Wash. Feb. 13, 2017); _see also Travellers Int'l AG v. Robinson_, 982 F.2d 96, 100 (3d Cir. 1992) ("Where, as in this case, a creditor has filed a claim, even though the claim is couched in protective language and is contingent, that creditor has submitted to the bankruptcy court's equitable jurisdiction and waived any Seventh Amendment right to a jury trial."); _see also MacGibbon_, 2006 WL 6810964, *9 (B.A.P. 9th Cir. Oct. 4, 2006) ("Here, Richard willingly subjected himself to the bankruptcy court's jurisdiction by filing his claims. Once he had done so, he triggered the claims allowance process, thereby submitting himself to the bankruptcy court's authority. **Simply because Richard would not receive a share of the distribution under the plan from funds recovered from the Trust Account does not mean that the bankruptcy court's jurisdiction suddenly terminated**.") (emphasis added).

[49] _CBI_, 529 F.3d at 463-64.

12

1    Nixon states elsewhere in its Motion that the "act of filing [its motion to withdraw its proof

2    of claim] has practically mooted" its filing of the Nixon POC. Motion, pg. 9:17-23. This is untrue.

3    Nixon availed itself of this Bankruptcy Court, and the bankruptcy rules and statutes which govern,

4    for its own financial benefit. Nixon cannot now escape the accompanying consequences. *See*

5    *Katchen*, 382 U.S. at 333 n.9 ("[H]e who invokes the aid of the bankruptcy court by offering a

6    proof of claim and demanding its allowance must abide the consequences of that procedure.")

7    (notations omitted); *In re Levoy*, 182 B.R. 827, 832 (B.A.P. 9th Cir. 1995) ("A creditor who offers

8    proof of his claim, and demands its allowance, subjects himself to the dominion of the court, and

9    must abide the consequences.") (quotations omitted); *PNP*, 184 B.R. at 807 ("A creditor cannot

10   reasonably expect to invoke those portions of the bankruptcy code that allow it to recover on its

11   claims and yet avoid the legal effect of other sections that do not work in its favor.").

12   Nixon chose the Bankruptcy Court as the adjudicator and factfinder for the propriety of the

13   Nixon-DC Solar attorney-client relationship and Nixon's legal services. Nixon consented to this

14   Bankruptcy Court's equitable jurisdiction for this subject matter. This Bankruptcy Court has the

15   statutory and constitutional authority to enter final orders and judgments.

16   Finally, while the Nixon AP asserts core claims and this Court has constitutional authority

17   to enter final orders, courts in this district have rejected a defendant's request to withdraw the

18   reference even when that is not the case.[50]

19   **F.  Judicial Economy, And Delay And Costs**

20   In *EPD*, the California district court denied the defendant's motion to withdraw the

21   reference in an avoidance action, reasoning in part that:

22   > [H]earing core matters in a district court could be an inefficient allocation of
23   > judicial resources given that the bankruptcy court generally will be more familiar
     > with the facts and issues. **Having the bankruptcy court submit proposed**
24   > **findings of fact and conclusions of law in fraudulent conveyance cases**
     > **promotes judicial economy and efficiency by making use of the bankruptcy**
25

26   [50] *See e.g., In re Access Ins. Servs., Inc.*, 2014 WL 6065641, *3 (D. Nev. Nov. 12, 2014) ("As it is
     undisputed that some of the Trustee's claims are core claims that arise under title 11, and as the
27   Court determines that the bankruptcy court may exercise supplemental jurisdiction over Plaintiffs'
     remaining claims, efficient use of judicial resources and uniformity of bankruptcy administration
28   support leaving the reference in place so that all claims may proceed in the bankruptcy court.").
     *citing Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1008 (9th Cir.1997).

13

court's unique knowledge of Title 11 and familiarity with the actions before them.[51]

The *EPD* court rejected that defendant's argument that unnecessary costs are avoided by withdrawal of the reference because of the district court's review, reasoning that "any inefficiency created by the need for de novo review is outweighed by other efficiencies gained in leaving the proceedings in bankruptcy court."[52] *See also* LBA Order.

That is even more true here. The Nixon AP brings core claims over which this Court has the exclusive jurisdiction and constitutional authority to enter final orders. Efficiencies are gained and costs and delay are saved by having this Court hear and decide these matters.

Nixon dismisses the time and resources invested by this Bankruptcy Court in these Bankruptcy Cases. However, this Bankruptcy Court has presided over many wide-ranging matters for years, ruling on a range of issues relating to the Carpoff Ponzi Scheme, adversary proceedings, substantive consolidation, settlement approvals, and the estate's creditor body. This Bankruptcy Court is well experienced and familiar with these Bankruptcy Cases, the players, and the facts. It is far more efficient for this Court to continue to preside over these issues.

### G. Uniformity Of Bankruptcy Administration

The policy of uniformity of bankruptcy administration favors denial of the Nixon's request to withdraw the reference. The Trustee asserts in this Nixon AP – near-identical to the Trustee's assertions in the 40+ other adversary proceedings she has brought in these Bankruptcy Cases – that Carpoff perpetrated the Carpoff Ponzi Scheme and certain transfers are avoidable and can be recovered for the benefit of the estate. Here, and in many of those other adversary proceedings, the Trustee intends to utilize the "Ponzi presumption" of insolvency.[53]

---

[51] *In re EPD Inv.*, 2013 WL 5352953, *6 (C.D. Cal. Sept. 24, 2013) (quotations omitted, emphasis added); *see also In re We Ins. Servs., Inc.*, 2021 WL 4150311, *3 & 4 (S.D. Cal. Sept. 13, 2021).

[52] *EPD,* 2013 WL 5352953, *5 (notations omitted); *see also Healthcentral.com,* 504 F.3d at 787–88 (having the bankruptcy court hear these actions "promotes judicial economy and efficiency by making use of the bankruptcy court's unique knowledge of Title 11 and familiarity with the actions before them"); *Access*, 2014 WL 6065641, *3.

[53] *See e.g., In re Nat'l Consumer Mortg., LLC*, 2013 WL 164247, *11 (D. Nev. Jan. 14, 2013).

14

Because (1) the Bankruptcy Court has already considered matters related to the Trustee's claims in this Nixon AP,[54] and is otherwise experienced with the unique issues in these Bankruptcy Cases; (2) the Trustee is prosecuting other adversary proceedings in the Bankruptcy Court with overlapping facts and claims; and (3) the Trustee's avoidance claims would not exist absent the bankruptcy;[55] "uniformity of bankruptcy administration" favors denial of Nixon's request to withdraw the reference. Indeed, "when the bankruptcy has proceeded for several years, withdrawal may undermine the uniform administration of bankruptcy proceedings."[56]

### H. Forum Shopping

Nixon is forum shopping. Nearly three years ago Nixon filed its POC seeking to have this Bankruptcy Court award an affirmative recovery of estate assets based on the quality of the pre-petition legal services it provided to DC Solar. Nixon – through bankruptcy counsel – swore to the truth of its Nixon POC, making it akin to a verified complaint. *See In re Garner*, 246 B.R. 617, 622 (B.A.P. 9th Cir. 2000) ("In short, a proof of claim executed by an attorney has an evidentiary effect similar to that of a verified complaint."). Nixon attached documentary support to its Nixon POC pursuant to F.R.B.P. 3001, gaining a presumption as to entitlement and amount.[57]

The Trustee has objected through her Nixon Complaint, as directed by F.R.B.P. 3007(b). The Nixon Complaint is a counterclaim to the Nixon POC,[58] and centers on the identical subject matter Nixon placed before this Court in its POC. Both parties, at that time, agreed to this Bankruptcy Court as the forum for adjudicating the propriety of Nixon's legal services.

That Nixon now strategically prefers to have this matter adjudicated elsewhere is of no moment. Nixon sought the aid of the Bankruptcy Court when it submitted the Nixon POC to obtain DC Solar estate assets. In securing the benefits provided by law (*e.g.,* 11 U.S.C. § 502 and F.R.B.P. 3001), Nixon consented to the Bankruptcy Court serving as the forum and adjudicator. Nixon should not be permitted to forum shop.

---

[54] *See e.g.,* Sub-Con Order, ¶¶3-45 and ECF Nos. 2790 & 3054.
[55] *Bryanna Cooper*, 2018 WL 11277403, *3.
[56] *We Ins. Servs.*, 2021 WL 4150311, *4.
[57] F.R.B.P. 3001(f); *Garner*, 246 B.R. at 622.
[58] *In re Brosio*, 505 B.R. 903, 912 (B.A.P. 9th Cir. 2014) (citing cases).

15

## I.  Centralization Of Disputes

There is strong public policy favoring centralization of disputes before the Bankruptcy Court.[59] Nixon's requested relief runs contrary to this well-settled rule. Just as the Trustee is litigating other disputes before the Bankruptcy Court, the Nixon AP should remain there as well. This increases efficiency and reduces expense to the estate and the risk of inconsistent rulings.

## J.  Nixon Has No Right to a Jury Trial; In The Alternative, The Reference Should Be Withdrawn Only When The Nixon AP Is Trial-Ready

While Nixon filed a demand for jury trial [ECF No. 16], the Trustee has moved to strike it as Nixon forfeited any jury trial right by filing its POC. *See* Sections V.D & V.E above, and the Trustee's contemporaneously-filed motion to strike, which discuss that: (1) the time-of-filing rule directs that this Court's jurisdiction is determined as of the commencement of the Nixon AP;[60] and (2) Nixon forfeited any jury trial right by filing its POC seeking a recovery from the DC Solar bankruptcy estate on the same or related subject matter as the Trustee's Nixon AP.[61]

But even if Nixon had not filed its POC three years ago and forfeited any jury trial right, that would merely demonstrate "cause" to withdraw the reference *when the matter is trial-ready*, not in its earlier stages. First, the Local Rules have set a procedure for just this situation, whereby this Bankruptcy Court handles all matters in an adversary until it is ready for a jury trial.

> **Consent and withdrawal**. Upon the court's determination that the demand was timely made and the party has a right to a jury trial, and if all parties have not filed

---

[59] *In re Eber*, 687 F.3d 1123, 1131 (9th Cir. 2012); *Balboa Cap. Corp. v. Siddiqui Transitions MHT LLC*, 2017 WL 7806635, *3 (C.D. Cal. Aug. 23, 2017) (identifying the "strong public policy favoring centralization of bankruptcy proceedings in a bankruptcy court").

[60] *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570–71 (2004); *In re Casamont Invs., Ltd.*, 196 B.R. 517, 521 (B.A.P. 9th Cir. 1996) ("Jurisdiction is determined as of the commencement of the action.") *citing In re Fietz*, 852 F.2d 455, n.2 (9th Cir. 1988); *see also Double Eagle Energy Servs., LLC v. MarkWest Utica EMG, LLC*, 936 F.3d 260, 263 (5th Cir. 2019); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 597 B.R. 466, 477 (Bankr. S.D.N.Y. 2019), leave to appeal denied sub nom. 612 B.R. 257 (S.D.N.Y. 2020) (a claimant's withdrawal of a proof of claim after the trustee files an adversary proceeding (counterclaim) against that claimant has no effect on the Bankruptcy Court's jurisdiction) (citing many cases).

[61] *Langenkamp v. Culp*, 498 U.S. 42 (1990); *Katchen v. Landy*, 382 U.S. 323, 334–35 (1966); *In re G.I. Industries*, 204 F.3d 1276, 1280 (9th Cir. 2000); *In re Advanced Rods, Inc*., 2005 WL 6960214 (B.A.P. 9th Cir. June 27, 2005); *In re Smith*, 389 B.R. 902, 916 (Bankr. D. Nev. 2008); *see also In re CBI Holding Co., Inc*., 529 F.3d 432 (2d Cir. 2008); *In re GYPC, Inc*., 2021 WL 5016129 (Bankr. S.D. Ohio Oct. 25, 2021); *Madoff*, 597 B.R. 466.

16

a written consent or consented on the record to a jury trial in the bankruptcy court, the bankruptcy court will certify the matter to the district court. Upon certification, the district court will open a new civil matter, and will assign a date for trial. **Unless the assigned judge orders otherwise, all proceedings will continue in the bankruptcy court until the matter is ready for trial.**[62]

<u>Second</u>, Ninth Circuit law contemplates and approves that the reference is appropriately withdrawn when the adversary is trial-ready. In *Healthcentral.com*, the Ninth Circuit concluded: "Universally these courts have all reached the same holding, that is, a Seventh Amendment jury trial right does not mean that bankruptcy courts must instantly give up jurisdiction and that the case must be transferred to the district court."[63] Rather, the bankruptcy court should retain jurisdiction over the pre-trial proceedings, reasoning as follows:

First, allowing the bankruptcy court to retain jurisdiction over pre-trial matters, does not abridge a party's Seventh Amendment right to a jury trial…. A bankruptcy court's pre-trial management will likely include matters of "discovery," "pre-trial conferences," and routine "motions," which obviously do not diminish a party's right to a jury trial. Moreover, even if a bankruptcy court were to rule on a dispositive motion, it would not affect a party's Seventh Amendment right to a jury trial, as these motions merely address whether trial is necessary at all.

Second, requiring that an action be immediately transferred to district court simply because of a jury trial right would **run counter to our bankruptcy system**. Under our current system Congress has empowered the bankruptcy courts to "hear" Title 11 actions, and in most cases enter relevant "orders." **As has been explained before, this system promotes judicial economy and efficiency by making use of the bankruptcy court's unique knowledge of Title 11 and familiarity with the actions before them. Accordingly, if we were to require an action's immediate transfer to district court simply because there is a jury trial right we would effectively subvert this system. Only by allowing the bankruptcy court to retain jurisdiction over the action until trial is actually ready do we ensure that our bankruptcy system is carried out**.[64]

## **CONCLUSION**

The Trustee has the exclusive authority to bring the Nixon AP for the benefit of the estate. She commenced the Nixon AP in this Bankruptcy Court, challenging Nixon's POC head-on. Nixon has consented to this Court's entry of final orders in the Nixon AP, a statutorily core proceedings for which the Bankruptcy Court has constitutional authority to finally adjudicate. And Nixon has no jury trial right.

---

[62] Local Rule 9015(e) (emphasis added).

[63] 504 F.3d 775, 787 (9th Cir. 2007) (citing cases, emphasis added).

[64] *Id*. (internal citations omitted and emphasis added).

17

1    Moreover, the Trustee has asserted dozens of other adversary proceedings in the

2    Bankruptcy Court seeking overlapping relief and addressing overlapping factual circumstances.

3    The Bankruptcy Court has presided over a wide range of other DC Solar-related matters over the

4    past three years, developing unique and specialized familiarity over these and other bankruptcy

5    issues in entering substantive and procedural rulings.

6    Nixon fails to satisfy its heavy burden to withdraw the reference and its efforts to forum

7    shop should be denied.

8    **WHEREFORE**, Plaintiff respectfully requests that the Court deny Nixon's request to

9    withdraw the reference, or in the alternative, deny the request until the Nixon AP is trial-ready,

10   and grant further relief as the Court deems just and proper.

11   DATED: January 14, 2022.

12   **HARTMAN & HARTMAN**

13   */s/ Jeffrey L. Hartman*
      Jeffrey L. Hartman, Esq.
14   *Attorney for Plaintiff Christina W. Lovato*

15

16   **MELAND BUDWICK, P.A.**

17   */s/ Michael S. Budwick*
      Michael S. Budwick, Esq.
18   Solomon B. Genet, Esq.
      Gil Ben-Ezra, Esq.
19   *Attorneys for Plaintiff Christina W. Lovato*

20

21

22

23

24

25

26

27

28

18

## **CERTIFICATE OF SERVICE**

I certify that on January 14, 2022, I caused to be served the above-named document as indicated below:

✔ a.  Via ECF to:

ALEXANDER E. BRODY     abrody@melandbudwick.com
ltannenbaum@melandbudwick.com ltannenbaum@ecf.courtdrive.com
mrbnefs@yahoo.com
LOUIS M. BUBALA     lbubala@kcnvlaw.com, cdroessler@kcnvlaw.com
bsheehan@kcnvlaw.com
MICHAEL S. BUDWICK     mbudwick@melandbudwick.com
ltannenbaum@melandbudwick.com ltannenbaum@ecf.courtdrive.com
SOLOMON B. GENET     sgenet@melandbudwick.com
ltannenbaum@melandbudwick.com ltannenbaum@ecf.courtdrive.com
JEFFREY L. HARTMAN     notices@bankruptcyreno.com abg@bankruptcyreno.com
CHRISTINA W. LOVATO     trusteelovato@att.net NV26@ecfcbis.com

✔ b.  Direct Email to:

Louis M. Bubala, Esq., at lbubala@kcnvlaw.com
Eric Macmichael, Esq. at emacmichael@keker.com
Elliot R. Peters, Esq. at epeters@keker.com

✔ c. Via Mail Service: Regular, first-class United States mail, postage fully pre-paid, addressed to:

Robert N.H. Christmas, Esq.
Nixon Peabody LLP
55 West 46 Street, 25th Floor
New York, NY 10036

Elliot R. Peters, Esq.
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111

I declare under penalty of perjury that the foregoing is true and correct.

DATED: January 14, 2022.

                              */s/ Michael S. Budwick*
                              Michael S. Budwick, Esq.

19

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| In re DOUBLE JUMP, INC. | Case No. 3:21-cv-00134-MMD |
| Debtor. | ORDER |
| CHRISTINA W. LOVATO, | Lead Case No. BK-S-19-50102-gs |
| Plaintiff, | Adversary Case No. 21-0507-gs |
| v. | |
| LBA REALTY FUND II-COMPANY I, LLC, | |
| Defendant. | |

**I.     SUMMARY**

This action involves an adversary proceeding related to a bankruptcy case. Defendant LBA Realty Fund II-Company I LLC ("LBA") moves to withdraw reference of the adversary proceeding from the bankruptcy court so that this action may be heard by the district court. (ECF No. 1 ("Motion").) LBA further requests that after withdrawing the reference, this Court transfer the action to the Eastern District of California for further proceedings. (*Id.*) Plaintiff Christina Lovato, the Chapter 7 bankruptcy trustee, responded (ECF No. 11) and LBA replied (ECF No. 12.) As explained below, the Court will deny LBA's motion to withdraw reference. Accordingly, the Court finds the request to transfer is moot, as that question is properly before the bankruptcy court.

**II.     BACKGROUND**

The following facts are adapted from Lovato's response brief. Between 2012 and 2018, Jeff Carpoff perpetrated a billion-dollar Ponzi scheme through Double Jump and other companies. (ECF No. 11 at 2.) The scheme offered investors the opportunity to "buy" mobile solar generators ("MSGs") in exchange for an eight- or nine-figure

**EXHIBIT 1**

1    investment. (*Id.* at 3.) Carpoff siphoned funds from the debtor companies for his personal

2    benefit. (*Id.*)

3          Following a law enforcement raid in December 2018, Double Jump and the other

4    debtor companies filed voluntary Chapter 11 petitions for bankruptcy in this District. (*Id.*)

5    In March 2019, the bankruptcy court converted the Chapter 11 petitions to Chapter 7

6    petitions and appointed Lovato as the Trustee. (*Id.*)

7          Lovato filed an adversary action ("Adversary") against LBA on January 22, 2021,

8    in the bankruptcy court. (ECF No. 1-1 at 2.) In the Adversary, Lovato asserted a fraudulent

9    conveyance claim against LBA under sections 544 and 550 of the Bankruptcy Code. (*Id.*)

10   LBA answered the complaint and moved to withdraw the reference on March 22, 2021.

11   (*Id.* at 3; ECF No. 1-2.) This action commenced in this Court the following day with LBA's

12   Motion. (ECF No. 1.) At the time LBA moved to withdraw reference of the Adversary,

13   Lovato had filed 41 distinct adversary proceedings before the bankruptcy court. (ECF No.

14   11 at 4.) Lovato contends that fraudulent conveyance is an issue in nearly all of those

15   adversaries. (*Id.*) Lovato further asserts that she contemplates bringing further

16   adversaries, as deadlines have been extended and certain claims are subject to tolling

17   agreements. (*Id.*)

18   **III.    DISCUSSION**

19         LBA argues the Court should withdraw reference of the Adversary because (1) the

20   bankruptcy court cannot finally adjudicate the fraudulent conveyance claims as a

21   constitutional matter and (2) withdrawal would serve prudential interests such as judicial

22   economy, preservation of resources, and expediency. (ECF No. 1 at 2-5.) Lovato opposes

23   the Motion, arguing that those interests are best served by waiting until the Adversary is

24   trial ready before withdrawing the reference. (ECF No. 11 at 5-8.) The Court agrees with

25   Lovato and will therefore deny the Motion.

26   **A.    Legal Standard**

27         District courts have jurisdiction over matters that arise under title 11. *See* 28 U.S.C.

28   § 1334. However, district courts "may provide that any or all cases under title 11 and any

2

1  or all proceedings arising under title 11 or arising in or related to a case under title 11

2  shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). A

3  bankruptcy court is authorized by statute to "hear and determine all cases under title 11

4  and all core proceedings arising under title 11, or arising in a case under title 11 . . . and

5  may enter appropriate orders and judgments" subject to appellate review by the district

6  court. 28 U.S.C. § 157(b)(1). A bankruptcy court's statutory authority to enter judgment in

7  a particular proceeding depends on whether that proceeding is a "core proceeding[ ]"

8  under 28 U.S.C. § 157(b)(1). "Put simply: If a matter is core, the statute empowers the

9  bankruptcy judge to enter final judgment on the claim, subject to appellate review by the

10  district court." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34 (2014).

11      "If a matter is non-core, and the parties have not consented to final adjudication by

12  the bankruptcy court, the bankruptcy judge must propose findings of fact and conclusions

13  of law. Then the district court must review the proceeding *de novo* and enter final

14  judgment." *Id.* at 34; *see also* 28 U.S.C. § 157(c). Instead, in a non-core proceeding, the

15  "bankruptcy judge shall submit proposed findings of fact and conclusions of law to the

16  district court, and any final order or judgment shall be entered by the district judge after

17  considering the bankruptcy judge's proposed findings and conclusions and after

18  reviewing de novo those matters to which any party has timely and specifically objected."

19  28 U.S.C. § 157(c)(1).

20      However, certain claims which are statutorily core may not be finally adjudicated

21  by a bankruptcy court without consent of the parties due to constitutional constraints. *See*

22  *Stern v. Marshall*, 564 U.S. 462, 502-03 (2011). In *Stern*, the Supreme Court held that

23  bankruptcy courts cannot make a final judgment on a cause of action traditionally within

24  the judicial power of an Article III court. *See id.* The Court reasoned that if a bankruptcy

25  court were to be assigned a matter traditionally within the judicial power of an Article III

26  court, this delegation would circumvent the protections provided by Article III, which

27  ensure that parties have access to an independent judiciary. *See id.*

28  ///

3

But a *Stern* claim—a core claim which may not be finally adjudicated by a bankruptcy court without consent—need not be heard in the first instance by a district court. *See Exec. Benefits Ins. Agency*, 573 U.S. at 36 ("The statute permits *Stern* claims to proceed as non-core within the meaning of § 157(c)."). The Ninth Circuit clarified that "*Stern* does not affect the statutory designation of matters as core" provided that the bankruptcy court does not enter final judgment. *In re EPD Inv. Co., LLC*, 821 F.3d 1146, 1151 (9th Cir. 2016) (further rejecting the adversary defendant's argument that because he raised the right to jury trial, the bankruptcy court could not preside over the adversary until final judgment).

The district court retains discretion to "withdraw [referral], in whole or in part, any case or proceeding referred under this section . . . for cause shown." 28 U.S.C. § 157(d). When determining whether to withdraw reference, "a district court should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Sec. Farms v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1999).

**B. Analysis**

LBA argues that the fraudulent conveyance claim Lovato asserts in the Adversary is statutorily core but constitutionally limited by LBA's Seventh Amendment right to a jury trial—in other words, it is a *Stern* claim.[1] (ECF No. 1 at 3.) A common-law fraudulent conveyance claim was similarly at issue in *Executive Benefits Insurance Agency v. Arkison*, where the Supreme Court found that *Stern* claims need not be heard by the district court in the first instance. *See* 573 U.S. at 35-36. Instead, the bankruptcy court may submit proposed findings of fact and conclusions of law for *de novo* review by the

---

[1] "[P]roceedings to determine, avoid, or recover fraudulent conveyances" are statutorily core proceedings. *See* 28 U.S.C. § 157(b)(2)(H). Indeed, a fraudulent conveyance claim remains statutorily core even after an adversary defendant asserts a jury trial right. *See In re EPD Inv. Co., LLC*, 821 F.3d 1146, 1151 (9th Cir. 2016) ("*Stern* and its progeny simply recognize that sometimes the bankruptcy court's statutory authority to decide a core matter must give way when that interest conflicts with a non-creditor's constitutional right to entry of a final judgment by an Article III adjudicator.").

4

1   district court, as it would for non-core claims. *See id.* at 36. Indeed, Lovato admits that

2   the bankruptcy court lacks authority to enter final judgment over the fraudulent

3   conveyance claims, but argues that the Court should therefore deny the Motion and

4   instead withdraw the reference when the Adversary is trial-ready. (*Id.* at 4-5.)

5         LBA states that other judges in this District have withdrawn reference in "similar

6   scenarios" where final adjudication by the bankruptcy court would eventually be

7   impossible. (ECF No. 12 at 4-5.) But the cases LBA cites are distinguishable and

8   unpersuasive. Reference was withdrawn in *Nelson v. XL America, Inc.*, after discovery

9   had ended and dispositive motions were prepared, and the claims at issue were

10  insurance coverage claims rather than core bankruptcy issues. *See* Case No. 2:16-cv-

11  00060-JAD-GWF, 2016 U.S. Dist. LEXIS 157788 (D. Nev. Nov. 14, 2016). In other cases,

12  reference was withdrawn because claims were non-core. *See, e.g.*, *Bagley v. Beville*,

13  Case No. 2:13-cv-01119-JCM-CWH, 2013 U.S. Dist. LEXIS 100488 (D. Nev. Jul. 18,

14  2013). The difference between core and non-core claims is not merely formalistic—

15  bankruptcy judges are particularly adept at adjudicating core bankruptcy claims, and the

16  Article III court benefits from their expertise. *See In re EPD Inv. Co. LLC*, Case No. CV

17  13-05536 SJO, 2013 WL 5352953, at *6 (C.D. Cal. Sept. 24, 2013) ("Having the

18  bankruptcy court submit proposed findings of fact and conclusions of law in fraudulent

19  conveyance cases 'promotes judicial economy and efficiency by making use of the

20  bankruptcy court's unique knowledge of Title 11 and familiarity with the actions before

21  them.'" (quoting *In reHeathcentral.com*, 504 F.3d 775, 787-88 (9th Cir. 9007)). While there

22  may ultimately be some duplication of efforts by leaving the reference in place until the

23  Adversary is ready for final adjudication, there are also considerable benefits for the fair

24  administration of the Adversary for core matters to be handled in the bankruptcy court.

25        The circumstances of this case likewise counsel leaving the Adversary referred.

26  As Lovato states—which LBA does not deny—several similar adversaries are already

27  proceeding in the same bankruptcy proceedings. (ECF Nos. 11 at 4.) The Court is

28  unpersuaded by LBA argument that other adversaries have no bearing this Adversary's

adjudication. (ECF No. 12 at 2.) Lovato argues that the adversaries she has filed relate to a Ponzi scheme, and that she seeks to avoid and recover fraudulent conveyances in almost all of the proceedings. (ECF No. 11 at 4.) The Court agrees that there may be overlapping legal and factual issues between this Adversary and other matters proceeding before the bankruptcy court. At this stage in the litigation, judicial economy favors leaving the Adversary referred.

The other factors courts consider when contemplating withdrawing a reference are either neutral or also favor referral. As explained above, the existence of related adversaries means both the uniformity of bankruptcy administration and the centralization of disputes weigh in favor of keeping the Adversary before the bankruptcy court. The Court is unpersuaded that Lovato is forum-shopping by opposing withdrawal of the reference, as the Adversary was initiated in the bankruptcy court. Lovato does not contend that LBA is forum-shopping, which the Court accepts, and finds this factor is neutral. (ECF No. 11 at 7.)

Ultimately, the Court agrees with Lovato that withdrawal of the reference is inappropriate at this stage. The Court will therefore deny the Motion without prejudice and will permit LBA to seek withdrawal when the Adversary is ready for dispositive adjudication or final judgment. Because reference will not be immediately withdrawn, the Court agrees with Lovato that the question of transfer is properly before the bankruptcy judge. The Court will therefore deny LBA's motion to transfer the Adversary to the Eastern District of California as moot.[2]

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

---

[2] *See, e.g., In re The Mortg. Store*, 464 B.R. 421, 424 n.3 (D. Haw. 2011) (finding a motion to transfer moot after denying a motion to withdraw reference).

6

1          It is therefore ordered that Defendant's motion to withdraw reference (ECF No. 1)

2   is denied without prejudice. The Court further finds that Defendant's request for transfer

3   is moot.

4          DATED THIS 9th Day of December 2021.

5

6

7   _____
    MIRANDA M. DU
8   CHIEF UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS – *Admitted PHV*
epeters@keker.com
ERIC H. MACMICHAEL – *Admitted PHV*
emacmichael@keker.com

633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188

KAEMPFER CROWELL
LOUIS M. BUBALA III - # 8974
lbubala@kcnvlaw.com
50 W. Liberty St., Ste. 700
Reno, NV 89501
Telephone: 775 852 3900
Facsimile: 777 327 2011

Attorneys For Defendant Nixon Peabody LLP

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>     Debtor,<br><br>__X__   Affects DC Solar Solutions, Inc.<br>__X__   Affects DC Solar Distributions, Inc.<br>__X__   Affects DC Solar Freedom, Inc.<br>__X__   Affects Double Jump, Inc. | Lead Case No. BK-19-50102-gs<br>(Chapter 7)<br><br>Substantively Consolidated with:<br><br>19-50130-gs  DC Solar Solutions, Inc.<br>19-50131-gs  DC Solar Distribution, Inc.<br>19-50135-gs  DC Solar Freedom, Inc. |
| CHRISTINA W. LOVATO,<br><br>     Plaintiff,<br><br>v.<br><br>NIXON PEABODY LLP,<br><br>     Defendant. | Adversary Case No.:  21-05072-gs<br><br>**NIXON PEABODY'S REPLY TO TRUSTEE'S OPPOSITION TO NIXON'S MOTION TO WITHDRAW REFERENCE**<br><br>**JURY TRIAL DEMANDED**<br><br>Hearing Date: February 18, 2022<br>Hearing Time: 9:30 a.m. |

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

179

1

# **TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ...................................................................................................1

4    II.   PROCEDURAL BACKGROUND...........................................................................2

5    III.  ARGUMENT ..........................................................................................................2

6          A.    The Trustee's constitutionally non-core claims predominate in this
                 Adversary Proceeding............................................................................................2

7

8                1.    Six of the Trustee's eight claims must be finally decided by an
                       Article III court. .............................................................................................4

9                2.    The Trustee's two remaining claims do not predominate............................7

10         B.    Each remaining factor concerning withdrawal of the bankruptcy reference
                 favors granting Nixon Peabody's motion. ............................................................7

11         C.    The Court should withdraw the reference now....................................................11

12   IV.   CONCLUSION......................................................................................................13

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1815282

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Bellingham Ins. Agency, Inc.*,
    702 F.3d 553 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v.
    Arkison*, 573 U.S. 25 (2014) .................................................................................6, 7

*In re EPD Inv. Co., LLC*,
    821 F.3d 1146 (9th Cir. 2016) ...................................................................................6

*Everett v. Art Brand Studios, LLC*,
    556 B.R. 437 (N.D. Cal. 2016) .................................................................................10

*In re FKF 3, LLC*,
    No. 13-CV-3601 (KMK), 2016 WL 4540842 (S.D.N.Y. Aug. 30, 2016)...........5, 6

*Nelson v. XL Am., Inc. (In re Ameri-Dream Realty, LLC)*,
    No. 2:16-CV-00060-JAD-GWF, 2016 U.S. Dist. LEXIS 157788 (D. Nev. Nov.
    14, 2016) ..................................................................................................................11

*Off. Comm.. of Unsecured Creditors v. Marini (In re Windspire Energy, Inc.)*,
    No. 3:13-cv-10-RCJ-WGC, 2013 U.S. Dist. LEXIS 46727 (D. Nev. April 1,
    2013) .........................................................................................................................11

*In re Rhodes Companies, LLC*,
    No. 2:12-CV-01272-MMD, 2012 WL 5456084 (D. Nev. Nov. 7, 2012)..................6

*In re Rosales*,
    No. 13-CV-01316-LHK, 2013 WL 5962007 (N.D. Cal. Nov. 7, 2013)...................10

*Rosenberg v. Harvey A. Bookstein*,
    479 B.R. 584 (D. Nev. 2012) ...................................................................................11

*Sec. Farms v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen &
    Helpers*,
    124 F.3d 999 (9th Cir. 1997) ....................................................................................2

*Shengdatech Liquidating Trust v. Hansen, Barnett, & Maxwell, P.C.*,
    No. 3:13-CV-00563-RCJ, 2013 WL 6408518 (D. Nev. Nov. 26, 2013)................11

*Stern v. Marshall*,
    564 U.S. 462 (2011)........................................................................................ *passim*

*In re Summers*,
    320 B.R. 630 (Bankr. E.D. Mich. 2005) ..................................................................7

ii
REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

181

*United States v. Anekwu,*
   695 F.3d 967 (9th Cir. 2012) ...............................................................................6

*USACM Liquidating Trust v. Compass USA SPE, LLC* (*In re USA Com. Mortg. Co.*),
   No. 2:14-cv-00455-RCJ-PAL, U.S. Dist. LEXIS 72663 (D. Nev. May 28, 2014), Dkt. No. 4 ........................................................................................11

*In re USDigital, Inc.*,
   461 B.R. 276 (Bankr. D. Del. 2011) ....................................................................3

*Wellness Int'l Network, Ltd. v. Sharif,*
   575 U.S. 665 (2015).............................................................................................5

*In re Zante, Inc.*,
   No. 3:10-CV-00231-RCJ-RAM, 2010 WL 5477768 (D. Nev. Dec. 29, 2010). Bankruptcy...................................................................................................2, 7

**Federal Statutes**

11 U.S.C. § 548(a)(1)(A) ............................................................................................9

11 U.S.C. § 548(a)(1)(B) ............................................................................................9

28 U.S.C. § 157(b) ......................................................................................................4

28 U.S.C. § 157(c) ......................................................................................................2

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

## I.     INTRODUCTION

The central premise of the Trustee's opposition—that Nixon waived its right to a jury and consented to final adjudication in this Court simply because it filed a proof of claim back in 2019—is wrong as a matter of law.  As set forth at greater length in Nixon's opposition to the Trustee's motion to strike Nixon's jury demand, Exhibit A ("MTS Opp."), Dkt. 51, the Trustee's state-law tort and fraudulent conveyance claims cannot be finally decided by the bankruptcy court because Nixon retains its right to a jury.  Those claims may be "core" under the bankruptcy code, but the constitution requires that they be decided by an Article III court, unless Nixon has consented to proceed here.  Nixon has not done so.  The filing of a proof of claim cannot as a matter of law amount to consent.  Consent instead turns on a litigant's course of conduct in the adversary proceeding, and Nixon's conduct here unambiguously reflects that it does not agree to adjudication outside of an Article III forum.

Once that erroneous premise is removed, the Trustee's remaining arguments against withdrawal of the reference fall away easily.  The six claims that must be decided by an Article III court predominate in every sense of the word over the two remaining claims.  Concerns of judicial efficiency, cost, and delay all favor withdrawing the reference too, and favor withdrawing it now.  Unlike the Trustee's other adversary proceedings, the claims against Nixon are predominantly state law tort claims that will be decided under California law.  Further underscoring the need to withdraw the reference, the Eastern District of California—an Article III court empowered to oversee this proceeding—is already familiar with the facts, the claims, and the identical underlying transactions that predominate the Trustee's complaint.[1]  As explained in Nixon's concurrently filed motion to transfer, concentrating litigation there avoids the risk of inconsistent judgments—a risk that is more than theoretical, given the important legal questions surrounding duty, privilege, knowledge, causation, and *in pari delicto* that will be litigated in each of these actions.  Each factor compels in favor of withdrawing the reference now and

---

[1] Because this is fundamentally an Eastern District of California case, Nixon Peabody respectfully suggests that the transfer motion be decided first.  The transferee court can then consider the motion to withdraw the reference if necessary.

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1    transferring this matter.

2    **II.    PROCEDURAL BACKGROUND**

3           Much of the relevant factual background is offered in Nixon's motion to withdraw the

4    bankruptcy reference.  *See Lovato v. Nixon Peabody*, No. 21-05072-GS, Dkt. 17 ("Mot.") at 2–6.

5    At the time Nixon filed this motion, it also filed a motion to transfer the adversary proceeding, *see*

6    *id.*, Dkt. 14, a jury demand, *see id.*, Dkt. 16, and a motion to withdraw its proof of claim in the

7    bankruptcy proceeding, *see In re Double Jump*, No. 19-50130-GS, Dkt. 2985.  The Trustee

8    opposed all three motions and then filed a motion to strike Nixon's jury demand.  *See Lovato v.*

9    *Nixon Peabody*, Dkt. 37.  Each of the Trustee's briefs repackages her mistaken argument that

10   Nixon waived its constitutional rights to a jury trial and adjudication before an Article III court

11   merely by filing its proof of claim in the bankruptcy proceeding back in 2019.  Because that

12   argument is incorrect, the rest of the Trustee's dependent arguments also fail.

13   **III.   ARGUMENT**

14          As set forth in Nixon's motion, withdrawal is favored where claims that the bankruptcy

15   court cannot finally decide predominate over other claims.  Mot. 6–7.  Courts also consider *inter*

16   *alia* "[1] the efficient use of judicial resources, [2] delay and costs to the parties, [3] uniformity of

17   bankruptcy administration, [4] the prevention of forum shopping, and [5] other related factors."

18   *Sec. Farms v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers*, 124 F.3d

19   999, 1008 (9th Cir. 1997).  Here, all factors favor withdrawal.

20          **A.    The Trustee's constitutionally non-core claims predominate in this Adversary**
21                 **Proceeding.**

22          The touchstone on a motion to withdraw the bankruptcy reference is, as the Trustee

23   appears to concede, "whether the bankruptcy court has the constitutional authority to enter final

24   judgment on the claim at issue."  *Lovato v. Nixon Peabody*, Dkt. 36 ("Opp.") at 9; *see also, e.g.*,

25   *In re Zante, Inc.*, No. 3:10-CV-00231-RCJ-RAM, 2010 WL 5477768, at *6 (D. Nev. Dec. 29,

26   2010).  Bankruptcy courts lack the authority to enter final judgment on claims designated non-

27   core under 28 U.S.C. § 157(c), as well as those designed "core" by the statute but required by the

28

1815282

184

Constitution to be finally decided by an Article III court—that is, *Stern* claims.[2]  *See, e.g.*, *In re USDigital, Inc.*, 461 B.R. 276, 279 (Bankr. D. Del. 2011).

      The Trustee concedes that at least six of her eight claims are *Stern* claims.[3]  Indeed, she calls her state law tort claims and her fraudulent conveyance claims "statutorily core" and then admits that "statutorily core claims" must ordinarily be finally decided by an Article III court.  Opp. 9–10.  She nevertheless argues that the bankruptcy court can finally decide the *Stern* claims because Nixon consented to adjudication here by filing a proof of claim in 2019.  Not so.  As set forth at considerable length in Nixon's concurrently filed Opposition to the Trustee's Motion to Strike Nixon's Jury Demand, MTS Opp. 5–9, the Trustee was correct in conceding that these six claims are *Stern* claims, but she is wrong that Nixon consented to final adjudication by the bankruptcy court.  Filing a proof of claim does not and cannot, as a matter of law, constitute consent, nor does it amount to a "forfeiture" of Nixon's right to a jury as the Trustee contends.  For the Court's convenience, Nixon attaches that opposition as Exhibit A here but also provides a summary of that analysis in its argument below.  The six claims that cannot be finally decided by the bankruptcy court predominate over the two that can.

---

[2] Some courts refer to these claims as *Stern* claims, while others refer to them as constitutionally non-core.  This brief adopts the term *Stern* claims for the purpose of consistency.

[3] The Trustee actually concedes in her opposition that her "statutorily core claims for avoidance and tort are *Stern* claims," thus including Claim VII for avoidance in the *Stern* analysis as well.  Nixon agrees that The Trustee's state-law tort claims (Claims I–IV) and fraudulent transfer claims (V–VI) are *Stern* claims.  *See* Nixon's Opposition to the Trustee's Motion to Strike the Jury Demand (attached as Exhibit A).  Nixon does not have a basis to conclude whether the Trustee's avoidance claim—as opposed to the fraudulent transfer claims underlying it—would also constitute a *Stern* claim.

1815282

**1.** **Six of the Trustee's eight claims must be finally decided by an Article III court.**

    **a.** **The state-law tort claims (Counts I–IV) at the heart of the Trustee's Complaint are *Stern* claims.**

The Trustee is correct that her state law counterclaims are *Stern* claims.[4]  Opp. 10.  In *Stern*, the Supreme Court held that, even where 28 U.S.C. § 157(b) permits the Bankruptcy Court to enter final judgment on a particular claim, "Article III of the Constitution [may] not."  564 U.S. at 482.  Just as in *Stern*, Article III does not permit a bankruptcy court to finally decide the state law counterclaims at issue here.  As set forth in Nixon's MTS Opp., the public-rights exception to Article III does not apply here; the Trustee's state-law counterclaims do not "assert[] a right of recovery created by federal bankruptcy law"; and the Trustee's claims "seek 'to augment the bankruptcy estate,'" not simply to allocate "'a pro rata share of the bankruptcy res.'"  *Id.* at 488–99.  Nor is bankruptcy-court adjudication permissible on the ground that adjudicating Nixon's entitlement to its proof of claim would ***necessarily*** resolve all the issues in the Trustee's state law tort claims.  The legal and factual differences between the two are manifest.  *See* MTS Opp. 7–8.  The Trustee's concession on this point was thus unavoidable: it is beyond dispute that her state-law counterclaims are *Stern* claims that must be finally decided by an Article III court absent consent to final adjudication by the bankruptcy court.

    **b.** **Nixon has not consented to final adjudication by the bankruptcy court of the Trustee's state law tort claims.**

Because the Trustee's state-law counterclaims are *Stern* claims, the bankruptcy court can finally decide them only if Nixon has consented.  As explained in Nixon's MTS Opp., to protect Article III prerogatives, consent to final adjudication by the bankruptcy court must be "knowing[]

---

[4] The Trustee's original basis for bankruptcy court jurisdiction was that the Complaint was "a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O)."  Adversary Compl., *Lovato v. Nixon Peabody*, Dkt. 1 at ¶ 13.  Nixon's motion explained in great detail how none of the Trustee's initial justifications could transform her state-law claims into core claims.  The Trustee now asserts that her state-law claims are "statutorily core" under two new sections: 28 U.S.C. §§ 157(b)(2)(B) and (C).  Opp. at 9 & n.39.  Although subsection (B) involves disallowance—and is inapplicable—the Trustee is correct that subsection (C) statutorily "permits the bankruptcy court to enter a final judgment on" counterclaims to a proof of claim in certain circumstances.  *Stern v. Marshall*, 564 U.S. 462, 478 (2011).

4
REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

186

and voluntar[y]." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 668 (2015). "[T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* at 684–85 (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)). Applying that test, Nixon has ***not*** consented to final bankruptcy-court adjudication of the Trustee's state-law tort claims. *See* MTS Opp. 5.

As an initial matter, notwithstanding the overwhelming emphasis that the Trustee places on it, Opp. 8–13, 15–16, Nixon's 2019 proof of claim does not and cannot constitute consistent. *Stern* established that a proof of claim is ***never fully voluntary*** and therefore can ***never imply consent*** to bankruptcy-court jurisdiction. In *Stern* itself, Pierce Marshall had filed a proof of claim before the debtor, Vickie Marshall, filed her counterclaim against him, but the Court did not find that the bankruptcy court had authorization to hear Vickie's counterclaim on that (or any) basis. 564 U.S. at 470. The Court instead explained that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings" because Pierce "***had nowhere else to go if he wished to recover from Vickie's estate***." *Id.* at 493. A proof of claim, in other words, can ***never*** be deemed fully voluntary, because a bankrupt's creditor has "nowhere else to go" but the bankruptcy court.[5] Indeed, the Court later recognized in *Wellness International* that "*Stern* was premised on ***nonconsent*** to adjudication by the Bankruptcy Court." 575 U.S. at 682 (emphasis added). Put simply, in light of *Stern* and *Wellness International*, "a creditor does not consent to final adjudication of a debtor's common law counterclaim merely by filing a proof of claim." *In re FKF 3, LLC*, No. 13-CV-3601 (KMK), 2016 WL 4540842, at *10

---

[5] The Trustee is therefore wrong in baldly declaring that "Nixon chose the Bankruptcy Court as the adjudicator and factfinder for the propriety of the Nixon-DC Solar attorney-client relationship and Nixon's legal services." Opp. 13. Nixon "had nowhere else to go if he wished to recover from [DC Solar's] estate." 564 U.S. at 493.

5
REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

187

1   (S.D.N.Y. Aug. 30, 2016).[6] Nixon has therefore not consented here. The Trustee has not cited a

2   single case striking a jury demand on a *Stern* claim where the only alleged basis for consent was

3   submission of a proof of claim. *See* MTS Opp. 10–11.

4         Under the correct standard, it is abundantly clear that Nixon has not consented to final

5   adjudication of the Trustee's *Stern* claim in bankruptcy court. *See id*. Absent express consent

6   (which no one argues occurred here), courts look to a litigant's course of conduct ***in the***

7   ***adversary proceeding*** to ascertain implied consent. *Stern*, 564 U.S. at 462 *In re FKF*, 2016 WL

8   4540842, at *10. Since the filing of this adversary proceeding, Nixon has consistently stated that

9   it does ***not*** consent to final adjudication in bankruptcy court. Nixon highlighted its lack of

10  consent in its first stipulation to extend time to respond, *see* Dkt. 10; its motion to transfer, Dkt.

11  14; the instant motion to withdraw the bankruptcy reference, Mot., Dkt. 17; and its jury demand,

12  Dkt. 16. As catalogued in the MTS Opp., Nixon's conduct here is not in any way comparable to

13  that which was at issue in prior cases in which courts have found consent. *See* MTS Opp. 11

14  nn.4–5 (collecting cases).

15        **c.**    **The Trustee's fraudulent conveyance claims must also be**
16                 **decided by an Article III court.**

17        As explained in greater detail in the MTS Opp., *id.* at 17–19, the Trustee's fraudulent

18  conveyance claims are *Stern* claims too—as she concedes. Opp. 10; *see also In re Bellingham*

19  *Ins. Agency, Inc*., 702 F.3d 553, 562 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v.*

20  *Arkison*, 573 U.S. 25 (2014).[7] Just as with the Trustee's state law tort claims, Nixon has not

21  consented to final adjudication of the fraudulent conveyance claims in bankruptcy court. *See*

22

23  ───────────────

   [6] As explained in Nixon's MTS Opp. (at 11 n.4), the Trustee's reliance on *In re EPD Inv. Co.,*

24  *LLC*, 821 F.3d 1146 (9th Cir. 2016) is unavailing. That decision's footnote regarding consent
   was not necessary to the court's decision—the holding was that the bankruptcy court's authority

25  to finally decide the claims before it was irrelevant to the motion to compel arbitration at issue on
   appeal—and is therefore non-binding dicta. *Id.* at 1150–51 & n.2; *see also Cf. United States v.*

26  *Anekwu*, 695 F.3d 967, 975 (9th Cir. 2012).

27  [7] *See also In re Rhodes Companies, LLC*, No. 2:12-CV-01272-MMD, 2012 WL 5456084, at *4
   (D. Nev. Nov. 7, 2012) ("[A] court deciding a fraudulent conveyance action exercises its Article

28  III judicial power, and the Seventh Amendment entitles a litigant to a jury trial on such claims.").

1    MTS Opp. 17–19. The same standard of consent that applies to the state-law claims applies here,

2    *In re Bellingham*, 702 F.3d at 568, and as explained above, *supra* Section III.A.1, and in the MTS

3    Opp. 17–19, there is no basis to conclude that Nixon provided its knowing and voluntary consent.

4    The fraudulent conveyance claims also must be decided by an Article III court.[8]

5              **2.    The Trustee's two remaining claims do not predominate.**

6         The Trustee does not dispute that the remaining claims do not predominate here. And

7    practically speaking, the Trustee's disallowance claim is already moot: Nixon has moved to

8    withdraw its proof of claim with prejudice and will not pursue payment on it regardless of how

9    that motion is resolved. The Trustee also fails to address the limited scope of her avoidance

10    claim—DC Solar did not directly pay for most of these services and thus cannot recover for

11    payments it did not make. *See In re Summers*, 320 B.R. 630, 648–49 (Bankr. E.D. Mich. 2005)

12    (holding that no claim exists under 11 U.S.C. § 548 for fraudulent transfer of assets that never

13    belonged to the debtor).

14         Moreover, as explained above, the disallowance and avoidance claims do not cover the

15    same scope—in breadth or depth—as the Trustee's state-law tort claims. To resolve the state-law

16    claims, the Court will need to conduct a completely different analysis, one spanning a much

17    longer time period (over eight years) with entirely different causation and damages issues. The

18    six constitutionally non-core claims predominate and must be tried to an Article III court, which

19    "weighs very heavily in favor of withdrawal." *In re Zante, Inc.*, 2010 WL 5477768, at *6.

20             **B.    Each remaining factor concerning withdrawal of the bankruptcy reference**

21                  **favors granting Nixon Peabody's motion.**

22         Nixon argued in its motion to withdraw that judicial efficiency, cost and delay,

23    administration of the bankruptcy estate, and forum-shopping concerns all counsel in favor of

24    withdrawing the bankruptcy reference now. *See* Mot. 10–15. As a preliminary matter, the

25    Trustee's arguments to the contrary, Opp. 13–17, all hinge upon the Trustee's erroneous

26    argument that the bankruptcy court has the authority to finally decide all of the Trustee's claims.

27

28

---

[8] Nixon's concurrently filed Reply to its Motion to Withdraw the Proof of Claim provides further detail on why the Court should allow withdrawal.

7

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

189

1 If the Court disagrees with that premise and finds that the state law tort claims and fraudulent

2 conveyance claims must be decided in an Article III forum, the Trustee's remaining arguments

3 are a dead letter.

4   ***First***, judicial efficiency, cost, and delay all favor withdrawal. As Nixon argued in its

5 motion, multiple courts have recognized that it is a poor use of resources for both the bankruptcy

6 court and the district court to consider each dispositive motion anew, especially where, as here, an

7 Article III court will ultimately have to preside over the eventual trial. *See* Mot. 10–11. The

8 Trustee has in fact acknowledged in her opposition to Nixon's motion to withdraw its proof of

9 claim that "*de novo* review would cause the Trustee to incur additional costs and delay." Dkt.

10 3108 at 15, *In re Double Jump, Inc.*, No. BK-19-50102-GS.

11   Other than repeating the incorrect argument that the bankruptcy court has "exclusive

12 jurisdiction" over even Nixon's *Stern* claims, the Trustee's only argument on this factor is that

13 "Nixon dismisses the time and resources invested by this Bankruptcy Court in these Bankruptcy

14 Cases." Opp. 14. That is false. Nixon appreciates the enormity of the task that is presiding over

15 a bankruptcy of this scope. But this adversary case has just been filed and the bankruptcy court

16 has not yet had to familiarize itself with the California state-law claims and defenses at issue or

17 with the nine-year factual record that underlies them. Nixon has no doubt that the bankruptcy

18 court is familiar with the DC Solar entities and their bankruptcy petitions, but this proceeding

19 involves the pre-petition conduct of Nixon and numerous other third parties involved in over 30

20 transactions, which the Bankruptcy Court has yet to address in depth.

21   As for the other adversary proceedings, which the Trustee references as already within the

22 bankruptcy court's knowledge, *see id.* at 14, a review of those actions shows that they are

23 fundamentally different from this one. None of the Trustee's remaining adversary proceedings

24 contain state-law tort claims that mirror the depth and the breadth of its claims against Nixon.

25 Mot. 10–11. Only two of the other 40+ proceedings have any tort-based claims at all, and both

26 proceedings differ significantly from this one, in which a nine-year relationship and 30

27

28

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

1    transactions are at issue.[9]  The Trustee misleadingly suggests that each of the 40+ proceedings at

2    issue involves fraudulent transfer claims similar to those at issue here.  *See* Opp. 14.  But the

3    Trustee's fraudulent transfer claims against Nixon are brought under 11 U.S.C. § 548(a)(1)**(B)**,

4    while *every* other fraudulent transfer claim arises under 11 U.S.C. § 548(a)(1)**(A)**.[10]  This

5    difference is significant.  Claims under subsection (A) focus on DC Solar's conduct and the

6    applicability of the Ponzi scheme exception, both of which are surely within the bankruptcy

7    court's knowledge and expertise.  The claims against Nixon under subsection (B), however,

8    requires the Court to analyze ***Nixon Peabody's*** conduct and determine whether DC Solar received

9    "less than a reasonably equivalent value in exchange" for what DC Solar paid Nixon.  11 U.S.C.

10   § 548(a)(1)(B)(i).  These issues have not been raised before the Bankruptcy Court and will likely

11   not be raised on any other occasion.

12        Indeed, as set forth in Nixon's transfer motion, the best use of resources would be for the

13   case to proceed in the Eastern District of California, where two strikingly similar cases involving

14   the knowledge and participation of third parties—including Nixon—are already pending.  *See*

15   Nixon's Mot. to Transfer, *Lovato v. Nixon Peabody*, Dkt. 14 at 14.  The Eastern District is already

16   considering the specific issues in ***this*** proceeding, which will also require coordinating discovery

17   with multiple third parties.

18        ***Second***, withdrawal will not harm the administration of the bankruptcy estate.  *See* Opp.

19   14–15.  The Trustee's primary argument here, again revolves around the other adversary

20   proceedings she has brought.  *See id.*  As just explained, those actions are fundamentally different

21   from this one.  She also argues that her "avoidance claims would not exist absent the

22   bankruptcy," *id.* at 15, but fails to address how district-court adjudication would somehow harm

---

[9] The individualized, tort-based claims against Nixon are unlike the two other proceedings the Trustee cites as having tort-based claims.  Adversary Case No. 21-5040-gs, which alleges a conversion claim, is about a post-petition transfer by the Carpoffs.  Adversary Case No. 21-5031-gs is against Paulette and Jeff Carpoff's children, who were employees of DC Solar.

[10] Subsection A primarily looks to the conduct of the debtor and whether the debtor had "actual intent to hinder, delay, or defraud any entity."  11 U.S.C. § 548(a)(1)(A).  Subsection B requires the Court to determine whether DC Solar received "less than a reasonably equivalent value in exchange" for what DC Solar paid Nixon.  11 U.S.C. § 548(a)(1)(B)(i).

9

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

administration of the DC Solar estate. To the contrary, numerous cases after *Stern* have required district courts to finally adjudicate fraudulent transfer claims that undergird an avoidance action; the Trustee does cite to a single case where that adjudication harmed the administration of the estate. Ultimately, the Trustee also fails to address that any slight disruption to the administration of a bankruptcy estate "is outweighed by the efficiency that will result in withdrawing the Trustee's non-core claims." *Everett v. Art Brand Studios, LLC*, 556 B.R. 437, 446 (N.D. Cal. 2016).[11]

**Third**, Nixon is not forum-shopping. *See* Opp. 15. As explained above, Nixon had nowhere else to go to file its proof of claim. And now that the Trustee cynically has seized upon that submission to attempt to deny Nixon its Seventh Amendment jury-trial right, Nixon has walked away from its proof of claim altogether. Nixon does not ultimately wish to be in ***any*** forum, but since it has been sued, Nixon wishes only (1) to preserve the rights guaranteed it by the Constitution and (2) to maximize efficiency and minimize costs. Those principles lead inexorably to the district court, particularly in the Eastern District of California. Taking the steps to accomplish those goals—goals which serve the judicial system too—is no more ***forum shopping*** than is any action declining magistrate jurisdiction, seeking to transfer a case, or moving to withdraw a reference. And the Trustee's suggestion that "Nixon now strategically prefers to have this matter adjudicated elsewhere," in apparent contrast to what Nixon "prefer[red]" when it filed its proof of claim, Opp. 15, makes no sense. Not only did Nixon have no choice where to file that proof of claim, but this action had not yet been filed and would not be filed for another 30 months. The insinuation that Nixon initially ***preferred*** to litigate this adversary proceeding here and later changed its mind belies reality. The Trustee's forum-shopping arguments should be disregarded.

---

[11] The Trustee does not address the possibility of severance. When "[u]niform administration of the bankruptcy estate is the sole factor that favors not withdrawing the reference," courts have severed non-core claims and allowed only core claims to proceed before the Bankruptcy Court. *In re Rosales*, No. 13-CV-01316-LHK, 2013 WL 5962007, at *7, (N.D. Cal. Nov. 7, 2013). Should the Court have concerns about administration of the estate, severance provides a feasible and practical alternative.

1815282

## C.     The Court should withdraw the reference now.

Because each factor counsels in favor of withdrawing the bankruptcy reference, the only remaining question is whether the Court should withdraw the reference now or later. The interests of judicial efficiency, avoiding unnecessary cost and delay, and fairness all weigh heavily in favor of withdrawing the reference now.

The Trustee's argument that the Court should "withdraw the reference when the matter is trial-ready, not in its earlier stages" ignores the most analogous cases. Opp. at 16. Where the claims that predominate must be decided by an Article III court, courts within this district have repeatedly concluded that withdrawal at an earlier stage is preferable. *See Shengdatech Liquidating Trust v. Hansen, Barnett, & Maxwell, P.C.,* No. 3:13-CV-00563-RCJ, 2013 WL 6408518, at *2–3 (D. Nev. Nov. 26, 2013) (withdrawing reference where non-core issues predominated and adjudication would likely not impact the bankruptcy administration); *see also Off. Comm.. of Unsecured Creditors v. Marini (In re Windspire Energy, Inc.)*, No. 3:13-cv-10-RCJ-WGC, 2013 U.S. Dist. LEXIS 46727, at *2–3 (D. Nev. April 1, 2013) (withdrawing reference in a case involving breach of fiduciary duty and fraudulent transfer because of judicial economy and on recommendation of the bankruptcy judge); *Nelson v. XL Am., Inc. (In re Ameri-Dream Realty, LLC),* No. 2:16-CV-00060-JAD-GWF, 2016 U.S. Dist. LEXIS 157788 (D. Nev. Nov. 14, 2016) (withdrawing reference to avoid duplicating efforts); *see also* Ex. F (*USACM Liquidating Trust v. Compass USA SPE, LLC* (*In re USA Com. Mortg. Co.*)*,* No. 2:14-cv-00455-RCJ-PAL, U.S. Dist. LEXIS 72663 (D. Nev. May 28, 2014), Dkt. No. 4 (withdrawing reference on recommendation of the bankruptcy judge because the parties would be litigating the same issues related to another action pending before the District Court)).

As Nixon noted in its Motion—and the Trustee does not refute—cases denying early withdrawal of the bankruptcy reference are easily distinguishable from this adversary proceeding. *See* Mot. at 12–13. **First**, many of those cases involve only fraudulent transfer claims, which may "routinely arise in the context of bankruptcy." *Rosenberg v. Harvey A. Bookstein*, 479 B.R. 584, 590 (D. Nev. 2012). **Second**, cases denying early withdrawal often have virtually identical adversary complaints already pending before the bankruptcy court for the **same** underlying

11

REPLY TO TRUSTEE'S OPPOSITION TO MOTION TO WITHDRAW REFERENCE
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1815282

193

1    fraudulent transfer claims.  *Third*, cases denying early withdrawal typically conclude that the

2    bankruptcy court is most familiar with the parties and issues.  Here, the Trustee's adversary

3    complaint against Nixon Peabody is unique in its individualized, tort-based claims and

4    allegations, which comprise almost the entirety of the Complaint.  *See supra* Section III.A.  And

5    as Nixon's motion to transfer explains, the Eastern District of California—not the bankruptcy

6    court—is the court most familiar with the parties, the claims, and the underlying pre-petition

7    conduct at issue.  The very same claims and defenses will be litigated before that court, which

8    already has familiarity with many of the criminal and civil cases related to DC Solar's downfall.

9            Although the Trustee argues that the order in *LBA* is "instructive" because it weighs "in

10   favor of denying withdrawal of reference until the . . . adversary is trial ready," *LBA* is

11   distinguishable for the same reasons and instead supports withdrawing ***this*** reference

12   immediately.  Opp. at 4.  The Trustee conceded in *LBA*—as she does here—that the adversary

13   complaint involved *Stern* claims.  *See LBA* Order at 5 ("Lovato admits that the bankruptcy court

14   lacks authority to enter final judgment over the fraudulent conveyance claims.").  The Court

15   denied early withdrawal because the Trustee seeks to "avoid and recover fraudulent conveyances

16   in almost all of the [adversary] proceedings," and "there may be overlapping legal and factual

17   issues between this Adversary and other matters proceeding before the bankruptcy court."  *Id.* at

18   6.  As explained above, however, the Trustee's fraudulent transfer claims against Nixon are

19   significantly different—factually and legally—from any of the Trustee's other adversary

20   proceeding.  None of the same elements or defenses will likely apply.  And what the Trustee

21   ignores is that, unlike this proceeding, *LBA* does not involve predominant state-law tort claims

22   alleging hundreds of millions of dollars in damages entirely unrelated to the bankruptcy court's

23   core powers.  *LBA*'s analysis also supports early withdrawal of this adversary proceeding.

24           By not withdrawing the reference now, the Court risks upending each of the interests at

25   stake in both this motion and in Nixon's motion to transfer.  Early withdrawal is the only way to

26   further the interests of justice, ensure judicial efficiency, promote the convenience of the parties,

27   and avoid unnecessary cost and delay.

28   / / /

1815282

194

1    **IV.    CONCLUSION**

2        For the foregoing reasons, this Court should withdraw the bankruptcy reference now.

3    Dated:  February 4, 2022                    KEKER, VAN NEST & PETERS LLP

4

5                                        By:    s/Elliot R. Peters
                                              ELLIOT R. PETERS
6                                              ERIC H. MACMICHAEL

7

8    Dated:  February 4, 2022            By:    KAEMPFER CROWELL

9                                              s/Louis M. Bubala III
10                                             LOUIS M. BUBALA III

11                                             Attorneys for Defendant Nixon Peabody
                                              LLP
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

13

1815282

# EXHIBIT A

| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>ELLIOT R. PETERS – *Admitted PHV*<br>epeters@keker.com<br>ERIC H. MACMICHAEL – *Admitted PHV*<br>emacmichael@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:      415 397 7188 | KAEMPFER CROWELL<br>LOUIS M. BUBALA III - # 8974<br>lbubala@kcnvlaw.com<br>50 W. Liberty St., Ste. 700<br>Reno, NV 89501<br>Telephone: 775 852 3900<br>Facsimile: 777 327 2011 |

Attorneys for Defendant Nixon Peabody LLP

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>          Debtor,<br><br><u>X</u>     Affects DC Solar Solutions, Inc.<br><u>X</u>     Affects DC Solar Distributions, Inc.<br><u>X</u>     Affects DC Solar Freedom, Inc.<br><u>X</u>     Affects Double Jump, Inc. | Lead Case No. BK-19-50102-gs<br>(Chapter 7)<br><br><u>Substantively Consolidated with:</u><br><br>19-50130-gs   DC Solar Solutions, Inc.<br>19-50131-gs   DC Solar Distribution, Inc.<br>19-50135-gs   DC Solar Freedom, Inc. |
| <br>CHRISTINA W. LOVATO,<br><br>          Plaintiff,<br><br>v.<br><br> NIXON PEABODY LLP,<br><br>          Defendant. | Adversary Case No.: 21-05072-gs<br><br>**NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND**<br><br>**JURY TRIAL DEMANDED**<br><br>Hearing Date: February 18, 2022<br>Hearing Time: 9:30 a.m. |

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

197

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..............................................................................................1

II.   BACKGROUND ...............................................................................................2

III.  ARGUMENT ....................................................................................................4

     A.    The Trustee's state-law counterclaims must be decided by a jury in the District Court absent Nixon's consent, which Nixon has not provided..................4

         1.    The Trustee concedes that her counterclaims are "*Stern* claims" that must be heard by an Article III court. ..........................................5

         2.    As a matter of law, Nixon's filing of a proof of claim has no bearing whatsoever on whether it consented to adjudication in the Bankruptcy Court, which it did not............................................10

         3.    If the Court finds the question presented here even close, it must err on the side of preserving Nixon's jury-trial right. ....................................14

         4.    Nixon's withdrawal of its proof of claim further undercuts the Trustee's motion. ...................................................................15

     B.    Nixon maintains a jury-trial right on the fraudulent-conveyance claims. .............17

     C.    Because the Trustee's claims must be heard by an Article III court, the bankruptcy reference should be withdrawn. ..........................................................19

IV.  CONCLUSION...............................................................................................20

i

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

198

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**Page(s)**</u>

3

**Cases**

4

*In re Adelphia Commc'ns Corp.*,
    307 B.R. 404 (Bankr. S.D.N.Y. 2004) ................................................................11

5

6

*In re Advanced Rods, Inc.*,
    No. OR-04-1536-RKMo, 2005 WL 6960214 (B.A.P. 9th Cir. June 27, 2005) ................11, 12

7

8

*In re AWTR Liquidation Inc.*,
    547 B.R. 831 (Bankr. C.D. Cal. 2016) ................................................................9

9

*In re Bellingham Ins. Agency, Inc.*,
    702 F.3d 553 (9th Cir. 2012), *aff'd*, 573 U.S. 25 (2014) ....................................18, 19

10

11

*In re Bernard L. Madoff Inv. Sec. LLC*,
    612 B.R. 257 (S.D.N.Y. 2020) ................................................................17

12

*In re Breland*,
    No. 09-11139-JCO, 2016 WL 3193819 (Bankr. S.D. Ala. May 27, 2016) ............................13

13

14

*Carlson v. Gatestone & Co. Int'l Inc.*,
    No. 17-CV-01818-BLF, 2017 WL 2615764 (N.D. Cal. June 16, 2017) ................................16

15

16

*In re CBI Holding Co., Inc.*,
    529 F.3d 432 (2d Cir. 2008) ................................................................11, 12

17

*Ceriale v. Superior Ct.*,
    48 Cal. App. 4th 1629 (1996) ................................................................4

18

19

*In re Cinematronics, Inc.*,
    916 F.2d 1444 (9th Cir. 1990) ................................................................19

20

*Cohen v. United States*,
    210 F.3d 382 (9th Cir. 2000) ................................................................17

21

22

*In re Cole*,
    No. 16-30960, 2017 WL 486920 (Bankr. W.D.N.C. Feb. 6, 2017) ..................................13

23

24

*Composite Res. Inc. v. Recon Med. LLC*,
    No. 2:17-CV-01755-MMD-VCF, 2021 WL 4941991 (D. Nev. Oct. 22, 2021) ...........................14

25

*In re Cooper*,
    No. EDCV 18-02279 JGB, 2018 WL 11277403 (C.D. Cal. Nov. 28, 2018) .............................19

26

27

*In re Cty. of Orange*,
    784 F.3d 520 (9th Cir. 2015) ................................................................14

28

ii

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

199

*In re Crystal Cascades Civ., LLC,*
   415 B.R. 403, 408 n.8 (B.A.P. 9th Cir. 2009).................................................................16

*DeFunis v. Odegaard,*
   416 U.S. 312 (1974)........................................................................................................17

*DePinto v. Provident Sec. Life Ins. Co.,*
   323 F.2d 826 (9th Cir. 1963) ...........................................................................................4

*In re Digimarc Corp. Derivative Litig.,*
   549 F.3d 1223 (9th Cir. 2008) ........................................................................................16

*Double Eagle Energy Servs., L.L.C. v. MarkWest Utica EMG, L.L.C.,*
   936 F.3d 260 (5th Cir. 2019) ..........................................................................................16

*In re EPD Inv. Co., LLC,*
   821 F.3d 1146 (9th Cir. 2016) ........................................................................................11

*Exec. Benefits Ins. Agency v. Arkison,*
   573 U.S. 25 (2014)......................................................................................................6, 19

*In re FKF 3, LLC,*
   No. 13-CV-3601 (KMK), 2016 WL 4540842 (S.D.N.Y. Aug. 30, 2016)............11, 12, 13, 16

*In re Frost, Inc.,*
   145 B.R. 878 (Bankr. W.D. Mich. 1992)........................................................................11

*In re G.I. Indus., Inc.,*
   204 F.3d 1276 (9th Cir. 2000) ....................................................................................11, 12

*Germain v. Connecticut Nat. Bank,*
   988 F.2d 1323 (2d Cir. 1993)............................................................................................6

*Granite Rock Co. v. Int'l Bhd. of Teamsters, Freight, Constr., Gen. Drivers,*
   *Warehousemen & Helpers, Loc. 287 (AFL-CIO),*
   649 F.3d 1067 (9th Cir. 2011) ........................................................................................14

*Intell. Prop. Dev., Inc. v. TCI Cablevision of California, Inc.,*
   248 F.3d 1333 (Fed. Cir. 2001)........................................................................................17

*Katchen v. Landy,*
   382 U.S. 323 (1966) ........................................................................................................11

*Maring v. PG Alaska Crab Inv. Co., LLC,*
   No. C05-0326-JCC, 2007 WL 9775428 (W.D. Wash. Oct. 2, 2007)...............................11

*In re Maui Indus. Loan & Fin. Co.,*
   No. 10-00235, 2012 WL 405056 (Bankr. D. Haw. Feb. 8, 2012) .................................16

iii

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

200

*In re McClelland*,
332 B.R. 90 (Bankr. S.D.N.Y. 2005) ............................................................11, 12

*In re Nady*,
138 B.R. 608 (D. Nev. 1992) .............................................................................19

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
375 U.S. 311 (1964) ...........................................................................................14

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
138 S. Ct. 1365 (2018) .......................................................................................15

*Okura & Co. (Am.) v. Careau Grp.*,
783 F. Supp. 482 (C.D. Cal. 1991) ......................................................................4

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) .............................................................................................15

*In re PNP Holdings Corp.*,
184 B.R. 805 (B.A.P. 9th Cir. 1995), *aff'd,* 99 F.3d 910 (9th Cir. 1996) ..............11

*In re Rhodes Cos., LLC*,
No. 2:12-CV-01272-MMD, 2012 WL 5456084 (D. Nev. Nov. 7, 2012) ..............18

*Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*,
597 B.R. 466 (Bankr. S.D.N.Y. 2019) ................................................................17

*Stern v. Marshall*,
564 U.S. 462 (2011) ................................................................................. *passim*

*Ta Chong Bank Ltd. v. Hitachi High Techs. Am., Inc.*,
610 F.3d 1063 (9th Cir. 2010) .....................................................................11, 12

*In re Tech. Licensing Corp.*,
423 F.3d 1286 (Fed. Cir. 2005)...........................................................................14

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016) ...............................................................................4

*In re Toledo*,
170 F.3d 1340 (11th Cir. 1999) .........................................................................16

*In re Toys "R" Us, Inc.*,
615 B.R. 96 (Bankr. E.D. Va. 2020)...................................................................11

*True Traditions, LC v. Wu*,
552 B.R. 826 (N.D. Cal. 2015) ..........................................................................13

iv

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

201

*United States v. Anekwu,*
    695 F.3d 967 (9th Cir. 2012) ........................................................................11

*United States v. Bell,*
    158 F. Supp. 3d 906 (N.D. Cal. 2016) ...........................................................12

*United States v. Helstoski,*
    442 U.S. 477 (1979).......................................................................................15

*United States v. Keen,*
    104 F.3d 1111 (9th Cir. 1996), *as amended on denial of reh'g* (Jan. 2, 1997).......................14

*United States v. Remolif,*
    227 F. Supp. 420 (D. Nev. 1964) ...................................................................15

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*
    *Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.,*
    602 F.3d 1087 (9th Cir. 2010) .......................................................................16

*Wabakken v. California Dep't of Corr. & Rehab.,*
    801 F.3d 1143 (9th Cir. 2015) .........................................................................9

*Wellness International Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015)............................................................................. *passim*

*Wilmington Tr. v. U.S. Dist. Ct. for Dist. of Hawaii,*
    934 F.2d 1026 (9th Cir. 1991) .......................................................................14

*In re Windstream Holdings, Inc.,*
    No. 19-22312 (RDD), 2020 WL 1304147 (Bankr. S.D.N.Y. Mar. 17, 2020) ..........................9

**Statutes**

11 U.S.C. § 544....................................................................................................3

11 U.S.C. § 548....................................................................................................3

11 U.S.C. § 550....................................................................................................3

28 U.S.C. § 157........................................................................................ *passim*

28 U.S.C. § 1334................................................................................................16

**Other Authorities**

Fed. R. Bankr. P. 9015.............................................................................4, 13, 20

v
NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

202

# I.       INTRODUCTION

The Trustee advances the stunning proposition that when Defendant Nixon Peabody LLP ("Nixon") filed a proof of claim for $110,000 in unpaid legal fees in early 2019, Nixon thereby knowingly and voluntarily waived its Seventh Amendment right to a jury trial on the Trustee's state-law tort counterclaims, which were not filed until *30 months later* and which dwarf Nixon's claim by more than three orders of magnitude, seeking *hundreds of millions of dollars* in damages. The Trustee is incorrect.

The Trustee does not dispute that, had she filed her legal-malpractice and breach-of-fiduciary-duty claims in an Article III court, Nixon would have a Seventh Amendment jury-trial right. Nor does she dispute that her claims are *Stern* claims—claims designated as "core" by statute but required by the Constitution to be decided by an Article III court, where Nixon would have the right to a jury. Instead, she argues that Nixon should be deprived of its Seventh Amendment right in this case solely because the proof of claim that Nixon filed in 2019 amounted to consent to final adjudication of her *Stern* claims by the bankruptcy court. That's wrong. The Trustee's effort to deny Nixon its fundamental right to a jury trial runs headlong into the Supreme Court's holdings in *Stern v. Marshall*, 564 U.S. 462 (2011), and *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015)—two cases that, tellingly, are hardly addressed in the Trustee's motion. Read together, those decisions hold that state tort-law counterclaims implicating broader issues than those raised by a proof of claim must be heard by an Article III court, absent the defendant's knowing and voluntary consent. And as a matter of law, that knowing and voluntary consent cannot be implied from the filing of a proof of claim, because *Stern* held (and *Wellness International* reaffirmed) that proofs of claim *never* are fully voluntary. The reason is simple: A creditor has "nowhere else to go" beside the bankruptcy court if it hopes to recover anything against the debtor's estate. 564 U.S. at 493.

Here it is plain both that the factual and legal issues raised by the Trustee's counterclaims are vastly broader in scope than those implicated by Nixon's proof of claim and that Nixon has never consented to adjudicating those counterclaims outside of an Article III tribunal. Nixon thus retains its Seventh Amendment right. The cases that the Trustee relies on—nearly all of which

1

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

203

1  pre-date *Stern*—do not indicate otherwise. In fact, the Trustee has not cited a single case in which

2  a court struck a jury demand on a *Stern* claim on the ground that filing a proof of claim, without

3  more, amounted to consent. At any rate, even if Nixon's right to a jury trial were deemed to be a

4  close question—which it isn't—binding precedent requires that any doubt be resolved in favor of

5  preserving Nixon's constitutional rights. This is doubly so now that Nixon has sought to

6  withdraw its proof of claim with prejudice.

7       The same result should follow for the Trustee's fraudulent-conveyance claims. Just like

8  state-law tort claims, fraudulent-conveyance claims have traditionally carried a Seventh

9  Amendment jury-trial right. The fraudulent-conveyance claims in this case are not so bound up in

10 the claims-allowance process that Article III permits them to be finally decided in bankruptcy

11 court; nor has Nixon consented to that result. It thus follows that these claims must be tried to a

12 jury in district court.

13       The Trustee's motion to strike Nixon's jury demand should be denied.

14 **II.    BACKGROUND**

15       The facts giving rise to this action are set forth at greater length elsewhere, including

16 Nixon's recently filed motion to dismiss. Dkt. 43. Relevant here, DC Solar was a Ponzi scheme

17 launched by Jeff and Paulette Carpoff, who are both now convicted felons. *See* Adversary

18 Complaint, Dkt. 1 ¶¶ 1–2, 10, 16, 48 ("Compl."). During the operation of their Ponzi scheme

19 from approximately 2010 through 2018, DC Solar retained Nixon to provide legal opinion letters

20 explaining the federal tax consequences of investing in DC Solar's funds. *Id.* ¶¶ 50, 106. The

21 opinion letters were clearly and explicitly premised on management-provided factual assumptions

22 that later turned out to be false.

23       DC Solar's scheme collapsed in December 2018 when federal law enforcement raided the

24 company's headquarters in the Eastern District of California. *Id.* ¶ 39. Shortly after that raid, the

25 various DC Solar entities began filing for bankruptcy in the District of Nevada. *Id.* ¶ 42. Those

26 proceedings have been consolidated and converted from Chapter 11 to Chapter 7. *See id.* ¶ 43; *In*

27 *re Double Jump, Inc.*, No. 19-50102-gs, Dkts. 390, 438. In March 2019, Nixon filed a proof of

28 claim arising out of three unpaid DC Solar invoices. *See* Claim 34-1, *In re DC Solar Solutions,*

*Inc.,* No BK-19-50130-GS ("*In re Double Jump, Inc.*"). Those invoices, two dated January 14, 2019 and another from February 13, 2019, totaled $111,223.95—a relatively small percentage of the approximately $3 million Nixon was paid over the course of its nine-year representation of DC Solar. Compl. ¶ 231.

On October 25, 2021, the Chapter 7 Trustee filed this Adversary Complaint against Nixon alleging five claims under California law, including malpractice (Count I), breach of fiduciary duty (Count II), aiding and abetting (Count III), and conspiracy (Count IV), as well as fraudulent transfer under 11 U.S.C. § 544 and California state law (Count V); fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(B) (Count VI); avoidance under 11 U.S.C. § 550 (Count VII); and disallowance (Count VIII). *See generally* Compl. ¶¶ 251-328. The Trustee alleges that DC Solar's bankruptcy estate should be able to recover "hundreds of millions" of dollars from Nixon on the theory that Nixon failed to investigate and prevent DC Solar's criminal misconduct. Nixon has moved to dismiss the complaint as barred by the *in pari delicto* doctrine, which dictates that a participant in an act of intentional fraud—or a bankruptcy trustee standing in that participant's shoes—cannot recover damages from another alleged participant. *See* Dkt. 43.

Since the filing of this adversary proceeding, Nixon has consistently stated that it does ***not*** consent to final adjudication in bankruptcy court. Nixon's first submission in this adversary proceeding was a simple stipulation to extend its time to respond to the complaint. *See* Dkt. 10. Nixon stated there that "by entering into this Stipulation, the Defendant does not intend to consent to jurisdiction or venue in this court, or to waive any right to contest jurisdiction or venue, and the Parties expressly reserve the right to move this court for an appropriate order as to jurisdiction or venue." *Id.* at 2. Nixon then filed a motion to transfer this case to the Eastern District of California, where it is already being sued for its work relating to DC Solar. *See* Dkt. 14. In that submission, too, Nixon stated that it "does not consent to the entry of final orders or judgments by the bankruptcy judge on any and all claims on which the bankruptcy judge cannot enter final orders or judgments consistent with Article III of the United States Constitution. Nixon Peabody demands a jury trial on all issues so triable in the Adversary Proceeding . . . ." *Id* at 4. Nixon said the same in its contemporaneously filed motion to withdraw the bankruptcy reference. Dkt. 17 at

4-5. Nixon also filed a jury demand (compliant with Local Rule 9015) that same day. Dkt. 16.

And Nixon also has moved to withdraw its proof of claim. Nixon thus relinquished any claim to its unpaid fees, recognizing that (1) it no longer expects ever to recover those fees; (2) it would therefore waste the parties' and the Court's time and resources to litigate over fees; and (3) the Trustee has cynically seized upon Nixon's filing of its relatively modest claim to argue that Nixon knowingly and voluntarily waived its right to a jury trial on the vastly larger counterclaims that the Trustee filed 30 months later—no matter how tangential those counterclaims are to Nixon's unpaid-fees claim. *See* Dkt. 2985, *In re Double Jump*.

Nevertheless, two months after Nixon irrevocably relinquished any right to seek payment on its proof of claim, the Trustee filed the present motion to strike Nixon's jury demand, relying entirely on the proof of claim to establish Nixon's purported "consent" to bankruptcy-court jurisdiction.

## III.  ARGUMENT

### A.  The Trustee's state-law counterclaims must be decided by a jury in the District Court absent Nixon's consent, which Nixon has not provided.

The Seventh Amendment to the United States Constitution provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII. "The Seventh Amendment thus secures the right to a jury trial for suits in which *legal* rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized, and equitable remedies are administered." *Teutscher v. Woodson*, 835 F.3d 936, 942-943 (9th Cir. 2016) (cleaned up). The Trustee does not and cannot dispute that her state-law tort claims for professional malpractice and breach of fiduciary duty involve legal, not equitable, rights and thus carry with them a jury trial right.[1] Had this suit been brought in the absence of a bankruptcy, there is no question that Nixon

---

[1] Notwithstanding any equitable origins, breach-of-fiduciary duty claims like those at issue here are "legal" and trigger a jury-trial right. *See* California Civil Jury Instructions No. 4100 (defining fiduciary duty for use in California jury trials); *see also DePinto v. Provident Sec. Life Ins. Co.*, 323 F.2d 826, 837 (9th Cir. 1963); *Okura & Co. (Am.) v. Careau Grp.*, 783 F. Supp. 482, 491 (C.D. Cal. 1991); *Ceriale v. Superior Ct.*, 48 Cal. App. 4th 1629, 1634 (1996).

1    would have the right to a trial by jury.

2           Instead, the Trustee maintains that, through the mere filing of a proof of claim in the

3    bankruptcy proceeding, Nixon implicitly waived its right to have a jury trial in an Article III court

4    regarding the Trustee's counterclaims in this adversary proceeding. Not so. Nixon retains its

5    Seventh Amendment jury trial right because the Constitution requires final adjudication by an

6    Article III court absent the parties' knowing and voluntary consent to bankruptcy-court

7    jurisdiction, which has not been provided here either expressly or impliedly. Far from evincing

8    consent, Nixon has stated since its very first submission in this case that it does ***not*** consent to

9    final adjudication by the bankruptcy court. Even if this Court were to find the question close,

10   constitutional concerns require preserving Nixon's right to a jury trial. Nixon's request to

11   withdraw its proof of claim in the main case bolsters its argument that consent is absent here.

12          As detailed below, the Court's analysis proceeds in two steps:

13          ***First***, the Court must decide whether the Trustee's counterclaims are so-called "*Stern*

14   claims"—claims assigned to the bankruptcy court by statute but barred from the bankruptcy court

15   by the constitutional scheme of separation of powers, as held in the Supreme Court's *Stern*

16   decision. Here that inquiry is resolved by the Trustee's express admission that her counterclaims

17   ***are*** *Stern* claims. We explain below why the law left the Trustee no choice but to concede this

18   critical point. *See* Part III.A.1., below.

19          ***Second***, the Court must decide whether the Trustee's *Stern* claims may nevertheless be

20   decided in bankruptcy court, without a jury, because Nixon impliedly consented to bankruptcy-

21   court jurisdiction when it filed a proof of claim. We explain below why the filing of a proof of

22   claim, while potentially bearing on the first (*Stern*-claim) inquiry, is completely irrelevant to this

23   second (consent) inquiry, as a matter of law. Accordingly, the Court must reject the Trustee's

24   contention that Nixon's filing of a proof of claim waived its constitutional right to have the

25   Trustee's counterclaims adjudicated by a jury in an Article III court. *See* Part III.A.2., below.

26          **1.     The Trustee concedes that her counterclaims are "*Stern* claims" that**
                     **must be heard by an Article III court.**

27

28          Title 28 U.S.C. § 157(b) authorizes bankruptcy courts to "hear and determine"—that is, to

5

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

207

1  enter final judgment on—"all core proceedings." *See Stern*, 564 U.S. at 475-476. Section 157(b)

2  lists 16 examples of core proceedings, one of which is "counterclaims by the estate against

3  persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C). But the Supreme Court held in

4  *Stern* that, even where that provision permits the Bankruptcy Court to enter final judgment on a

5  counterclaim, "Article III of the Constitution [may] not." 564 U.S. at 482.[2] The *Stern* Court

6  recognized that "Article III is an inseparable element of the constitutional system of checks and

7  balances that both defines the power and protects the independence of the Judicial Branch." *Id.* at

8  482–83 (cleaned up). Article III, the Court instructed, "could neither serve its purpose in the

9  system of checks and balances nor preserve the integrity of judicial decisionmaking if the other

10  branches of the Federal Government could confer the Government's 'judicial Power' on entities

11  outside Article III." *Id.* at 484. Because deciding the claims at issue in *Stern* entailed exercising

12  the judicial power of the United States, the Supreme Court held that the bankruptcy court "lacked

13  the constitutional authority to enter a final judgment." *Id.* at 503. The Court recognized the

14  narrow scope of its decision, but nevertheless admonished:

> If our decision today does not change all that much, then why the fuss? Is there really a threat to the separation of powers where Congress has conferred the judicial power outside Article III only over certain counterclaims in bankruptcy? The short but emphatic answer is yes. A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. "Slight encroachments create new boundaries from which legions of power can seek new territory to capture."

20  *Stern*, 564 U.S. at 502–03 (citation omitted).

21       In sum, under *Stern*, even where § 157(b)(2)(C) purports to authorize a bankruptcy court

22  to enter final judgment on a counterclaim, the Constitution forbids it if deciding the counterclaim

23  entails exercising the judicial power of the United States. *Id.* at 486–88. Such claims—ones

24

---

25  [2] *See also Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 28 (2014) ("In *Stern* . . . this Court
    held that even though bankruptcy courts are statutorily authorized to enter final judgment on a
26  class of bankruptcy-related claims, Article III of the Constitution prohibits bankruptcy courts
    from finally adjudicating certain of those claims."); *Germain v. Connecticut Nat. Bank*, 988 F.2d
27  1323, 1327 (2d Cir. 1993) ("Neither Congress nor the courts may deprive litigants of their
    constitutional rights simply by labeling a cause of action 'core.'").

28

6

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs
1817383

208

1  designated by statute for final adjudication in the bankruptcy court but prohibited by the

2  Constitution from proceeding in that way—have since come to be called "*Stern* claims." *See, e.g.*,

3  *Wellness Int'l*, 575 U.S. at 678.

4     The Trustee has conceded, as she must, that her state-law counterclaims are *Stern*

5  claims.[3] On this point, the Trustee is correct. The *Stern* court laid out four primary reasons why a

6  non-Article III court could not decide debtor Vickie Marshall's tortious-interference counterclaim

7  against her stepson, Pierce Marshall: (1) the counterclaim did not fall within the "public rights

8  exception" to Article III; (2) the trustee was not asserting a right of recovery created by federal

9  bankruptcy law; (3) the trustee was "seek[ing] to augment the bankruptcy estate," not simply to

10  handle the *pro rata* distribution of assets; and (4) ruling on Pierce Marshall's proof of claim

11  would not "**necessarily** result in the resolution of Vickie's counterclaim." *Id.* at 488-499

12  (emphasis added).

13     Here, the same reasons require Article III adjudication.

14     **a.** The Trustee has never argued that the public-rights exception permits her claims to be

15  tried to an Article I court. That exception applies where a claim "can be pursued only by grace of

16  the other branches" or "historically could have been determined exclusively by those branches."

17  564 U.S. at 493 (cleaned up). Here, as in *Stern*, the state-law tort claims "involve[] the most

18  prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with

19  broad substantive jurisdiction, on a common law cause of action, when the action neither derives

20  from nor depends upon any agency regulatory regime." *Id.* at 494.

21     **b.** Nor can the Trustee argue that she is "asserting a right of recovery created by federal

22  bankruptcy law." *Stern*, 564 U.S. at 498. The state-law counterclaims are "in no way derived

23  from or dependent upon bankruptcy law"; rather, they are "state tort action[s] that exist[] without

24  regard to any bankruptcy proceeding." *Id.* at 499. This fact, too, indicates that Article III

25

26  [3] *See, e.g.*, Dkt. 37 at 9 ("Mot.") (explaining rule that "Article III to the Constitution permits bankruptcy courts to finally adjudicate *Stern* claims . . . with the parties' consent"); *see also* Dkt.
27  36 (Trustee Opp. to Mot. to Withdraw Reference) at 10 ("As a constitutional matter, the Trustee's statutorily core claims for avoidance and tort are *Stern* claims and may be finally adjudicated by
28  this Bankruptcy Court with consent.").

1817383

1  adjudication is required.

2  **c.** *Stern* distinguished between "actions that seek 'to augment the bankruptcy estate'"—

3  which require Article III adjudication—"and those that seek 'a pro rata share of the bankruptcy

4  res.'" *Stern*, 564 U.S. at 499 (quoting *Granfinanciera v. Nordberg*, 492 U.S.33. 56 (1989)). Here,

5  the Trustee's counterclaims fall into the first bucket. As explained above, the Trustee seeks

6  ***hundreds of millions of dollars*** from Nixon. That is a paradigmatic example of a claim that seeks

7  to augment the estate; indeed, the recovery that the Trustee seeks for her counterclaims is at least

8  ***one thousand times greater*** than Nixon's now-withdrawn proof of claim.

9  **d.** In *Stern*, as here, the debtor argued that final adjudication by the bankruptcy court was

10  permissible because the counterclaim defendant filed a proof of claim in the bankruptcy

11  proceeding. 564 U.S. at 495-96. But the Court concluded that, although there was "some overlap

12  between Vickie's counterclaim and Pierce's . . . claim" against the estate, "there was never any

13  reason to believe that the process of adjudicating Pierce's proof of claim would necessarily

14  resolve Vickie's counterclaim." *Id.* at 497. The same is true here:

15  - The three invoices at issue in Nixon's proof of claim total just over $100,000 and are

16    dated from early 2019. The Trustee's state-law counterclaims, in contrast, deal with over

17    30 separate transactions, each of which was billed separately and for which Nixon had

18    already been paid $2.9 million by DC Solar. Compl. ¶¶ 3, 231.

19  - The Trustee makes scores of factual allegations in her adversary complaint that are not

20    implicated by Nixon's proof of claim. She alleges, for example, that Nixon had a conflict

21    of interest dating back to October 2010, *see id.* ¶ 50; committed malpractice in connection

22    with DC Solar's first transaction, in late 2010 and early 2011, *id.* ¶¶ 76-82, "failed to

23    properly document its representation of Solutions and Distribution" in 2010, also at the

24    outset of its representation, *id.* ¶¶ 51, 55; wrote letters in 2014 and 2015 stating that some

25    of the DC Solar investment funds were also Nixon clients, *id.* ¶ 67 & Ex. 2; and received

26    payments from some of the DC Solar investment funds, *id.* ¶ 70. Finding whether the

27    Trustee has proven these allegations would play no role in deciding whether Nixon is

28    entitled to payment on its proof of claim.

8

- The Trustee's state-law counterclaims also require the Court to consider whether Nixon committed malpractice before March 2017, when the Trustee alleges Nixon obtained "actual knowledge" of DC Solar's wrongdoing until March 2017. *See id.* ¶¶ intro., 183, 281, 296. The DC Solar deals out of which the 2019 proof of claim arose would have closed after March 2017. But 25 of the 32 transactions in which the Trustee alleges Nixon was involved closed ***before*** March 2, 2017. *See id.* ¶ 122. Importantly, the Trustee ***never*** asked Nixon partner Forrest Milder about the firm's proof of claim in the Rule 2004 examination she took while investigating her counterclaims.

- Ultimately, the Court need look no further than the fact that Nixon's proof of claim sought about $100,000 in unpaid fees and the Trustee seeks "hundreds of millions of dollars in damages." *Id.* ¶ intro. It cannot be the case that resolving whether Nixon was entitled to $100,000 in early 2019 "would necessarily result in the resolution of [the Trustee's] counterclaim[s]." *Stern*, 564 U.S. at 497.

Courts analyzing the extent of intertwinement between a counterclaim and a proof of claim sometimes apply the test for collateral estoppel and res judicata to inform their decision. *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD), 2020 WL 1304147, at *8 (Bankr. S.D.N.Y. Mar. 17, 2020); *In re AWTR Liquidation Inc.*, 547 B.R. 831, 837 (Bankr. C.D. Cal. 2016). Here, those principles cut decisively in favor of requiring Article III adjudication. Collateral estoppel in the Ninth Circuit requires, among other things, that "the issue necessarily decided at the previous proceeding is ***identical*** to the one which is sought to be relitigated." *Wabakken v. California Dep't of Corr. & Rehab.*, 801 F.3d 1143, 1148 (9th Cir. 2015) (emphasis added and citation omitted). Not even the Trustee has argued that Nixon's proof of claim and the Trustee's state-law counterclaims raise ***identical*** issues—nor could she. *See* Mot. 15.

It is thus both undisputed and indisputable that the Trustee's state-law counterclaims are *Stern* claims. Accordingly, they must be heard by the jury in an Article III court—unless Nixon has consented to final adjudication by the bankruptcy court. As explained next, Nixon has not done so.

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

211

**2. As a matter of law, Nixon's filing of a proof of claim has no bearing whatsoever on whether it consented to adjudication in the Bankruptcy Court, which it did not.**

Because the Trustee's state-law counterclaims are *Stern* claims, the bankruptcy court can finally decide them only if Nixon has consented. Recognizing that Article III protections "help to ensure the integrity and independence of the Judiciary," the Supreme Court held in *Wellness International* that a litigant's consent to final adjudication by the bankruptcy court must be "knowing[] and voluntar[y]." 575 U.S. at 668-669. "[T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* at 685 (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)). This rigorous test of voluntariness ensures that "the Article III right is substantially honored." *Id.* at 684. Under that test, it is clear that Nixon has ***not*** consented to final bankruptcy-court adjudication of the Trustee's state-law tort claims.

**a.** The Trustee's one and only basis for arguing consent is the fact that Nixon filed a proof of claim in the bankruptcy proceedings. That argument fails as a matter of law because *Stern* established that a proof of claim is ***never fully voluntary*** and therefore can ***never imply consent*** to bankruptcy-court jurisdiction. At most, a proof of claim may have some bearing on the threshold question whether the claim at issue is a *Stern* claim. But in the subsequent "consent" inquiry, a proof of claim carries no weight.

In *Stern*, Pierce Marshall had filed a proof of claim before the debtor, Vickie Marshall, filed her counterclaim. 564 U.S. at 470. If that had been enough to prove Pierce's consent to bankruptcy-court jurisdiction, the remainder of the Court's analysis would have been superfluous: The Supreme Court's discussion would have begun and ended with the proof of claim. But it did not. The Court in fact stated that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings." *Id.* at 493. This was so without regard to the ***contents*** of Pierce's proof of claim. Rather, the Court reached that conclusion on the ground that Pierce "***had nowhere else to go if he wished to recover from Vickie's estate.***" *Id.* A proof of claim, in other words, can ***never*** be deemed fully voluntary, because a bankrupt's creditor has "nowhere else to go" but the bankruptcy court. Indeed, the Court later recognized in *Wellness International* that

10

1   "*Stern* was premised on **nonconsent** to adjudication by the Bankruptcy Court." 575 U.S. at 682

2   (emphasis added). Put simply, in light of *Stern* and *Wellness International*, "a creditor does

3   not consent to final adjudication of a debtor's common law counterclaim merely by filing

4   a proof of claim." *In re FKF 3, LLC*, No. 13-CV-3601 (KMK), 2016 WL 4540842, at *10 n.4

5   (S.D.N.Y. Aug. 30, 2016).[4] By simply filing a proof of claim, Nixon likewise has not consented

6   here.

7           Unsurprisingly, therefore, the Trustee finds herself unable to cite even one decision

8   striking a jury demand on a *Stern* claim where the only alleged basis for consent was submission

9   of a proof of claim. And the cases that the Trustee does cite are far afield. Remarkably, ***every***

10  ***single case*** on which the Trustee relies predates *Stern* and *Wellness International*.[5] That alone is

11

12

13

14

---

15  [4] The Trustee relies on *In re EPD Inv. Co., LLC*, 821 F.3d 1146 (9th Cir. 2016), for its
    observation that one of the defendants, Poshow Ann Kirkland, had consented to bankruptcy-court
16  jurisdiction by filing a proof of claim. *Id*. at 1150 n.2. But *EPD* is inapposite. Poshow was not the
    party challenging jurisdiction on appeal; thus, the parties were not litigating whether she had
17  consented. *Id.* at 1150. Rather, they were litigating another defendant's motion to compel
    arbitration. The court's holding was that, for purposes of the motion to compel, it did not matter
18  whether the bankruptcy court could render a ***final*** judgment, which makes the footnote about
    consent *dicta*. *Id.* at 1150-51. The statement that Poshow consented to bankruptcy court
19  jurisdiction was "unnecessary" to the court's judgment (and apparently not even litigated) and is
    therefore not binding. *Cf. United States v. Anekwu*, 695 F.3d 967, 975 (9th Cir. 2012).
20

21  [5] *See In re PNP Holdings Corp.*, 184 B.R. 805, 806 (B.A.P. 9th Cir. 1995), *aff'd*, 99 F.3d 910
    (9th Cir. 1996) (cited at 12); *Katchen v. Landy*, 382 U.S. 323 (1966) (cited at 12); *In re G.I.
22  Indus., Inc.*, 204 F.3d 1276 (9th Cir. 2000) (cited as 12); *Ta Chong Bank Ltd. v. Hitachi High
    Techs. Am., Inc.*, 610 F.3d 1063 (9th Cir. 2010) (cited at 12); *Maring v. PG Alaska Crab Inv. Co.,
23  LLC*, No. C05-0326-JCC, 2007 WL 9775428 (W.D. Wash. Oct. 2, 2007) (cited at 13); *In re
    Advanced Rods, Inc.*, No. OR-04-1536-RKMo, 2005 WL 6960214 (B.A.P. 9th Cir. June 27,
24  2005) (cited at 13); *In re Frost, Inc.*, 145 B.R. 878 (Bankr. W.D. Mich. 1992) (cited at 13); *In re
    McClelland*, 332 B.R. 90 (Bankr. S.D.N.Y. 2005) (cited at 14); *In re CBI Holding Co., Inc.*, 529
25  F.3d 432 (2d Cir. 2008) (cited at 14). The Trustee quotes (at 13 n.44) a single 2020 case from the
    bankruptcy court in the Eastern District of Virginia, *see In re Toys "R" Us, Inc.*, 615 B.R. 96, 102
26  (Bankr. E.D. Va. 2020), but that decision was merely quoting a 2004 opinion by another court,
    *see In re Adelphia Commc'ns Corp.*, 307 B.R. 404, 419 (Bankr. S.D.N.Y. 2004), amid a personal
27  jurisdiction discussion. It has no persuasive value here.

28

---

11

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

213

1   reason enough to discount those authorities as reliable statements of current law.[6] But even taken

2   at face value, the Trustee's cases establish only the unremarkable proposition that a bankruptcy

3   court can finally decide *Stern* claims where they "are integral to, and directly affect the allowance

4   of, the proof of claim." *In re CBI*, 529 F.3d at 468; *see also Ta Chong Bank*, 610 F.3d at 1069; *In*

5   *re G.I. Indus.*, 204 F.3d at 1279-80; *In re Advanced Rods*, 2005 WL 6960214, at *5; *In re*

6   *McClelland*, 332 B.R. at 94-95. As explained above, that is not so here.

7       In short, as a matter of law, Nixon's proof of claim is simply irrelevant to the question

8   whether it consented to final adjudication by the bankruptcy court.

9       **b.** Absent express consent (which no one argues occurred here), courts look to a litigant's

10  course of conduct ***in the adversary proceeding*** to ascertain implied consent. *Stern*, 564 U.S. at

11  480-481; *In re FKF*, 2016 WL 4540842, at *10 n.4. *Stern* provides a useful illustration of what

12  consent looks like. In that matter, not only did Vickie Marshall, the debtor, file a state-law tort

13  claim against Pierce Marshall, but Pierce also filed a state-law defamation claim against Vickie.

14  564 U.S. at 481. The Supreme Court held that Pierce had consented to the bankruptcy court's

15  final adjudication of that claim—***not*** simply because he had filed a proof of claim, but because he

16  had advised the bankruptcy court that he agreed with Vickie that the bankruptcy court should

17  determine the value of his claim. *Id.* Moreover, the Supreme Court observed that "Pierce

18  identifie[d] no point in the record where he argued to the Bankruptcy Court that it lacked the

19  authority to adjudicate his proof of claim because the claim sought recompense for a personal

20  injury tort." *Id.* In fact, "Pierce repeatedly stated to the Bankruptcy Court that he was happy to

21  litigate there," so the Supreme Court concluded that it would "not consider his claim to the

22  contrary, now that he is sad." *Id.* at 482.

23      Other decisions have found implied consent where, for example, the defendant (1)

24

25  [6] "In the Ninth Circuit, where intervening Supreme Court authority 'undercut[s] the theory or
    reasoning underlying a prior circuit precedent in such a way that the cases are clearly
26  irreconcilable,' a district court 'should consider itself bound by the intervening higher authority
    and reject the prior circuit precedent as having been effectively overruled.'" *United States v. Bell*,
27  158 F. Supp. 3d 906, 914–15 (N.D. Cal. 2016) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th
    Cir. 2003)).
28

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1  sandbagged the court, first "s[eeking] affirmative relief from the bankruptcy court believing it

2  might win and then cr[ying] foul over the court's entry of final judgment when it los[t]," *True*

3  *Traditions, LC v. Wu*, 552 B.R. 826, 837 (N.D. Cal. 2015); or (2) "actively appear[ed] before the

4  Court at various hearings" without "rais[ing] a proper objection," *In re Breland*, No. 09-11139-

5  JCO, 2016 WL 3193819, at *2 (Bankr. S.D. Ala. May 27, 2016); or (3) failed to file a motion,

6  required by the local rules, asking the bankruptcy court to determine that the adversary

7  proceeding was not finally decidable by the bankruptcy court, *In re Cole*, No. 16-30960, 2017

8  WL 486920, at *2 (Bankr. W.D.N.C. Feb. 6, 2017).

9        Nixon's conduct here stands in stark contrast to that of Pierce Marshall and the other

10  litigants who gave their implied consent to bankruptcy-court adjudication of *Stern* claims. Since

11  the filing of this adversary proceeding, Nixon has clearly and consistently maintained that it does

12  ***not*** consent to final adjudication in bankruptcy court, taking care to say so in its initial scheduling

13  stipulation, in its motions to withdraw the reference and to transfer, and in its jury demand filed in

14  compliance with Local Rule 9015. *See supra* 3. Nixon's actions here have been neither dilatory

15  nor motivated by gamesmanship. Its conduct far more closely resembles that at issue in *In re*

16  *FKF*, where the court found a lack of consent because the defendant's "amended answer

17  demanded a jury trial and raised the Court's lack of constitutional authority as an affirmative

18  defense, . . . and where he filed his initial motion to withdraw the reference less than two months

19  after filing the amended answer." 2016 WL 4540842, at *10 n.4.

20        Here, therefore, the Trustee cannot seriously contend that Nixon consented to entry of

21  final judgment in this Court. Nixon's conduct since the filing of this matter is unequivocal: It has

22  not consented to final adjudication outside of an Article III forum. Finding consent here would

23  eviscerate the requirement that consent be "knowing and voluntary"—i.e., that "the litigant or

24  counsel was made aware of the need for consent and the right to refuse it, and still voluntarily

25  appeared to try the case before the non-Article III adjudicator." *Wellness Int'l*, 575 U.S. at 674

26  (citation omitted).

27

28

13

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

215

**3.** **If the Court finds the question presented here even close, it must err on the side of preserving Nixon's jury-trial right.**

If the Court determines that the question presented here is close—which it isn't—precedent requires it to err on the side of denying the Trustee's motion. At least three principles support this conclusion.

*First*, the Ninth Circuit has admonished that "[i]n close cases, a court should err on the side of preserving the right to a jury trial." *Granite Rock Co. v. Int'l Bhd. of Teamsters, Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Loc. 287 (AFL-CIO)*, 649 F.3d 1067, 1069 (9th Cir. 2011); *see also see also Composite Res. Inc. v. Recon Med. LLC*, No. 2:17-CV-01755-MMD-VCF, 2021 WL 4941991, at *2 (D. Nev. Oct. 22, 2021) (same). The right to a jury trial "has occupied an exceptional place in the history of the law." *Wilmington Tr. v. U.S. Dist. Ct. for Dist. of Hawaii*, 934 F.2d 1026, 1028 (9th Cir. 1991). Accordingly, "the right to grant mandamus to require jury trial where it has been improperly denied is settled." *In re Tech. Licensing Corp.*, 423 F.3d 1286, 1288 (Fed. Cir. 2005) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 511 (1959)); *see also In re Cty. of Orange*, 784 F.3d 520, 526 (9th Cir. 2015); *Wilmington*, 934 F.2d at 1028 (9th Cir. 1991). A court in this district recently resolved a close question regarding a party's entitlement to a jury trial in favor of preserving that right, because the court did "not wish to invite mandamus proceedings" by declaring that the trial would be a bench trial. *Composite Res.*, 2021 WL 4941991, at *2.

*Second*, similar tie-breaking principles govern in other contexts in which waiver or forfeiture of constitutional rights are at issue. The Supreme Court has explained that, for "[w]aivers of constitutional rights to be effective . . . [they] must be deliberately and understandingly made and can be established only by clear, unequivocal, and unambiguous language." *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 332 (1964). Thus, for example, waivers of the right to counsel in favor of self-representation,[7] Fourth Amendment protections

---

[7] *United States v. Keen*, 104 F.3d 1111, 1114 (9th Cir. 1996), *as amended on denial of reh'g* (Jan. 2, 1997).

1    from warrantless searches,[8] and the protections offered by the Speech or Debate Clause[9] must all

2    be unequivocal. The high bar for finding relinquishment of a constitutional right is not just for

3    individuals, either. A state's waiver of sovereign immunity must also be unequivocal.[10] Here,

4    where the Trustee rests her waiver argument entirely on the 2019 proof of claim, there is no

5    sound basis to conclude that Nixon waived its right to a jury trial.

6        ***Third***, the Supreme Court has long insisted that even modest usurpations of Article III

7    powers are to be guarded against assiduously. That comes not just from *Stern* and its insistence

8    that Congress not "chip away at the authority of the Judicial Branch," 564 U.S. at 502–03, but

9    also from its earlier decision in *Northern Pipeline Construction Company v. Marathon Pipe Line*

10   *Company*, where it rejected an argument that "would require that we replace the [separation-of-

11   powers] principles delineated in our precedents, rooted in history and the Constitution, with a rule

12   of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an

13   independent Judicial Branch of the Federal Government." 458 U.S. 50, 74 (1982). The Court

14   recently reiterated the point that "Congress cannot 'confer the Government's 'judicial Power' on

15   entities outside Article III," *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S.

16   Ct. 1365, 1372–73 (2018) (citing *Stern*, 564 U.S. at 484)). Thus, absent ***clear*** indication that the

17   Trustee's claims do not require Article III adjudication, or that Nixon consented to adjudication

18   outside of an Article III court, the Court should preserve Article III adjudication and Nixon's

19   right to a jury trial.

20                   **4.    Nixon's withdrawal of its proof of claim further undercuts the
                             Trustee's motion.**

21

22       As set forth at greater length in the motion filed in the main case, Nixon has sought to

23   withdraw its proof of claim. Dkt. 2985, *In re Double Jump*. The Trustee thus devotes the final two

24   pages of her motion to arguing that "a claimant's withdrawal of a proof of claim *after* the trustee

25   files an adversary proceeding (counterclaim) against that claimant has no effect on this

26

27   [8] *United States v. Remolif*, 227 F. Supp. 420, 422–23 (D. Nev. 1964).

     [9] *United States v. Helstoski*, 442 U.S. 477, 492 (1979).

28   [10] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).

15

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383                                                                                      217

Bankruptcy Court's jurisdiction." Mot. 16-17. As an initial matter, the Court need not reach that argument because, for the reasons discussed above, the bankruptcy court never had the authority to finally decide the Trustee's state-law tort claims, since they are *Stern* claims and Nixon has not consented to have them adjudicated in this Court. That would be so even if the proof-of-claim had not been withdrawn.

The Trustee's argument is also wrong. "*Stern* suggests that the relevance of filing a proof of claim to the Article III analysis is limited by its practical implications for the claims resolution process." *In re FKF*, 2016 WL 4540842, at \*8 n.3. That is, "the justification for the 'necessarily resolved' rule is practical: where a Trustee's counterclaims are resolved by the bankruptcy court in the process of adjudicating a creditor's proof of claim, the creditor has 'no basis' for demanding a second adjudication of those claims in an Article III court." *Id.* (citing *Stern*, 564 U.S. at 496). But here, like in *In re FKF*, Nixon's decision to abandon its proof of claim means that ***nothing*** will be resolved in the claims-allowance process. *Id.* That process simply is not going to happen. It follows that Nixon's initial filing of a proof of claim cannot and should not affect Nixon's entitlement to Article III adjudication. *See also In re Maui Indus. Loan & Fin. Co.*, No. 10-00235, 2012 WL 405056, at \*2 (Bankr. D. Haw. Feb. 8, 2012) ("Mr. Albright should be permitted to withdraw his proof of claim and preserve his right to a jury trial.").

The Trustee relies almost exclusively on subject-matter-jurisdiction cases for the proposition that the time of filing "is the only time that matters" for jurisdictional purposes. *See* Mot. 16-17 (citing *In re Crystal Cascades Civ., LLC*, 415 B.R. 403, 408 n.8 (B.A.P. 9th Cir. 2009)); *Double Eagle Energy Servs., L.L.C. v. MarkWest Utica EMG, L.L.C.*, 936 F.3d 260, 263 (5th Cir. 2019); *In re Toledo*, 170 F.3d 1340, 1346 n.8 (11th Cir. 1999)).[11] But subject-matter jurisdiction is not the issue here: Neither party disputes that 28 U.S.C. § 1334 authorizes a federal

---

[11] The Trustee also cites in passing several other decisions that are equally inapplicable here. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1091 (9th Cir. 2010) (CAFA jurisdiction); *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1236–37 (9th Cir. 2008) (diversity jurisdiction); *Carlson v. Gatestone & Co. Int'l Inc.*, No. 17-CV-01818-BLF, 2017 WL 2615764, at \*2 (N.D. Cal. June 16, 2017) (attorney's fees in removed actions).

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

218

court to hear the Trustee's state-law counterclaims. Rather, the question before the Court is whether Nixon's 2019 proof of claim affected its right to final adjudication by an Article III court. The requirements of Article III differ in material ways from statutory subject-matter jurisdiction. "Article III jurisdiction . . . must be present throughout all stages of the proceedings." *Cohen v. United States*, 210 F.3d 382 (9th Cir. 2000) (TABLE). The time of filing is therefore ***not*** "the only time that matters" for purposes of Article III. *DeFunis v. Odegaard*, 416 U.S. 312, 319-320 (1974) (mootness deprives court of Article III jurisdiction); *Intell. Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1342 (Fed. Cir. 2001) (district court "divested" of Article III jurisdiction by subsequent events).

Apparently recognizing that authority for her position is scant, the Trustee places great weight upon *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 597 B.R. 466 (Bankr. S.D.N.Y. 2019), where a bankruptcy court concluded that "the withdrawal of the Defendants' Claims did not strip the Court of its equitable jurisdiction that attached at the time-of-filing." *Id.* at 486. But there, the Trustee's claims were not *Stern* claims—just claims to avoid and recover excess transfers—well within the bankruptcy court's constitutionally permissible jurisdiction. 597 B.R. at 473-476; *see also In re Bernard L. Madoff Inv. Sec. LLC*, 612 B.R. 257, 267 (S.D.N.Y. 2020). As a result, the bankruptcy court's retention of jurisdiction, even once the defendant sought to withdraw its proof of claim, did not present "constitutional concerns regarding Congress's reallocation of the judicial power," because "the Trustee's rights ar[o]se from Congress's exercise of its own constitutional role in the administration of bankruptcy." *Id.* at 270. That is not the case here, where, just as in *Stern*, state-law tort claims outside the bankruptcy court's jurisdiction are at issue.

In sum, the bankruptcy court never had authority to finally decide the Trustee's state law counterclaims, but now that Nixon has abandoned its proof of claim, it should be especially clear that an Article III court must preside.

**B.    Nixon maintains a jury-trial right on the fraudulent-conveyance claims.**

Besides her common-law tort claims, the Trustee includes two fraudulent-conveyance claims. *See* Compl. counts V-VI. Like the Trustee's state-law counterclaims, fraudulent-

conveyance actions are designated "core" proceedings by the statute. 28 U.S.C. § 157(b)(2)(H). But, also like the Trustee's counterclaims, fraudulent-conveyance claims "cannot be decided outside the Article III courts." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 562 (9th Cir. 2012) (assuming without deciding that fraudulent-conveyance claims are *Stern* claims), *aff'd*, 573 U.S. 25 (2014); *see also In re Rhodes Cos., LLC*, No. 2:12-CV-01272-MMD, 2012 WL 5456084, at *4 (D. Nev. Nov. 7, 2012) ("[A] court deciding a fraudulent conveyance action exercises its Article III judicial power, and the Seventh Amendment entitles a litigant to a jury trial on such claims."). The Ninth Circuit so concluded in *Bellingham* even though the "source" of the fraudulent conveyance claim was the Bankruptcy Code. 702 F.3d at 564.

The filing of a proof of claim, despite all the great weight placed upon it by the Trustee (at 11), does not alter the conclusion. The Ninth Circuit in *In re Bellingham* indicated that *Stern* required treating fraudulent-conveyance claims against a creditor no differently than state-law counterclaims: Only in the event that the fraudulent-conveyance claims "necessarily ha[ve] to be resolved in the course of the claims-allowance process" does Article III permit bankruptcy courts to finally decide them. *Bellingham*, 702 F.3d at 564. Just as with the Trustee's state-law tort claims, her fraudulent-transfer claims would not ***necessarily*** be decided in determining whether to allow Nixon's proof of claim. Exhibit 7 to the Trustee's Complaint lists certain transfers that she wishes to avoid. But they are, by definition, different payments for different legal work than the unpaid invoices that gave rise to Nixon's proof of claim. It thus cannot be the case that an inquiry into whether Nixon is entitled to payment of those unpaid invoices will ***necessarily*** resolve whether the transfers listed in Exhibit 7 were fraudulent.

Nixon has not consented to final adjudication of the fraudulent-conveyance claims in bankruptcy court. The same consent standard that applies to the state-law counterclaims applies here. *See, e.g.*, *In re Bellingham*, 702 F.3d at 568. Cases finding that a fraudulent-transfer defendant consented to bankruptcy-court jurisdiction have involved far clearer indicia of consent than are present in this case. In *In re Bellingham*, for instance, the challenger "did not simply fail to object to the bankruptcy judge's authority to enter final judgment in the fraudulent conveyance action; it affirmatively assented to suspend its demand for a jury trial in district court to give the

---

18

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs
1817383

220

bankruptcy judge an opportunity to adjudicate the claim." 702 F.3d at 568. That party in fact "did not raise a constitutional objection to the bankruptcy court's entry of final judgment in favor of the Trustee until after the briefing in this appeal was complete, when it filed a motion to vacate the bankruptcy court's judgment on the eve of oral argument." *Id*. Similarly, in *In re Pringle*, the defendant "actively participated in the fraudulent transfer proceeding" by "answering the complaint, participating in discovery, [and] contesting issues at trial." 495 B.R. 447, 457–58 (B.A.P. 9th Cir. 2013). And in *In re Beshmada, LLC*, defendant "did not object to the bankruptcy court's jurisdiction, even though he was actively engaged in litigating the matter" until more than a year after the proceeding was filed. CV 13-8342 GAF, 2014 WL 4060262, at *4 (C.D. Cal. Aug. 18, 2014). In this case, as explained above (at 3), Nixon has "consistently expressed [its] objection to the Bankruptcy Court's jurisdiction and challenged its authority to enter a final judgment before it issued any decision." *In re Cooper*, No. EDCV 18-02279 JGB, 2018 WL 11277403, at *2 (C.D. Cal. Nov. 28, 2018) (finding no express or implied consent).

In short, because Article III does not grant the bankruptcy court authorization to finally decide the Trustee's fraudulent-conveyance claims, and Nixon has not consented to this Court's doing so, those claims, like the state-law counterclaims, must be decided by an Article III court.[12]

## C. Because the Trustee's claims must be heard by an Article III court, the bankruptcy reference should be withdrawn.

The Supreme Court has held that the appropriate procedure for *Stern* claims is that set forth in 28 U.S.C. § 157(c)(1). *Exec. Benefits*, 573 U.S. at 37–38. Section 157(c)(1) permits parties to "submit proposed findings of fact and conclusions of law to the district court" for *de novo* review. *Id.* But "where a jury trial is required and the parties refuse to consent to bankruptcy jurisdiction, withdrawal of the case to the district court is appropriate." *In re Cinematronics, Inc.*, 916 F.2d 1444, 1451 (9th Cir. 1990); *In re Nady*, 138 B.R. 608, 610 (D. Nev. 1992) (recognizing that bankruptcy courts cannot preside of jury trials without consent). The procedure set forth by

---

[12] Because Nixon no longer intends to pursue its proof of claim, Count VIII in the Trustee's complaint, for disallowance, is moot. The Court therefore need not reach the question whether Nixon has a jury-trial right on that claim for relief.

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

§ 157(c)(1) is also subject to § 157(d), which allows the district court to withdraw the bankruptcy reference at any time "for cause shown."

Thus, if the Court agrees that the Trustee's state-law counterclaims and fraudulent-conveyance claims are *Stern* claims and that Nixon has not consented to final adjudication in the bankruptcy court, it must withdraw the reference and certify the matter for the district court. L.R. 9015(e). And for the reasons set forth in the pending motion to withdraw the reference, rather than waiting until "the matter is ready for trial," *id.*, the most prudent course is to withdraw the reference now.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the Trustee's motion to strike Nixon's jury demand.

Dated: February 4, 2022                                    KEKER, VAN NEST & PETERS LLP


By:    s/Elliot R. Peters
_____
ELLIOT R. PETERS
ERIC H. MACMICHAEL


Dated: February 4, 2022                    By:    KAEMPFER CROWELL


s/Louis M. Bubala III
_____
LOUIS M. BUBALA III

Attorneys for Defendant Nixon Peabody LLP

20

NIXON PEABODY'S OPPOSITION TO MOTION TO STRIKE JURY TRIAL DEMAND
Lead Case No. BK-19-50102-gs; Adversary Case No. 21-05072-gs

1817383

222